# Exhibit 30

**NOTICE: 11 U.S.C. § 1125(b) PROHIBITS SOLICITATION OF AN ACCEPTANCE OR REJECTION OF A PLAN OF REORGANIZATION IN A PENDING BANKRUPTCY CASE UNLESS A COPY OF THE PLAN OF REORGANIZATION OR A SUMMARY THEREOF IS ACCOMPANIED OR PRECEDED BY A COPY OF A DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. THIS PROPOSED DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AND, THEREFORE, THE FILING AND DISSEMINATION OF THIS PROPOSED DISCLOSURE STATEMENT IS NOT INTENDED TO BE, NOR SHOULD IT BE CONSTRUED AS, AN AUTHORIZED SOLICITATION PURSUANT TO 11 U.S.C. § 1125 AND RULE 3017 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE. NO SUCH SOLICITATION WILL BE MADE EXCEPT AS AUTHORIZED PURSUANT TO SUCH LAW AND RULES. THIS PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL ONLY.**

**THIS SOLICITATION IS BEING CONDUCTED NOT ONLY WITH RESPECT TO THE THREE DEBTORS IN THE BELOW-CAPTIONED BANKRUPTCY CASE, BUT ALSO BY COLTEC INDUSTRIES INC WITH RESPECT TO A NEW ENTITY NAMED OLDCO, LLC (WHICH WILL BE A SUCCESSOR BY MERGER TO COLTEC INDUSTRIES INC) PRIOR TO ITS FILING OF A VOLUNTARY PETITION UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE. BECAUSE NO CHAPTER 11 CASE HAS YET BEEN COMMENCED FOR OLDCO, LLC, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE WITH RESPECT TO OLDCO, LLC. FOLLOWING COMMENCEMENT OF ITS CHAPTER 11 CASE, OLDCO, LLC EXPECTS TO PROMPTLY SEEK AN ORDER OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT AND THE SOLICITATION OF VOTES WITH RESPECT TO OLDCO, LLC. THE ASSETS AND LIABILITIES OF OLDCO, LLC AND THE TRANSACTIONS THAT WILL CREATE OLDCO, LLC ARE DESCRIBED IN FULL IN THIS DISCLOSURE STATEMENT.**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

| | |
|---|---|
| IN RE:<br><br>GARLOCK SEALING TECHNOLOGIES LLC, et al.,<br><br>             Debtors.[1] | Case No. 10-BK-31607<br><br>Chapter 11<br><br>Jointly Administered |

---

[1]    The debtors in these jointly administered cases are Garlock Sealing Technologies LLC; Garrison Litigation Management Group, Ltd.; and The Anchor Packing Company. This solicitation is also being conducted by Coltec

IN RE:

OLDCO, LLC, SUCCESSOR BY MERGER TO COLTEC INDUSTRIES INC,

     Debtor.

Case No. [Not yet filed]

Chapter 11

[Joint Administration To Be Requested]

## DISCLOSURE STATEMENT FOR MODIFIED JOINT PLAN OF REORGANIZATION OF GARLOCK SEALING TECHNOLOGIES LLC, ET AL. AND OLDCO, LLC, PROPOSED SUCCESSOR BY MERGER TO COLTEC INDUSTRIES INC

Dated: July 29, 2016

RAYBURN COOPER & DURHAM, P.A.

C. Richard Rayburn, Jr. (N.C. Bar No. 6357)
Albert F. Durham (N.C. Bar No. 6600)
John R. Miller, Jr. (N.C. Bar No. 28689)

1200 Carillion, 227 West Trade Street
Charlotte, NC 28202
Telephone: (704) 334-0891

*Counsel to the Debtors Garlock Sealing Technologies, LLC, Garrison Litigation Management Group, Ltd., and The Anchor Packing Company*

ROBINSON, BRADSHAW & HINSON, P.A.

Garland S. Cassada (N.C. Bar No. 12352)
Jonathan C. Krisko (N.C. Bar No. 28625)
Richard C. Worf (N.C. Bar No. 37143)

101 North Tryon Street, Suite 1900
Charlotte, NC 28246
Telephone: (704) 377-2536

*Special Corporate and Litigation Counsel to the Debtors Garlock Sealing Technologies LLC, Garrison Litigation Management Group, Ltd., The Anchor Packing Company, and OldCo, LLC*

ORRICK, HERRINGTON & SUTCLIFFE, LLP

Jonathan P. Guy
Gregory D. Beaman

1152 15th Street, NW
Washington, DC 20005

GRIER FURR & CRISP, PA

A. Cotten Wright (N.C. Bar No. 28162)

101 North Tryon Street, Suite 1240
Charlotte, NC 28246
Telephone: (704) 375-3720

Industries Inc pursuant to Sections 1125(g) and 1126(b) of the Bankruptcy Code and Rule 3018(b) of the Federal Rules of Bankruptcy Procedure with respect to OldCo, LLC which, in the event this Plan is accepted by the requisite numbers of claimants in Class 5, will become a successor by merger to Coltec Industries Inc and commence a bankruptcy case that will be jointly administered under Case No. 10-BK-31607. The term "Debtors" includes OldCo, LLC.

Telephone: (202) 339-8400

*Counsel for Joseph W. Grier, III, Future Asbestos Claimants' Representative and Ad Hoc Coltec Future Asbestos Claimants' Representative*

*Counsel for Joseph W. Grier, III, Future Asbestos Claimants' Representative and Ad Hoc Coltec Future Asbestos Claimants' Representative*

CAPLIN & DRYSDALE, CHARTERED

Elihu Inselbuch
Trevor W. Swett III
Jeffrey A. Liesemer

One Thomas Circle, N.W.
Washington, D.C.  20005
Telephone: (202) 862-5000

*Counsel for the Official Committee of Asbestos Personal Injury Claimants and the Ad Hoc Coltec Asbestos Claimants Committee*

MOON WRIGHT & HOUSTON, PLLC

Travis W. Moon (N.C. Bar No. 3067)
Richard S. Wright (N.C. Bar No. 24622)

227 West Trade St., Suite 1800
Charlotte, NC 28202
Telephone: (704) 944-6560

*Counsel for the Official Committee of Asbestos Personal Injury Claimants and the Ad Hoc Coltec Asbestos Claimants Committee*

PARKER POE ADAMS & BERNSTEIN, LLP

Daniel G. Clodfelter (N.C. Bar No. 7661)
Ashley A. Edwards (N.C. Bar No. 40695)

Three Wells Fargo Center
401 South Tryon Street, Suite 3000
Charlotte, NC 28202
Telephone: (704) 335-9054

*Counsel to OldCo, LLC, Successor By Merger To Coltec Industries Inc*

## SUMMARY OF THE PLAN OF REORGANIZATION
## AND THE CLAIMS RESOLUTION PROCEDURES

### A.    What Is the Plan and How Did It Come to Be?

Garlock Sealing Technologies LLC, Coltec Industries Inc, the Official Committee of Asbestos Personal Injury Claimants, and the Future Asbestos Claimants' Representative, along with other Plan Proponents, have reached a comprehensive settlement permanently resolving present and future asbestos personal injury claims (the "**Comprehensive Settlement**"). The Comprehensive Settlement is incorporated into the Modified Joint Plan of Reorganization of Garlock Sealing Technologies LLC, et al. and OldCo, LLC, proposed successor by merger to Coltec Industries Inc (the "**Plan**"), attached as **Exhibit 1** to this Disclosure Statement. The Plan Proponents are soliciting votes for acceptance of the Plan. *Please refer to Article 1 of the Plan for definitions of terms used but not defined in this Disclosure Statement.* Please note that the description of the Plan in this Disclosure Statement is provided for summary purposes only. If there is any inconsistency between the Plan and the descriptions of the Plan in the Disclosure Statement, the terms of the Plan will govern. You should read the entire Plan and its exhibits in order to understand its terms.

The Plan Proponents are the following parties:

- Garlock Sealing Technologies LLC ("**GST**"), Garrison Litigation Management Group, Ltd. ("**Garrison**"), and The Anchor Packing Company ("**Anchor**"), who are debtors in the above-captioned bankruptcy case.

- OldCo, LLC ("**OldCo**"), a proposed successor by merger to Coltec Industries Inc, parent of GST and Garrison. OldCo will file (but has not yet filed) a Chapter 11 Case as an integral part of the Comprehensive Settlement. That filing is contingent upon acceptance of the Plan by Asbestos Claimants, as described more fully below. As a result, certain holders of Claims against Coltec Industries Inc are being solicited through this Disclosure Statement prior to OldCo's Chapter 11 filing. Also prior to such Chapter 11 filing, Coltec Industries Inc will undergo the "**Coltec Restructuring**," a corporate restructuring, described more fully below, which is an integral part of the settlement embodied in the Plan and is also contingent upon acceptance of the Plan by Asbestos Claimants. For the sake of convenience, the term "**Coltec**" in this Disclosure Statement and the Plan refers to Coltec Industries Inc prior to the Coltec Restructuring and refers to OldCo subsequent to the Coltec Restructuring. "**Debtors**" refers to GST, Garrison, Anchor, and OldCo and "**Existing Debtors**" refers to GST, Garrison, and Anchor (but not Coltec).

- The Official Committee of Asbestos Personal Injury Claimants ("**Committee**"), which is the official committee of creditors appointed to represent the interests of holders of current GST Asbestos Claims in the above-captioned bankruptcy case.

- The Ad Hoc Coltec Asbestos Claimants Committee ("**Ad Hoc Coltec Committee**"), which is the *ad hoc* committee for persons holding present Coltec Asbestos Claims, and which negotiated on behalf of Coltec Asbestos Claimants in the negotiations that led to the Plan. Following OldCo's Chapter 11 filing, one or more Coltec Asbestos Claimants whose

i

attorneys participated on the Ad Hoc Coltec Committee will be appointed to the Committee.

- The Future Asbestos Claimants' Representative ("**FCR**"), who is Joseph W. Grier, III, appointed in the above-captioned bankruptcy case as the legal representative to represent the interests of, appear on behalf of, and be a fiduciary to the holders of future GST Asbestos Claims.

- The Ad Hoc Coltec Future Claimants' Representative, also Mr. Grier, who served as the representative of holders of future Coltec Asbestos Claims during the negotiations that led to the Plan. The Plan Proponents will support Mr. Grier's official appointment as representative for holders of future Coltec Asbestos Claims in OldCo's Chapter 11 Case, and "FCR" in this Disclosure Statement refers to Mr. Grier in both capacities.

The Plan will result in a permanent resolution of all asbestos personal injury claims against GST, Garrison, and Coltec (defined in the Plan as "**GST Asbestos Claims**" and "**Coltec Asbestos Claims**," and together, "**Asbestos Claims**") other than certain Foreign Asbestos Claims as described below. The resolved Asbestos Claims are referred to as "**Channeled Asbestos Claims**" in this Disclosure Statement. The Plan will establish a trust under Section 524(g) of the Bankruptcy Code (as defined in the Plan, the "**Asbestos Trust**," also referred to as the "**Settlement Facility**") to process and pay Channeled Asbestos Claims pursuant to Claims Resolution Procedures ("**CRP**") attached as Exhibit B to the Plan. In exchange for funding the Asbestos Trust, GST, Coltec, Garrison, and certain additional parties (defined as "**Asbestos Protected Parties**") will be protected by an injunction (defined in the Plan as the "**Asbestos Channeling Injunction**") that will prohibit assertion of Channeled Asbestos Claims against those parties. The Asbestos Protected Parties are described more fully below.

The effect of "channeling" Asbestos Claims to the Trust through the Asbestos Channeling Injunction is that they may only be pursued through, and paid from, the Asbestos Trust. Channeled Asbestos Claims may not be asserted against the Reorganized Debtors (*i.e.*, Reorganized GST, Reorganized Garrison, and Reorganized Coltec) or any of the other Asbestos Protected Parties.

The Asbestos Trust will be funded with cash and securities totaling $480 million, consisting principally of (a) $400 million in cash delivered on the day immediately preceding the Effective Date, (b) an option to acquire EnPro Industries, Inc. stock having a value of $20 million, exercisable one year after the Effective Date; and (c) $60 million in cash delivered to the Trust within one year of the Effective Date. The Asbestos Trust will be administered by a Trustee, Mr. Lewis R. Sifford. The Asbestos Trust will be solely responsible for paying Channeled Asbestos Claims, as well as the expenses of the Asbestos Trust.

Holders of Asbestos Claims in Class 5 are the only claimants whose rights are impaired by the Plan. Accordingly, Class 5 is the only Class of Claims that will vote on the Plan. The rights of

all other Classes of Claims are not impaired by the Plan, and holders of such Claims will not vote on the Plan.[2]

As described in detail below, the Plan follows almost six years of vigorously contested litigation and is the result of months of negotiations among the Plan Proponents, which resulted in a Term Sheet for Permanent Resolution of All Present and Future GST Asbestos Claims and Coltec Asbestos Claims on March 17, 2016 (the "**Term Sheet**," attached as **Exhibit 2** to this Disclosure Statement, without its exhibits). In addition to the Plan Proponents, the ultimate parent of the Debtors, EnPro Industries, Inc. ("**EnPro**") is a party to the Term Sheet. The Plan supersedes the Second Amended Plan of Reorganization (the "**Second Amended Plan**"), which was proposed by GST, Garrison, and Anchor and supported by the FCR, but was opposed by the Committee and rejected by the class of holders of current GST Asbestos Claims. A hearing previously scheduled for June 2016 to consider confirmation of the Second Amended Plan over the rejection by the class of current holders of GST Asbestos Claims will not take place since the Second Amended Plan has been superseded by the Plan described in this Disclosure Statement.

From the perspective of holders of Asbestos Claims, the Plan improves upon the Second Amended Plan in numerous respects. The Plan provides $480 million in guaranteed funding for Asbestos Claims, whereas the Second Amended Plan provided only $327.5 million in guaranteed funding for Asbestos Claims. The Second Amended Plan also provided $30 million for resolving Asbestos Claims by litigation, as well as $132 million (nominal) in contingent contributions for such litigation. But claimants who chose to litigate would only be paid if they obtained a judgment, litigation costs would also have been paid from the litigation fund, and the $132 million would only have become available as necessary over a 40-year period according to a fixed schedule. The $480 million in the Asbestos Trust under the Plan will also pay Coltec Asbestos Claims, which would not have been paid under the Second Amended Plan. In addition, more claimants are eligible for payments under the Plan than under the Second Amended Plan because, for example, the Plan provides for settlement offers and payments to claimants alleging certain cancers other than mesothelioma, lung cancer, and laryngeal cancer, and also pays claimants alleging any one of three degrees of asbestosis (severe asbestosis, disabling asbestosis, and non-disabling asbestosis). Debtors also support the Plan, which will bring certainty and finality to their responsibility for Asbestos Claims, and will avoid further protracted and costly litigation in the Garlock bankruptcy case.

If the Plan is not confirmed, all parties have reserved all of their rights to pursue alternative courses of action in the Chapter 11 Cases. Accordingly, if the Plan is not confirmed, Debtors might seek confirmation of the Second Amended Plan over the objection of current Asbestos Claimants. Alternatively, it may not be possible to confirm a plan of reorganization, in which case GST might be liquidated (as explained in detail below). The Plan Proponents believe that the Plan is better for Asbestos Claimants than any of these options.

---

[2] In addition, Class 9 GST/Garrison Equity Interests are impaired and will vote on the Plan. They are held by Coltec and will accept the Plan.

For all of these reasons, **the Plan Proponents, including the Committee and the FCR as representatives of Asbestos Claimant constituencies, strongly recommend that Asbestos Claimants in Class 5 vote to accept the Plan.**

## B. How Will the Asbestos Trust Be Funded?

The Asbestos Trust will be mostly funded on the Plan's Effective Date and fully funded within one year after that date, with assets worth $480 million as a result of the following contributions:

- On the day immediately preceding the Effective Date:

  o GST or Garrison will transfer $370 million in Cash to the Asbestos Trust;

  o Coltec will transfer $30 million in Cash to the Asbestos Trust; and

  o Coltec, EnPro, and the Asbestos Trust will enter into an Option and Registration Rights Agreement granting an Option that will entitle the Asbestos Trust to purchase for one dollar, on or after the first anniversary of the Effective Date, the number of shares of EnPro common stock having a trading value equal to $20 million. The Option will give Debtors the right to call the Option for $20 million in cash on any date prior to the first anniversary of the Effective Date and will give the Asbestos Trust the right to put the Option for $20 million in cash on the day prior to the first anniversary of the Effective Date. Other details of this Option are described below.

- On or before the first anniversary of the Effective Date, Coltec will transfer $60 million in Cash to the Asbestos Trust (the "**Deferred Contribution**").

The Deferred Contribution will be guaranteed by EnPro and will be secured by a first-priority lien on or security interest in 50.1% of the GST/Garrison Equity Interests, which will be released once the Deferred Contribution has been paid in full.

In addition to these contributions, as described in more detail below, the Asbestos Trust may become entitled to additional consideration if Coltec's insurance recoveries exceed a certain level.

## C. How Will Asbestos Claimants Receive Distributions from the Asbestos Trust?

The Asbestos Trust will process and pay Channeled Asbestos Claims (if they are entitled to payment) under procedures and criteria contained in the CRP referenced above. The purpose of the CRP is to generate settlement offers that are fair, expeditious and properly reflective of the injuries allegedly caused by exposure to asbestos fibers or dust from Coltec Products or GST Products, and to ensure that over the life of the Asbestos Trust, present and future Asbestos Claims are treated fairly and equitably in all matters, including the payment of settlement amounts that are as equal as possible to other payments for similarly situated claimants in the same disease category. Pursuant

to the Asbestos Channeling Injunction and related Plan provisions, the Asbestos Trust will assume responsibility for Channeled Asbestos Claims, and the Debtors, Reorganized Debtors, and other Asbestos Protected Parties will have no further responsibility for Channeled Asbestos Claims and will be protected from such claims.

The CRP were the subject of extensive negotiation by the Plan Proponents during the period that led to execution of the Term Sheet. The CRP contain a full description of the criteria and procedures the Asbestos Trust will use to pay claims. You should read the entire CRP in order to understand all of these requirements. Below is a summary of the key provisions of the CRP that will be of greatest relevance to most Asbestos Claimants and the settlement offers they will receive from the Asbestos Trust.

Asbestos Claimants may submit a Claim for Expedited Claim Review or, if the Claim is an Extraordinary Claim, Extraordinary Claim Review. A Claim will be eligible for Extraordinary Claim Review only under special circumstances described below, and will also be subject to additional verification and documentation requirements.

### 1. *Coltec/GST Product Contact*

As an initial matter, to be eligible for any settlement offer, the Asbestos Claimant must demonstrate Coltec/GST Product Contact, defined as some combination of Direct GST Product Contact, Direct Coltec Product Contact, Bystander Coltec/GST Product Contact, or Secondary Coltec/GST Product Contact. These definitions require specific kinds of contact with Coltec products or GST products that contained asbestos or asbestos-containing components. The activities that qualify as Coltec/GST Product Contact are defined in the CRP. For example, Direct GST Product Contact means the hands-on performance of one of the following workplace activities on a regular basis: (a) grinding, scraping, or wire-brushing of GST asbestos gaskets in the removal process; (b) cutting individual gaskets from GST asbestos sheet material; or (c) cutting or removal of GST asbestos packing. A claimant may present only one claim on account of Coltec/GST Product Contact, regardless of whether the claimant had contact with Coltec products, GST products, or both.

Claimants alleging diseases other than mesothelioma will have to demonstrate at least six months of Coltec/GST Product Contact. Mesothelioma claimants are not required to demonstrate six months of Coltec/GST Product Contact, but claimants who do not will receive lower offers than claimants who do, as described below. For purposes of the six-month duration requirement, Coltec/GST Product Contact while confined to a ship at sea for fifty (50) days will be deemed equivalent to six months of total Coltec/GST Product Contact. Claimants who only experienced Secondary Coltec/GST Product Contact will receive a settlement offer only if diagnosed with malignant mesothelioma. Claimants who experienced no Coltec/GST Product Contact, as defined in the CRP, will not receive a settlement offer.

### 2. *Expedited Claim Review*

Settlement offers in Expedited Claim Review will be calculated objectively, based on facts about the Asbestos Claimant and the injured party upon whose alleged injury the Claim is based (the "**Injured Party**").

v

The calculation of an Asbestos Claimant's Expedited Claim Review settlement offer will begin with Maximum Settlement Values that are based on the Asbestos Claimant's occupation and industry at the time he or she experienced GST Product Contact. These occupations and industries are divided into five Contact Groups, Groups 1-5, defined based on the assumed potential frequency and intensity of contact with Coltec Products and/or GST Products in the occupation and industry. The classification of occupation and industry combinations into Contact Groups is contained in Appendix IV to the CRP.

Each Contact Group is assigned a Maximum Settlement Value. As described in more detail below, subject to the requirements of the Term Sheet and the CRP, the Plan Proponents have agreed on preliminary Maximum Settlement Values for Disclosure Statement purposes, but the Trustee will have ultimate authority to set Maximum Settlement Values, and moreover, will have authority to change them over time pursuant to the CRP.

An Asbestos Claimant's Expedited Claim Review offer will be some percentage of the Maximum Settlement Value, as determined by the Claimant's disease and medical information, demographic characteristics, jurisdiction (in the case of Present Claims), economic loss, law firm (in the case of Present Claims), and duration of activity or activities in which Coltec/GST Product Contact occurred.

### a. Medical Information Factor

The following diseases are compensated under the CRP: malignant mesothelioma, asbestos-related lung cancer, severe asbestosis, asbestos-related other cancer (colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer), disabling asbestosis, and non-disabling asbestosis. Each of the diseases will be assigned a Medical Information Factor, with malignant mesothelioma assigned a factor of 1 and the other diseases assigned lower factors. The higher the Medical Information Factor, the higher the percentage of the Maximum Settlement Value the Claimant will receive. As described in more detail below, subject to the requirements of the Term Sheet and the CRP, the Plan Proponents have agreed on preliminary Medical Information Factors for Disclosure Statement purposes, but the Trustee will have ultimate authority over these factors and the ability to change them over time.

Appendix I to the CRP contains the detailed requirements for each disease, and Claimants who do not meet those criteria will not receive a settlement offer. Section 6.6 of the CRP also contains general requirements concerning the reliability and credibility of medical evidence.

Claimants alleging a non-malignant condition will not be required to release subsequent malignant claims against the Asbestos Trust, and may assert those subsequent Claims against the Asbestos Trust in accordance with the CRP.

### b. Age Factor

Claims based on younger Injured Parties will receive higher settlement offers than Claims based on older Injured Parties. The Age Factor will range between 0.7 and 1.4, as described in the CRP, with higher Age Factors receiving higher percentages of the Maximum Settlement Value for the Contact Group.

*c. Life Status Factor*

A Claim based on an Injured Party who is alive at the time the Claim is filed will receive a Life Status Factor of 1.3, and otherwise, a Life Status Factor of 1.

*d. Dependents Factor*

If the Injured Party does not have a spouse or other dependents at the time the Claim is filed, the Claim will be assigned a Dependents Factor of 0.8. If the Injured Party has a spouse but no other dependents, the Dependents Factor will be 1, and if the Injured Party has dependents other than a spouse who derive at least one-half of their financial support from the Injured Party, the Dependents Factor will be 1.4.

*e. Economic Loss Factor*

The Claimant may, but need not, document the Injured Party's economic loss related to loss of earnings, pension, social security, home services, medical expenses, and funerary expenses. The Economic Loss Factor will range between 1 and 1.4, and the calculation is described in the CRP.

*f. Duration of Coltec/GST Product Contact Factor*

The Duration Factor will be based on the Injured Party's time performing the activity or activities in which the Injured Party experienced Coltec/GST Product Contact, and will range between 0.8 and 1.2, with maximum credit coming at eight years or more of the activity or activities. For purposes of this factor, time while confined to a ship at sea for 100 days will be treated as the equivalent of one year.

*g. Jurisdiction Factor and Law Firm Factor*

Present Claimants (*i.e.*, those whose Claims are based on diagnoses dated on or before the Effective Date) who believe that their Jurisdiction (as defined in the CRP) justifies a higher settlement offer from the Asbestos Trust because of the values of historical settlements and verdicts in such Jurisdiction against the Debtors will have an opportunity to provide evidence to that effect to the Asbestos Trust. In addition, Present Claimants who believe that the identity of the law firm representing them justifies a higher settlement offer from the Asbestos Trust because the law firm obtained above-average pre-bankruptcy settlements and verdicts for similarly situated claims against the Debtors will have the opportunity to provide evidence to that effect to the Asbestos Trust. In computing the amount of a settlement offer, the Jurisdiction Factor and the Law Firm Factor will each range between 1 and 1.2, depending on whether the Asbestos Trustee is convinced that data concerning the Jurisdiction or law firm warrants an upward adjustment. For Future Claimants (*i.e.*, those whose Claims are based on diagnoses dated after the Effective Date), the Jurisdiction Factor and Law Firm Factor will be deemed to be 1.

*h. Calculation of Expedited Claim Review offer*

The Asbestos Trust will calculate the Expedited Claim Review offer by multiplying the Medical Information Factor, Age Factor, Life Status Factor, Dependents Factor, Economic Loss

Factor, Duration of Coltec/GST Product Contact Factor, Jurisdiction Factor, and Law Firm Factor; calculating the resulting total as a percentage of what the maximum product of those factors would be; and then multiplying that percentage by the appropriate Maximum Settlement Value. If the Injured Party had Coltec/GST Product Contact in more than one Contact Group, the Asbestos Trust will calculate a separate settlement offer based on the Injured Party's time in each Contact Group, and will offer the Claimant the highest settlement offer yielded by the calculation. A Claimant alleging mesothelioma who has less than six months of Coltec/GST Product Contact will receive a proportionately reduced settlement offer.

### 3. *Extraordinary Claim Review*

A Claim is eligible for Extraordinary Claim Review only if it meets all other requirements in the CRP and pertains to an Injured Party alleging a malignant disease (*i.e.*, malignant mesothelioma, asbestos-related lung cancer, or other asbestos-related cancer) who credibly documents (a) that the Injured Party had a history of extraordinary Coltec/GST Product Contact with little or no exposure to asbestos from other entities' products, and (b) that no substantial recovery has been obtained, or is likely to be obtained, from any source other than the Asbestos Trust. Few, if any, Asbestos Claimants are expected to meet these requirements. The Trustee will decide whether a Claim is an Extraordinary Claim in the first instance, and any appeal will be to a special Extraordinary Claims Panel, whose decision will not be reviewable.

The maximum potential settlement offer for an Extraordinary Claim will be five times the Expedited Claim Review settlement offer. The Trustee will have complete and unreviewable discretion to determine what percentage of this maximum value the Asbestos Trust will offer for a given Extraordinary Claim, taking into consideration the number of companies that contributed to the Injured Party's exposure to asbestos-containing products.

Claimants electing Extraordinary Claim Review will have to submit additional information and documentation beyond what is required for Expedited Review. With respect to all claims asserted against other entities (including other trusts), the Claimant will be required to identify the entity, the date the claim was made, and the amounts of all payments received or to be received from the entity, and must submit copies of any documents submitted to or served upon the entity containing information regarding the Injured Party's contact with asbestos or asbestos-containing products. The Claimant will also have to deliver a continuing authorization to the Asbestos Trust authorizing all Trusts to release the Claimant's submissions and disclose the status of any claim. These requirements are to ensure that the Claimant is in fact an Extraordinary Claimant entitled to a higher recovery. Finally, the Claimant's attorney (or the Claimant, if *pro se*) must certify that he or she has fully investigated the injuries upon which the Claim is based and that no good-faith basis exists to bring a claim against any entity not identified by the Claimant.

### 4. *Maximum Settlement Values and Medical Information Factors*

As described above, the settlement offers Asbestos Claimants will get under both Expedited Claim Review and Extraordinary Claim Review depend on the Maximum Settlement Values and Medical Information Factors. Subject to the requirements of the Term Sheet and the CRP, the parties have agreed on preliminary Maximum Settlement Values and Medical Information Factors for Disclosure Statement purposes:

| Contact Group | Maximum Settlement Values |
|---|---|
| Group 1 | $148,000 |
| Group 2 | $44,400 |
| Group 3 | $18,500 |
| Group 4 | $9,250 |
| Group 5 | $740 |

| Disease | Medical Information Factor |
|---|---|
| Mesothelioma | 1.0 |
| Asbestos-Related Lung Cancer | 0.25 |
| Severe Asbestosis | 0.25 |
| Asbestos-Related Other Cancer | 0.1 |
| Disabling Asbestosis | 0.03 |
| Non-Disabling Asbestosis | 0.02 |

As noted above, the Trustee will ultimately determine the Maximum Settlement Values and Medical Information Factors. Section 2.3 describes the factors the Trustee is to consider, including all the anticipated Claim payments and expenses of the Asbestos Trust. The Trustee will also determine each year the Maximum Annual Payment, considering many of the same factors, and the Trust's total payments to Claimants cannot exceed the Maximum Annual Payment in that year.

The Trustee is permitted to lower the Maximum Annual Payment and Maximum Settlement Values if in the course of the year it appears there is a risk of Future Claimants not receiving settlement offers equal to those of similarly situated Present Claimants. The Trustee more generally will have the authority to increase or decrease Maximum Settlement Values proportionately over time to ensure equal treatment of similarly situated Claimants (though any increase will require consent by the FCR and Claimants Advisory Committee, described below). Finally, the Trustee will adjust Maximum Settlement Values upward each year to account for inflation.

### 5. *Trust Claims Payment Ratio*

The calculation of Maximum Settlement Values and Medical Information Factors will also depend on the Trust Claims Payment Ratio, which governs the allocation of the Asbestos Trust's assets among the diseases compensated. The Trust Claims Payment Ratio is 85% for Claims based on malignant mesothelioma, 10% for Claims based on lung cancer, and 5% for Claims based on other cancer, severe asbestosis, disabling asbestosis, and non-disabling asbestosis. The Trustee will apply the Trust Claims Payment Ratio to the Maximum Annual Payment for each year to determine the funds available to compensate Claims in each disease category. Funds not used in each category in each year will roll over to that category for subsequent years, and if there are insufficient funds in any category in any year, the claims will be rolled over to the following year.

The Trustee may not amend the Claims Payment Ratio for five years. After that time, the Trustee may amend the Claims Payment Ratio (or roll funds from one category to another) only to prevent manifest injustice, but a larger-than-predicted number of Claims in Categories B or C will not constitute manifest injustice.

### 6. *Foreign Asbestos Claims*

Foreign Asbestos Claims—defined as Claims based on alleged exposure to asbestos fibers or dust from Coltec Products and/or GST Products that occurred outside the United States and its territories and possessions with respect to Injured Parties who are not United States citizens or permanent residents—generally are not compensable under the CRP. If, however, a Holder of a Foreign Asbestos Claim files a lawsuit in the United States, the Asbestos Trust will process the Claim and, if the Foreign Claimant meets the CRP criteria, will offer $100 if the disease alleged is mesothelioma, $50 if the disease alleged is asbestos-related lung cancer or severe asbestosis, $25 if the disease alleged is asbestos-related other cancer or disabling asbestosis, and $10 if the disease alleged is non-disabling asbestosis. Foreign Asbestos Claims will be in the same category as non-severe asbestosis for purposes of the Claims Payment Ratio. The rights of Holders of Foreign Asbestos Claims to recourse and remedies under applicable foreign law outside the United States (to the extent such rights exist) will be unaffected by the Plan, without prejudice to the Reorganized Debtors' defenses against any such claims. Debtors have never paid, or even received, a Foreign Asbestos Claim from an individual in a court or other tribunal outside of the United States.

As described in more detail in Section 5.3.6 below, the Plan also contemplates a settlement between the Debtors, EnPro, and Garlock of Canada Ltd and the Canadian provincial workers' compensation boards resolving all remedies the Provincial Boards may possess under Canadian law or in the United States under U.S. law against these entities or their Affiliates. Approval of this settlement is a condition to confirmation of the Plan, which is unilaterally waivable by the Debtors.

### 7. *Settled GST Asbestos Claims and Pre-Petition Judgment GST Asbestos Claims*

The CRP also contain procedures governing the payment of GST Asbestos Claims that are settled and unpaid ("**Settled GST Asbestos Claims**"), or the subject of judgments ("**Pre-Petition Judgment GST Asbestos Claims**"). Pre-Petition Judgment GST Asbestos Claims must have filed a proof of claim on or before the Asbestos Claims Bar Date (or else obtain relief from the Bankruptcy Court); the Debtors believe there are only two such Claims (listed on Appendix VII to the CRP), both based on the same Injured Party. Moreover, the Asbestos Trust will have the right to appeal those judgments, which will only be paid as judgments if the Asbestos Trust decides not to appeal or the appeal is unsuccessful. The holders of these Claims may, however, pursue the Claims as non-judgment Claims under the CRP.

The Asbestos Trust will pay Settled GST Asbestos Claims that were filed on or before the Settled Claims Bar Date (or that obtain relief from the Bankruptcy Court) and are either not disputed by Debtors or otherwise determined by the Trustee to be subject to enforceable settlement agreements. A list of Claims that the Debtors have identified as potentially eligible for payment as Settled GST Asbestos Claims is attached as Appendix VI to the CRP. Holders of alleged Settled GST Asbestos Claims are also free to submit their Claims as non-settled Claims under the CRP.

x

Settled GST Asbestos Claims and Pre-Petition Judgment GST Asbestos Claims that are entitled to payment will also be subject to a payment percentage, calculated as described in Section 3.5. In addition, total payments on Settled GST Asbestos Claims are limited to $10 million.

There are no Coltec Asbestos Claims that are settled and unpaid or are the subject of judgments.

### 8. *Indirect Claims*

The CRP also provide for payment of Indirect Claims, *i.e.*, claims asserted as third-party indemnification, contribution, subrogation, or similar Claims. The criteria for payment of these Claims are contained in Section 10 of the CRP. Valid Indirect Claims will be subject to the same criteria and payment provisions as other Asbestos Claims, including, where applicable, compliance with (or relief from) the Asbestos Claims Bar Date. It appears that no Indirect Claims were submitted by the Asbestos Claims Bar Date.

### 9. *Claims Processing*

In general, the Asbestos Trust will process Claims on a first-in, first-out ("**FIFO**") basis. The CRP contain deadlines by which Asbestos Claims must be filed to be eligible for settlement offers. The Trustee will be responsible for developing claim forms that satisfy the requirements of the CRP. In the event a Claimant accepts a settlement offer made by the Asbestos Trust, the Claimant will be required to execute releases of the Asbestos Trust and other parties, and payment will occur in the order releases are received.

To have Claims processed, Claimants must submit filing fees: (a) $100 for Claims based on malignant mesothelioma, (b) $75 for Claims based on lung cancer, and (c) $50 for Claims based on severe asbestosis, other cancer, disabling asbestosis, or non-disabling asbestosis. The fees will be refunded in full to Claimants who receive settlement offers.

Claimants who do not receive settlement offers under Expedited Claim Review, or who disagree with their settlement offers, will have the opportunity to pursue binding or non-binding arbitration, and if that does not resolve the dispute, to file suit against the Asbestos Trust in the tort system. As noted above, the Trustee's decisions regarding Extraordinary Claim offers will not be reviewable by any court; an Extraordinary Claim Review Panel will be created to hear appeals from any decision by the Trustee that an Asbestos Claim is not an Extraordinary Claim, but the decisions of that panel will be final and unreviewable.

Arbitration awards will be limited to the Maximum Settlement Value for the appropriate Contact Group. Judgments in the tort system will also be limited to the Maximum Settlement Value for the appropriate Contact Group, and punitive damages will not be paid. Any judgment will be paid in installments, with the first installment equal to the Asbestos Trust's final settlement offer or the award in arbitration (whichever is greater) paid according to the FIFO payment queue, and any balance paid in years six (6) through ten (10) following the year of the initial payment, without interest.

Finally, the CRP provide the Trustee with extensive powers to audit Claims and take action in the event of fraudulent filings.

## D. **How Will the Asbestos Trust Be Administered?**

The Asbestos Trust will be administered according to the Trust and Settlement Facility Agreement attached as Exhibit A to the Plan (the "**Trust Agreement**"). The Trust Agreement was also extensively negotiated by the Plan Proponents, and you should review the Trust Agreement itself for a full understanding of all its provisions.

The Trustee will administer the Asbestos Trust, and will be responsible for holding and investing the Asbestos Trust's assets; paying the Asbestos Trust's liabilities and expenses; hiring employees, agents, and experts; and administering the CRP, among other duties.[3] The Trust Agreement contains provisions governing succession and compensation of the Trustee. The Trustee will be entitled to employ attorneys and other professionals.

The Trustee will be advised by a Claimants Advisory Committee ("**CAC**") and the FCR. The CAC will consist of nine members, identified on the signature page of the Trust Agreement attached to the Plan, who are attorneys representing asbestos personal injury claimants, including Asbestos Claimants. The CAC will be responsible for representing the interests of current Asbestos Claimants. The FCR will be Mr. Grier (or any duly appointed successor) and will represent the interests of future Asbestos Claimants. The Trustee is required to consult with the CAC and FCR regarding certain matters and must obtain the consent of the CAC and FCR with respect to other matters, including increasing the Maximum Annual Payment or Maximum Settlement Values, changing the Claims Payment Ratio, or increasing the Medical Information Factors. The Trust Agreement contains provisions governing succession of the CAC and FCR, and compensation of the FCR (the CAC members will not be compensated except for expenses). The CAC and FCR will be entitled to employ attorneys and other professionals, whose fees and expenses will be paid by the Asbestos Trust in accordance with the Asbestos Trust Agreement.

In addition, the Asbestos Trust and the Reorganized Debtors will enter into a Cooperation Agreement pursuant to which the Reorganized Debtors will share certain information relating to Asbestos Claims with the Asbestos Trust in the processing, resolution, and defense of Asbestos Claims. The form of Cooperation Agreement is attached as Exhibit C to the Plan, but the Trustee will have the opportunity to review and propose changes to the Cooperation Agreement before it is executed.

## E. **How Will Other Classes of Claims and Interests Be Treated?**

No classes of Claims or Equity Interests are impaired other than Asbestos Claims (Class 5) and GST/Garrison Equity Interests (Class 9).[4] All other classes are unimpaired, and they will

---

[3] The Asbestos Trust will also have a separate "Delaware Trustee," a requirement of Delaware law, whose duties will be limited to accepting service of process on behalf of the Asbestos Trust and executing certificates required to be filed under Delaware law.

[4] Bankruptcy Code § 1124 explains the circumstances under which a plan's treatment of a class of claims or equity interests constitutes impairment of those claims or equity interests. Broadly stated, any alteration of a creditor's or equity interest holder's legal rights by a plan constitutes impairment.

not be solicited and will not vote on the Plan. The treatment of Claims other than Asbestos Claims is discussed in more detail below.

Anchor is a dormant company with no assets. Under the Plan, it will be liquidated and dissolved, and holders of Anchor Claims, including holders of asbestos personal injury claims against Anchor, are not expected to recover anything on these Claims.

## F.      How Will Asbestos Claimants Vote on the Plan?

With respect to Holders of Asbestos Claims in Class 5, the Bankruptcy Code provides that the Asbestos Channeling Injunction may be issued under Section 524(g) of the Bankruptcy Code only if (a) the Holders of the Asbestos Claims to be channeled under the injunction are classified separately under the Plan, and (b) seventy-five percent (75%) in number of the Holders of the Asbestos Claims in that class who actually vote on the Plan vote to accept the Plan.

As described in more detail below, Asbestos Claimants may vote by individual Ballot or Master Ballot, and will be temporarily allowed for voting purposes upon meeting certain criteria. **The *last day* to vote to accept or reject the Plan is December 9, 2016. To be counted, your Ballot must be *actually received* by the Balloting Agent by such date. The *record date* for determining which creditors may vote on the Plan is July 1, 2016.**

## G.      Disclaimers

**This Disclosure Statement contains summaries of certain provisions of the Plan, certain statutory provisions, certain documents related to the Plan, certain events in the Chapter 11 Cases (or events anticipated to occur in Coltec's Chapter 11 Case), and certain financial information. Although the Plan Proponents believe that the Disclosure Statement and related document summaries are fair and accurate, they are qualified to the extent they do not set forth the entire text of the Plan, such documents, or any statutory provisions. The terms of the Plan govern in the event of any inconsistency with this Disclosure Statement. All exhibits to the Disclosure Statement are incorporated into and are a part of this Disclosure Statement as if set forth in full herein. The statements contained in this Disclosure Statement are made as of the date hereof, unless otherwise specified, and the Plan Proponents disclaim any obligation to update any such statements.**

**Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995: All forward-looking statements contained herein involve material risks and uncertainties and are subject to change based on numerous factors, including factors that are beyond the Debtors' control. Accordingly, the Debtors' future performance and financial results may differ materially from those expressed or implied in any such forward-looking statements. Such factors include, but are not limited to, those described in this Disclosure Statement. Debtors do not undertake to publicly update or revise their forward-looking statements even if experience or future changes make it clear that any projected results expressed or implied therein will not be realized.**

**Except as otherwise specifically noted, the financial information contained herein has not been audited by a certified public accountant and has not necessarily been prepared in accordance with Generally Accepted Accounting Principles. Although Debtors have**

attempted to be accurate in all material respects, the Debtors are unable to warrant or represent that all of the information contained in this Disclosure Statement is without error. No representation concerning the Debtors or the value of the Debtors' assets has been authorized by the Bankruptcy Court other than as set forth in this Disclosure Statement or any other Disclosure Statement approved by the Bankruptcy Court. The Plan Proponents are not responsible for any information, representation, or inducement made to obtain your acceptance, which is other than, or inconsistent with, information contained herein and in the Plan.

For purposes of this Disclosure Statement, the following rules of interpretation shall apply: (i) whenever the words "include," "includes," or "including" are used they shall be deemed to be followed by the words "without limitation," (ii) the words "hereof," "herein," "hereby," and "hereunder" and words of similar import shall refer to this Disclosure Statement as a whole and not to any particular provision, (iii) section and exhibit references are to this Disclosure Statement unless otherwise specified, and (iv) with respect to any distribution under the Plan, "on" a date means on or as soon as reasonably practicable thereafter.

In connection with solicitation of acceptances of this Plan pursuant to Sections 1126(a) and 1126(b) of the Bankruptcy Code, the Plan Proponents are providing a Solicitation Package, consisting of the Disclosure Statement, the enclosures hereto, and a Ballot or Master Ballot, as applicable, to each record holder of Claims and Equity Interests eligible to vote as of the voting record date. This Disclosure Statement is to be used by each such eligible holder solely in connection with its evaluation of the Plan.

Coltec has not yet commenced a reorganization case under Chapter 11 of the Bankruptcy Code as of the date of the distribution of this Disclosure Statement. If, however, Class 5 accepts the Plan in requisite numbers, Coltec expects to undertake the out-of-court Coltec Restructuring described in this Disclosure Statement and then file a bankruptcy petition. If Class 5 does not accept the Plan in requisite numbers, Coltec reserves the right not to file a bankruptcy petition or engage in the out-of-court Coltec Restructuring as described in this Disclosure Statement.

This Disclosure Statement has been prepared in accordance with Section 1125 of the Bankruptcy Code and Rule 3016(c) of the Federal Rules of Bankruptcy Procedure, and not necessarily in accordance with federal or state securities laws or other non-bankruptcy law. This Disclosure Statement was prepared with the intent to provide "adequate information" (as defined in the Bankruptcy Code) to enable Holders of Claims and Equity Interests in the Debtors to make informed judgments about the Plan. By Order dated June __, 2016, the Disclosure Statement was approved by the Bankruptcy Court as containing "adequate information" under Bankruptcy Code § 1125 with respect to GST, Garrison, and Anchor. The Bankruptcy Court has not yet approved the Disclosure Statement with respect to Coltec. Coltec expects to promptly seek an order of the Bankruptcy Court approving this Disclosure Statement and the solicitation of votes with respect to Coltec following commencement of its Chapter 11 case.

**TABLE OF CONTENTS**

**Page**

1. INTRODUCTION .................................................................................................. 1

2. DESCRIPTION OF THE DEBTORS, THEIR PRIMARY ASSETS, AND
   EVENTS LEADING TO THE FILING OF THESE CASES ........................................ 1
   2.1 General Overview of the Debtors ................................................................. 1
   2.2 The Debtors' Businesses.............................................................................. 2
       2.2.1 GST ............................................................................................... 2
       2.2.2 Garrison......................................................................................... 3
       2.2.3 Coltec ............................................................................................ 3
           2.2.3.1 Coltec's Business Operations....................................... 4
           2.2.3.2 Results of Coltec's Combined Business Operations................. 5
   2.3 Assets of GST, Garrison, and Anchor ......................................................... 8
       2.3.1 Estimated Value of Reorganized GST's Core Business ............................ 8
       2.3.2 Cash............................................................................................... 8
       2.3.3 Garlock Insurance ........................................................................... 8
       2.3.4 Affiliate Notes................................................................................. 9
           2.3.4.1 The Coltec and Stemco Notes and the 2005 Corporate
                   Restructuring ................................................................. 9
           2.3.4.2 GST/Garrison Grid Notes ........................................... 10
           2.3.4.3 Garrison/Anchor Notes .............................................. 11
       2.3.5 Claims and Causes of Action............................................................ 11
           2.3.5.1 Avoidance Actions and Certain Related Claims Against
                   Affiliates........................................................................ 11
           2.3.5.2 GST Recovery Actions ............................................... 13
           2.3.5.3 Maintenance of Causes of Action and Preservation of
                   All Causes of Action Not Expressly Settled or Released ....... 15
   2.4 LIABILITIES OF GST, GARRISON, AND ANCHOR .................................... 16
       2.4.1 Non-Asbestos Related Liabilities of GST, Garrison, and Anchor........... 16
           2.4.1.1 Administrative Claims ................................................ 16
           2.4.1.2 Secured Claims ......................................................... 16
           2.4.1.3 Priority Claims .......................................................... 16
           2.4.1.4 GST General Unsecured Claims ................................... 17
       2.4.2 Estimated Liability of GST, Garrison, and Anchor for Asbestos-
             Related Claims ............................................................................... 17
       2.4.3 GST's Asbestos Litigation History.................................................... 18
           2.4.3.1 GST's Asbestos-Containing Products............................ 18
       2.4.4 Pending GST Asbestos Claims ......................................................... 18
   2.5 Assets and liabilities of coltec .................................................................. 20
       2.5.1 Assets and Liabilities of Coltec ....................................................... 20
           2.5.1.1 Long-Term Debt ........................................................ 22
           2.5.1.2 Affiliate Notes........................................................... 22
           2.5.1.3 Investment in Subsidiaries .......................................... 22
           2.5.1.4 Coltec Insurance........................................................ 23

## TABLE OF CONTENTS
(continued)

**Page**

2.5.1.5    Other Assets and Liabilities ............................................... 26

2.5.2   Asbestos Claims Against Coltec Industries Inc ..................................... 26

2.5.3   Coltec Restructuring and Assets and Liabilities of Filing Entity OldCo, LLC ................................................................................. 31

3.   THE CHAPTER 11 FILINGS .................................................................... 34

3.1   Significant Events During the Course of the Chapter 11 Cases ......................... 34

3.1.1   Appointment of Official Creditors Committees and the Future Claimants' Representative ................................................... 35

3.1.1.1   Official Committee of Unsecured Creditors .......................... 35

3.1.1.2   Asbestos Claimants Committee .................................. 35

3.1.1.3   Representative for Future Asbestos Claimants ..................... 35

3.1.2   Employment of Professionals ........................................................ 35

3.1.3   Adversary Proceeding Obtaining Stay of Asbestos-Related Litigation Against Non-Debtor Affiliates ............................................... 37

3.1.4   Extensions of Exclusivity Period ..................................................... 37

3.1.5   December 9, 2010 Discovery Order ............................................... 38

3.1.6   Order Granting the Existing Debtors' Motion for Estimation of Mesothelioma Claims ................................................... 38

3.1.7   Estimation Trial and Order Estimating Aggregate Mesothelioma Liability ................................................... 38

3.1.8   Committee's Motion to Reopen Estimation Record .............................. 40

3.1.9   Committee Discovery Regarding Pre-Petition Transactions ................... 40

3.1.10  The Debtors' Initial Plan of Reorganization ..................................... 40

3.1.11  The Debtors' First Amended Plan of Reorganization ........................... 40

3.1.12  The Settlement Agreement with the Future Claimants' Representative Regarding the Second Amended Plan .......................... 40

3.1.13  Preliminary Confirmation Proceedings on the Now-Superseded Second Amended Plan ................................................... 41

3.1.14  Litigation Moratorium ................................................................ 42

3.1.15  Ad Hoc Coltec Asbestos Claimants Committee and Discussions Resulting In Comprehensive Settlement .................................. 42

4.   IMPORTANT BAR DATES AND DEADLINES ........................................... 43

4.1   Non-Asbestos Claims Bar Date ..................................................... 43

4.2   Settled GST Asbestos Claims Bar Date ............................................. 43

4.3   Bar Date For certain GST Asbestos Claims ....................................... 44

4.4   bar date for certain coltec asbestos claims ....................................... 44

4.5   Administrative Claims Bar Date ..................................................... 45

4.6   Fee Claim Bar Date ................................................................... 45

5.   SUMMARY OF THE PLAN ..................................................................... 46

**TABLE OF CONTENTS**

(continued)

Page

5.1     Overview of the Plan ................................................................................ 46
5.2     Classification and Treatment of Claims.................................................. 46
        5.2.1   Provisions for Payment of Administrative Expense Claims and
                Priority Tax Claims.................................................................... 46
        5.2.2   Classified Claims ....................................................................... 47
                5.2.2.1    Class 1. Priority Claims .............................................. 47
                5.2.2.2    Class 2. Secured Claims.............................................. 47
                5.2.2.3    Class 3. Workers' Compensation Claims..................... 48
                5.2.2.4    Class 4. Intercompany Claims..................................... 49
                5.2.2.5    Class 5. Asbestos Claims ............................................ 49
                5.2.2.6    Class 6. GST General Unsecured Claims .................... 49
                5.2.2.7    Class 7. Coltec General Unsecured Claims................. 50
                5.2.2.8    Class 8. Anchor Claims............................................... 50
                5.2.2.9    Class 9. GST/Garrison Equity Interests ...................... 50
                5.2.2.10   Class 10. Other Debtor Equity Interests...................... 50
        5.2.3   Resolution of Disputed Claims ................................................... 51
        5.2.4   Distribution on Account of Disputed Claims ............................... 51
5.3     Implementation of the Plan.................................................................... 51
        5.3.1   Vesting of Assets ....................................................................... 51
        5.3.2   Post-Confirmation Management and Corporate Governance Issues ....... 52
        5.3.3   The Asbestos Trust ..................................................................... 52
                5.3.3.1    Creation of the Asbestos Trust..................................... 52
                5.3.3.2    Funding of the Asbestos Trust ..................................... 53
                5.3.3.3    Assumption of Claims and Demands by the Asbestos
                           Trust ......................................................................... 53
                5.3.3.4    Asbestos Trust Governance .......................................... 54
                5.3.3.5    Cooperation Agreement ............................................... 54
                5.3.3.6    Asbestos Insurance Rights ........................................... 55
        5.3.4   Distributions Under the Plan and Delivery of Distributions.................... 56
        5.3.5   Dissolution of Anchor.................................................................. 56
        5.3.6   Conditions to the Consummation of the Plan, Right to Withdraw or
                Amend Plan................................................................................ 56
        5.3.7   Merger of Coltec with New Coltec................................................ 57
5.4     Discharge, injunctions, and releases ....................................................... 57
        5.4.1   Discharge ................................................................................... 57
        5.4.2   Asbestos Channeling Injunction ................................................... 58
        5.4.3   Releases and Indemnification ...................................................... 60
                5.4.3.1    Settlement and Release by Debtors and Reorganized
                           Debtors of Avoidance Actions and Other Estate Claims ........ 60
                5.4.3.2    Specific Release of Intercompany Asbestos Claims............... 61
                5.4.3.3    Settlement and Release by Debtors and Estate Parties ........... 61
                5.4.3.4    Settlement and Release of Certain Claims ............................. 62
                5.4.3.5    No Actions on Account of Released Claims........................... 62

**TABLE OF CONTENTS**
(continued)

**Page**

|  |  |  | |
|---|---|---|---|
| | | 5.4.3.6 Indemnification | 62 |
| 5.5 | other plan provisions | | 63 |
| | 5.5.1 | Modification or Withdrawal of the Plan | 63 |
| | 5.5.2 | General Reservation of Rights | 63 |
| | 5.5.3 | Retention of Jurisdiction | 63 |
| | 5.5.4 | Exculpation | 63 |
| 6. | VOTING AND CONFIRMATION PROCEDURES | | 64 |
| 6.1 | Voting Procedures | | 64 |
| 6.2 | Confirmation Procedures | | 66 |
| | 6.2.1 | Confirmation Hearing | 66 |
| | 6.2.2 | Objections to Confirmation of the Plan | 66 |
| 7. | REQUIREMENTS FOR CONFIRMATION OF THE PLAN | | 68 |
| 7.1 | Bankruptcy Code § 1129 Generally | | 68 |
| 7.2 | Vote Required for Class Acceptance | | 70 |
| 7.3 | Feasibility of the Plan | | 70 |
| 7.4 | "Best Interests" Test | | 70 |
| 7.5 | Information about Corporate Governance, Officers, and Directors of Reorganized Debtors | | 72 |
| | 7.5.1 | Management Compensation and Incentive Program | 72 |
| | 7.5.2 | Prospective Officer and Director Insurance | 72 |
| 8. | IMPORTANT CONSIDERATIONS AND RISK FACTORS | | 72 |
| 8.1 | Risks Related to the Debtors' Business and these Chapter 11 Cases | | 73 |
| | 8.1.1 | Certain Risks Associated with the Chapter 11 Cases | 73 |
| | 8.1.2 | Risks Relating to the Projections | 73 |
| | 8.1.3 | Risks Relating to the Value of the Reorganized Debtors | 74 |
| | 8.1.4 | Leverage, Liquidity, and Capital Requirements | 75 |
| | 8.1.5 | Certain Risks of Non-Occurrence of the Effective Date | 75 |
| | 8.1.6 | Prolonged Continuation of the Chapter 11 Cases May Harm the Debtors' Business | 75 |
| | 8.1.7 | Risks Relating to Coltec's Chapter 11 Filing | 75 |
| | 8.1.8 | Risks of Non-Confirmation of the Plan | 76 |
| | 8.1.9 | Risk of Post-Confirmation Default | 76 |
| | 8.1.10 | Objections to Claims | 76 |
| | 8.1.11 | Risk Regarding the Solvent Insurance Carriers | 76 |
| 8.2 | Risk Factors Affecting the asbestos trust | | 76 |
| 9. | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | | 77 |
| 9.1 | Continuation of the Chapter 11 Cases | | 77 |

## TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 9.2 | Alternative Plans of Reorganization | 77 |
| 9.3 | Chapter 7 Liquidation | 77 |

| | | |
|---|---|---|
| 10. | FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 77 |

10.1 Federal Income Tax Consequences ................................................. 78
    10.1.1 General Discussion ........................................................... 78
    10.1.2 Deduction of Amounts Transferred to Satisfy Asbestos Claims ............. 78
    10.1.3 Cancellation of Debt Income .............................................. 79
    10.1.4 Net Operating Losses ........................................................ 79
    10.1.5 Alternative Minimum Tax ................................................. 79
    10.1.6 Federal Income Tax Consequences to Holders of Claims and the Asbestos Trust .................................................................. 79
        10.1.6.1 Holders of Asbestos Claims ................................... 79
        10.1.6.2 Treatment of the Asbestos Trust ............................. 80
        10.1.6.3 Consequences to Holders of GST General Unsecured Claims ............................................................. 80
    10.1.7 U.S. Federal Information Reporting and Backup Withholding ............... 81

| | | |
|---|---|---|
| 11. | CONCLUSION AND RECOMMENDATION | 81 |

| | |
|---|---|
| Exhibit 1 | Second Amended Plan of Reorganization |
| Exhibit 2 | Term Sheet for Resolution of All Present and Future GST Asbestos Claims and Coltec Asbestos Claims, dated March 17, 2016 (w/o exhibits) |
| Exhibit 3 | Post-Petition Operating Results of GST and Management Forecast |
| Exhibit 4 | Current Officers and Directors of Debtors |

1. **<u>INTRODUCTION</u>**

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition history, their material liabilities, the reorganization, and the anticipated post-reorganization operations of the Reorganized Debtors. This Disclosure Statement describes the terms and provisions of the Plan, specifically including the creation of the Asbestos Trust pursuant to Section 524(g) of the Bankruptcy Code to which Channeled Asbestos Claims will be channeled, with the Reorganized Debtors and other Asbestos Protected Parties receiving permanent injunctive protection from Asbestos Claims. The Disclosure Statement also describes certain alternatives to the Plan, the effects of confirmation of the Plan, and certain risk factors associated with the Plan. In addition, the Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims eligible to vote must follow for their votes to be counted.

Although the Plan Proponents believe that the descriptions and summaries contained in this Disclosure Statement are fair and accurate in all material respects, they are qualified in their entirety to the extent that they do not set forth the entire text of the documents and statutory provisions discussed. Please consult the documents themselves, including the Plan and exhibits to the Plan, for a full understanding of their contents.

2. **<u>DESCRIPTION OF THE DEBTORS, THEIR PRIMARY ASSETS, AND EVENTS LEADING TO THE FILING OF THESE CASES</u>**

2.1 **<u>GENERAL OVERVIEW OF THE DEBTORS</u>**

GST, a North Carolina limited liability company, and Garrison, a North Carolina corporation, are wholly owned subsidiaries of Coltec, a Pennsylvania corporation. Coltec is wholly owned by EnPro, a North Carolina corporation headquartered in Charlotte, North Carolina. EnPro (NPO) shares are traded on the New York Stock Exchange.

Anchor, a North Carolina corporation, is a wholly-owned, non-operating subsidiary of Garrison. GST acquired Anchor as a wholly owned subsidiary in June 1987. For many years before GST acquired Anchor and for several years thereafter, Anchor distributed fluid sealing materials, including gaskets and packing. In 1994, Anchor ceased business operations and in 1996 GST transferred its Equity Interest in Anchor to Garrison.

Some of the gaskets and packing produced and/or sold by GST (prior to 2001) and Anchor (prior to 1988) contained asbestos. Since the 1970s, GST and Anchor have received hundreds of thousands of claims by individuals alleging personal injuries or wrongful death related to exposure to asbestos from such products. Prior to the Petition Date, Garlock paid approximately $1.37 billion in indemnity payments and hundreds of millions in defense costs to resolve these claims.

Anchor has no assets or insurance and has not paid to defend or settle an asbestos claim since 2005.

Coltec is not currently in bankruptcy but, pursuant to the Comprehensive Settlement, is soliciting acceptance of the Plan as a "prepackaged plan of reorganization" that would provide

for the permanent settlement of Coltec Asbestos Claims contemporaneously with GST Asbestos Claims. Some of the businesses operated by Coltec and its predecessors, apart from GST, manufactured equipment with asbestos-containing components, principally gaskets and packing, made by other companies. These Coltec businesses often, though not exclusively, used components manufactured by GST. As a result, since approximately 1992, these Coltec businesses have received tens of thousands of claims by individuals alleging personal injuries or wrongful death caused by exposure to asbestos-containing components in Coltec's products. The businesses operated by Coltec and its predecessors that received such claims are Fairbanks Morse Engine, Fairbanks Morse Pump, Quincy Compressor, Central Moloney, France Compressor, Delavan, and Farnam.

Claimants who sued Coltec businesses generally also sued GST. Although Coltec has paid approximately $7.9 million to defend claims relating to products manufactured or sold by its non-GST subsidiaries or divisions, Coltec has never paid any money to settle an asbestos personal injury claim. Claimants routinely agreed to dismiss Coltec asbestos claims without payment when they reached settlements with GST with respect to their GST asbestos claims.

## 2.2 THE DEBTORS' BUSINESSES

### 2.2.1 GST

GST's business was founded in 1887 in Palmyra, New York. GST produces and sells high performance fluid-sealing products, including gaskets and compression packing used in internal piping and valve assemblies in numerous industries. GST employs approximately nine hundred and thirty people and has a global sales presence serviced from manufacturing facilities in Palmyra, New York and Houston, Texas.

GST also owns three non-Debtor foreign subsidiaries that own manufacturing operations in Canada, Mexico, and Australia.

In 2015, GST and its subsidiaries had global sales of approximately $217 million. In 2014, 2013, and 2012, GST and its subsidiaries had global sales of approximately $240 million, $244 million, and $240 million, respectively. In 2015, GST and its subsidiaries had income before reorganization expenses and income taxes excluding asbestos-related expenses of approximately $68 million, and in 2014, 2013, and 2012, GST and its subsidiaries had income before reorganization expenses and income taxes excluding asbestos-related expenses of approximately $203 million,[5] $85 million, and $78 million, respectively. *See* Post-Petition Operating Results of GST and Management Forecast, attached to this Disclosure Statement as **Exhibit 3**.

GST continuously develops innovative products to meet the changing preferences of its customers. In 2005, GST began a multi-year, $40 million capital project to modernize and improve its Palmyra manufacturing facilities, which has been completed since the Petition Date.

---

[5] The Debtors adjusted 2014 income based on recording a reduction in asbestos liability resulting from the Estimation Opinion and the provisions of the Debtors' Second Amended Plan. Income net of this adjustment to booked asbestos liability was $75 million.

2

GST believes that its new, state-of-the-art facilities have enhanced the company's position as the high quality producer in its industry. During the period of 2010 through 2015, GST spent an average of approximately $4.6 million annually on capital expenses, continuously upgrading its facilities, new product development capabilities, and equipment in order to retain its position as a leading manufacturer in its field.

### 2.2.2 Garrison

Garrison, which is headquartered in East Rochester, New York, was formed in 1996 to manage the defense and resolution of asbestos claims against GST and Coltec. Pursuant to an Exchange Agreement dated September 13, 1996 (the "**Exchange Agreement**"), Garrison undertook all future responsibility for the resolution of asbestos claims against GST, agreeing to indemnify GST for any losses it might suffer related to asbestos claims and to assume the defense and settlement of such claims. The Exchange Agreement also provided for GST's transfer of assets to Garrison to fund the resolution of asbestos claims against GST, including GST's right to receive payments under any insurance policies that covered asbestos-related claims against GST. GST retained a security interest in such insurance assets to secure Garrison's obligations under the Exchange Agreement. *See* Section 2.3.4.2 below for certain financial arrangements between Garrison and GST and Section 2.3.4.3 for certain financial arrangements between Garrison and Anchor.

From its inception to the Petition Date, Garrison (a) supervised a nationwide network of law firms defending asbestos claims against GST and Coltec; (b) managed the defense and resolution of asbestos claims against GST and Coltec; (c) paid judgments, settlements, and defense costs; and (d) collected insurance that covered losses associated with asbestos claims against GST. Since the Petition Date, Garrison has continued to work on the resolution of asbestos claims against GST by, among other things, updating the Debtors' master claims database, responding to discovery, providing support services for the Debtors' professionals, continuing to collect insurance, and participating in plan formulation. Garrison currently employs five people, including paralegals, accountants, and data entry personnel.

In addition to managing litigation and resolution of asbestos claims against GST, Garrison was paid fees and reimbursed expenses for managing the defense and resolution of asbestos claims against Anchor and Coltec.

### 2.2.3 Coltec

Coltec is a longstanding, diversified manufacturer that was variously known in prior years as Penn-Texas Corporation (until 1959), Fairbanks Whitney Corporation (until 1964), and Colt Industries Inc (until 1990). Colt Industries Inc then changed its name to Coltec Industries Inc on May 3, 1990. Coltec merged with Runway Acquisition Corporation, a subsidiary of Goodrich Corporation ("**Goodrich**") on July 12, 1999 and survived as a wholly owned subsidiary of Goodrich. EnPro was incorporated on January 11, 2002 as a wholly owned subsidiary of Goodrich and is the sole parent entity of Coltec. On May 31, 2002, the shares of EnPro were distributed to the shareholders of Goodrich, and EnPro became a separate public company, with Coltec continuing as its direct, wholly-owned subsidiary through the date hereof. Coltec's headquarters are in Charlotte, North Carolina.

3

### 2.2.3.1   Coltec's Business Operations

Through its divisions and a number of direct and indirect foreign and domestic subsidiaries, Coltec operates a broad and diverse range of engineered industrial products manufacturers. These businesses include Garrison and the Garlock Group (described below) of which GST is a significant part. Coltec's material business operations include:

*Fairbanks Morse (Fairbanks Morse).* Fairbanks Morse is currently an unincorporated division of Coltec. Headquartered in Washington, DC, Fairbanks Morse designs, manufactures, sells, and services heavy-duty, medium-speed diesel engines and generator sets, and dual-fuel engines. Fairbanks Morse operates a manufacturing facility in Beloit, Wisconsin and operates service centers across the United States and one in Canada. As part of the pre-bankruptcy Coltec Restructuring, Fairbanks Morse will become a separately incorporated entity.

*The Garlock Group.*  The Garlock family of companies, which is composed of a number of direct and indirect subsidiaries of Coltec, including GST, design, manufacture and sell sealing products, including: metallic, non-metallic and composite material gaskets; dynamic seals; compression packing; hydraulic components; expansion joints; flange sealing and isolation products; pipeline casing spacers/isolators; casing end seals; modular sealing systems for sealing pipeline penetrations; and safety-related signage for pipelines. These products are used in a variety of industries, including chemical and petrochemical processing, petroleum extraction and refining, pulp and paper processing, power generation, food and pharmaceutical processing, primary metal manufacturing, mining, and water and waste treatment.  The Garlock Group is headquartered in Palmyra, New York, and operates production facilities in New York, as well as in Texas, Colorado, Australia, Canada, China, Dubai (UAE), Germany, India, Mexico, Singapore, and the United Kingdom.

*The Stemco Group.*  The Stemco group, which is composed of a number of direct and indirect subsidiaries of Coltec, designs, manufactures and sells heavy-duty truck wheel-end components and systems including: seals; hubcaps; mileage counters; bearings; locking nuts; brake products, such as brake drums, automatic brake adjusters, brake friction and shoes, hardware and brake kits; suspension components, such as steering knuckle king-pins and bushings, spring pins and bushings, other polymer bushing components, and air springs for tractor, trailer and cab suspensions; tire pressure monitoring and inflation systems and automated mileage collection devices; as well as trailer-end aerodynamic devices designed to increase fuel efficiency. Along with group headquarters in Longview, Texas, the Stemco group operates manufacturing facilities in Texas, Georgia, Michigan, Tennessee, Kentucky, Ohio, Canada, Australia, Mexico, and China.

*The Technetics Group.*  The Technetics group, composed of a number of direct and indirect subsidiaries of Coltec, designs, manufactures, and sells high performance metal seals; elastomeric seals; bellows and bellows assemblies; pedestals for semiconductor manufacturing; and a wide range of polytetrafluoroethylene (PTFE) products.  These products are used in a variety of industries, including electronics and semiconductor, aerospace, land-based turbines, power generation, oil and gas, food and beverage, and other industries.  Technetics' group headquarters is located in Columbia, South Carolina and Technetics operates production

4

facilities in California, Florida, Massachusetts, Pennsylvania, South Carolina, Texas, France, Germany, Singapore, and the United Kingdom.

*The Compressor Products International (CPI) Group.* The CPI group's business, which is operated by a number of direct and indirect subsidiaries of Coltec, designs, manufactures, sells and services components for reciprocating compressors and engines. These components, which include packing and wiper rings, piston and rider rings, compressor valve assemblies, divider block valves, compressor monitoring systems, lubrication systems, and related components are utilized primarily in the refining, petrochemical, natural gas gathering, storage and transmission, and general industrial markets. CPI maintains its headquarters in Stafford, Texas and has production facilities in California, Louisiana, Pennsylvania, Texas, Wyoming, Australia, Canada, China, France, Germany, Netherlands, Spain, and the United Kingdom.

*The GGB Group.* The GGB group's business, which is operated by a number of direct and indirect subsidiaries of Coltec, designs, manufactures and sells self-lubricating, non-rolling, metal polymer, engineered plastics, and fiber reinforced composite bearing products, as well as aluminum bushing blocks for hydraulic applications. These products are used in a wide variety of markets such as the automotive, pump and compressor, construction, power generation, and general industrial markets. The GGB group's headquarters are located in Annecy, France, and GGB operates production facilities in New Jersey, Brazil, France, Germany, Slovakia and China.

*EnPro Learning System, LLC ("**Learning System**").* Learning System, a direct wholly owned subsidiary of Coltec, offers safety consulting services, safety courses, and safety conferences throughout the year to assist companies in developing and implementing protocols to improve workplace safety. Learning System is headquartered in Charlotte, North Carolina and offers safety courses and conferences at various production facilities of EnPro and its subsidiaries and at other external locations.

The current business operations of Coltec will be substantially reorganized by the Coltec Restructuring before Coltec (renamed OldCo, LLC) files its Chapter 11 case. At the time OldCo files its Chapter 11 petition, only the Learning System business will be a part of OldCo's operations. For more information on the Coltec Restructuring, see Section 2.5.3 below.

### 2.2.3.2 Results of Coltec's Combined Business Operations

As the only direct, wholly-owned subsidiary of EnPro, Coltec either directly (through its divisions) or indirectly (through its direct and indirect foreign and domestic subsidiaries) operates all of the business operations of EnPro, other than certain general and administrative expenses incurred directly by the EnPro Industries, Inc. legal entity (on a stand-alone basis, the "**Parent**").

The following tables present condensed consolidating statements of operations of: (i) the Parent, (ii) Coltec and its direct and indirect subsidiaries (excluding the Existing Debtors and their subsidiaries) on a combined basis and (iii) the eliminations necessary to arrive at the consolidated results of EnPro on a consolidated basis, in each case for the following periods: (a) the three months ended March 31, 2016, (b) the twelve months ended December 31, 2015 and (c) the twelve months ended December 31, 2014.

5

The condensed consolidating statements of operations are not intended to present the results of operations for any purpose other than to set forth certain information regarding the combined operations of Coltec and its direct and indirect foreign and domestic subsidiaries (other than Existing Debtors and their subsidiaries) for purposes of this Disclosure Statement.

**CONDENSED CONSOLIDATING STATEMENTS OF OPERATIONS (UNAUDITED)**
**Three Months Ended March 31, 2016**
**(in millions)**

| | EnPro Industries, Inc. | | Coltec and Certain of Its Subsidiaries* | | Remaining Subsidiaries of Coltec* | | Eliminations | | Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Net sales | $ | — | $ | 205.0 | $ | 112.2 | $ | (22.3) | $ | 294.9 |
| Cost of sales | | — | | 144.6 | | 75.0 | | (22.3) | | 197.3 |
| Gross profit | | — | | 60.4 | | 37.2 | | — | | 97.6 |
| Operating expenses: | | | | | | | | | | |
| Selling, general and administrative | | 8.9 | | 46.1 | | 30.6 | | — | | 85.6 |
| Asbestos settlement | | — | | 80.0 | | — | | — | | 80.0 |
| Other | | 0.1 | | 1.3 | | 3.0 | | — | | 4.4 |
| Total operating expenses | | 9.0 | | 127.4 | | 33.6 | | — | | 170.0 |
| Operating income (loss) | | (9.0) | | (67.0) | | 3.6 | | — | | (72.4) |
| Interest expense, net | | (4.6) | | (8.5) | | — | | — | | (13.1) |
| Other expense | | — | | (1.6) | | — | | — | | (1.6) |
| Income (loss) before income taxes | | (13.6) | | (77.1) | | 3.6 | | — | | (87.1) |
| Income tax benefit (expense) | | 4.5 | | 39.3 | | (3.5) | | — | | 40.3 |
| Income (loss) before equity in earnings of subsidiaries | | (9.1) | | (37.8) | | 0.1 | | — | | (46.8) |
| Equity in earnings of subsidiaries, net of tax | | (37.7) | | 0.1 | | — | | 37.6 | | — |
| Net income (loss) | $ | (46.8) | $ | (37.7) | $ | 0.1 | $ | 37.6 | $ | (46.8) |
| Comprehensive income (loss) | $ | (39.9) | $ | (30.8) | $ | 5.9 | $ | 24.9 | $ | (39.9) |

*Excludes the Existing Debtors and their subsidiaries.

**CONDENSED CONSOLIDATING STATEMENTS OF OPERATIONS**
**Year Ended December 31, 2015**
**(in millions)**

| | EnPro Industries, Inc. | | Coltec and Certain of Its Subsidiaries* | | Remaining Subsidiaries of Coltec* | | Eliminations | | Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Net sales | $ | — | $ | 837.8 | $ | 428.1 | $ | (61.5) | $ | 1,204.4 |
| Cost of sales | | — | | 591.6 | | 278.8 | | (61.5) | | 808.9 |
| Gross profit | | — | | 246.2 | | 149.3 | | — | | 395.5 |
| Operating expenses: | | | | | | | | | | |
| Selling, general and administrative | | 27.6 | | 157.1 | | 118.1 | | — | | 302.8 |

| | EnPro Industries, Inc. | | | |
|---|---|---|---|---|
| Goodwill and other intangible asset impairment | — | 5.6 | 41.4 | — | 47.0 |
| Other | 1.8 | 1.2 | 5.1 | — | 8.1 |
| Total operating expenses | 29.4 | 163.9 | 164.6 | — | 357.9 |
| Operating income (loss) | (29.4) | 82.3 | (15.3) | — | 37.6 |
| Interest expense, net | (13.1) | (38.8) | (0.2) | — | (52.1) |
| Other expense, net | (2.8) | (1.3) | — | — | (4.1) |
| Income (loss) before income taxes | (45.3) | 42.2 | (15.5) | — | (18.6) |
| Income tax benefit (expense) | 12.1 | (9.5) | (4.9) | — | (2.3) |
| Income (loss) before equity in earnings of subsidiaries | (33.2) | 32.7 | (20.4) | — | (20.9) |
| Equity in earnings of subsidiaries, net of tax | 12.3 | (20.4) | — | 8.1 | — |
| Net income (loss) | $ (20.9) | $ 12.3 | $ (20.4) | $ 8.1 | $ (20.9) |

*Excludes the Existing Debtors and their subsidiaries.

**CONDENSED CONSOLIDATING STATEMENTS OF OPERATIONS**
**Year Ended December 31, 2014**
**(in millions)**

| | EnPro Industries, Inc. | Coltec and Certain of Its Subsidiaries* | Remaining Subsidiaries of Coltec* | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net sales | $ — | $ 801.4 | $ 456.3 | $ (38.4) | $ 1,219.3 |
| Cost of sales | — | 555.5 | 285.5 | (38.4) | 802.6 |
| Gross profit | — | 245.9 | 170.8 | — | 416.7 |
| Operating expenses: | | | | | |
| Selling, general and administrative | 41.1 | 144.5 | 133.9 | — | 319.5 |
| Asbestos settlement | — | 30.0 | — | — | 30.0 |
| Other | 0.8 | 1.2 | 1.8 | — | 3.8 |
| Total operating expenses | 41.9 | 175.7 | 135.7 | — | 353.3 |
| Operating income (loss) | (41.9) | 70.2 | 35.1 | — | 63.4 |
| Interest income (expense), net | 6.6 | (50.6) | (0.1) | — | (44.1) |
| Other income (expense) | (10.0) | 23.3 | — | — | 13.3 |
| Income (loss) before income taxes | (45.3) | 42.9 | 35.0 | — | 32.6 |
| Income tax benefit (expense) | 15.3 | (16.6) | (9.3) | — | (10.6) |
| Income (loss) before equity in earnings of subsidiaries | (30.0) | 26.3 | 25.7 | — | 22.0 |
| Equity in earnings of subsidiaries, net of tax | 52.0 | 25.7 | — | (77.7) | — |
| Net income | $ 22.0 | $ 52.0 | $ 25.7 | $ (77.7) | $ 22.0 |

*Excludes the Existing Debtors and their subsidiaries.

For additional information regarding the consolidated operations of EnPro, please see the EnPro Quarterly Report on Form 10-Q for the three months ended March 31, 2016 and the

7

EnPro Annual Report on Form 10-K for the year ended December 31, 2015. These documents are available online at http://www.enproindustries.com/sec-filings.

### 2.3 ASSETS OF GST, GARRISON, AND ANCHOR

#### 2.3.1 Estimated Value of Reorganized GST's Core Business

GST's principal offices and largest manufacturing facility are located in Palmyra, New York. GST owns the Palmyra offices and plants subject to a "lease-leaseback" arrangement extending through February 2026 with the Wayne County Industrial Development Agency. GST has a second, leased manufacturing facility in Houston, Texas. GST owns substantial property and equipment at each of the two operating facilities used in connection with its business, as well as finished inventory and raw materials. A more detailed description of these assets is included in GST's Schedules of Assets and Liabilities, filed on July 20, 2010 (Docket No. 249). Since the Petition Date, GST has continued to operate in the ordinary course of business, and has acquired and divested assets in the ordinary course of business consistent with its pre-petition operations.

The Debtors have engaged FTI Consulting to advise them with respect to the enterprise value and reorganized value of GST's core business operations. FTI's analysis reflects a going concern value for GST's core business, including its non-debtor subsidiaries, in the range of $250 million to $286 million. The Debtors concur with FTI's conclusions regarding the value of the Debtors' core business operations.

#### 2.3.2 Cash

As of March 31, 2016, GST (exclusive of its non-Debtor subsidiaries) held approximately $245.4 million in Cash ($4.6 million), Cash equivalents ($47.7 million), and United States Treasury Notes ($200.0 million). Inclusion of Cash held by non-debtor subsidiaries increases this figure by $29.5 million.

#### 2.3.3 Garlock Insurance

Coltec purchased certain general liability insurance policies to cover losses associated with, among other things, product liability claims against Coltec and certain of its subsidiaries. A block of these insurance policies, in effect from 1976, the year after Coltec purchased GST, to 1984, when insurance policies began excluding asbestos-related losses from coverage, included GST as an insured (the "**Available Shared Insurance**"). Under the Available Shared Insurance policies, GST is entitled to be indemnified for losses associated with asbestos claims against GST that trigger coverage under such policies. Prior to these Chapter 11 Cases, proceeds from these policies have been used to pay a portion of the indemnity payments made to resolve asbestos claims against GST.

In addition to GST, Coltec and certain other Non-Debtor Affiliates also have indemnity rights against the carriers under the Available Shared Insurance policies, which also cover such Affiliates for asbestos-related losses. To the extent Coltec or any non-Debtor Affiliate is required to defend and pay any future asbestos litigation or pending asbestos litigation, Coltec or such non-Debtor Affiliate is entitled to be indemnified under those insurance policies for any such claim that triggers such policies.

As of the Petition Date, $194 million of available products hazard limits or insurance receivables arising from settlements with insurance carriers existed under the Available Shared Insurance policies. Since the Petition Date, the Debtors have collected approximately $116.6 million of the Available Shared Insurance (including insurance recoveries of approximately $6.1 million from insolvent insurance carriers); therefore, the amount of Available Shared Insurance from solvent insurance carriers with investment grade ratings, as of March 31, 2016, is approximately $80 million. A list of Asbestos Insurance Policies issued to the Debtors is attached as Exhibit E to the Plan.

A summary of the expected insurance receipts from various insurers is set forth below.

| Insurance Carrier | S&P Debt Rating | AM Best Rating | Remaining Amount $ in 000 |
|---|---|---|---|
| Aetna Casualty and Surety (Travelers) | AA | A++ | 4,213 |
| AIG | A+ | A | 42,000 |
| Employers Mutual Assurance Co. | n/a | A | 10,000 |
| Fireman's Fund | AA | A+ | 8,762 |
| Republic Insurance Co. | A+ | A | 10,000 |
| Safety Insurance Co. | A | A+ | 5,000 |
| **Total (Solvent Carriers)** | | | **79,975** |

### 2.3.4 Affiliate Notes

#### 2.3.4.1 The Coltec and Stemco Notes and the 2005 Corporate Restructuring

GST holds two separate promissory notes in the aggregate face amount of approximately $227 million: one issued by Coltec in the face amount of $73,381,000 (the "**Coltec Note**") and the other issued by a wholly-owned indirect subsidiary of Coltec, Stemco LP, a Texas limited partnership ("**Stemco TX**") in the face amount of $153,865,000 (the "**Stemco Note**"). The Coltec Note and the Stemco Note each mature on January 1, 2017 and bear interest at 11.0% per annum. Cash payments are due in an amount equal to 6.5% per year, and deferred payment of interest in the amount of 4.5% (the "**PIK Amount**") are added to the principal amount outstanding under the Coltec Note and Stemco Note each year.

Each of the Coltec Note and the Stemco Note was delivered to GST on March 11, 2005, in connection with a corporate restructuring (the "**2005 Corporate Restructuring**"), and each was amended and restated on January 1, 2010.

First, pursuant to a Membership Interest Purchase Agreement dated March 11, 2005, GST sold to Coltec the following limited liability company membership interests: 100% of the membership interests in Coltec Industrial Products LLC and 96.3% of the membership interests in GGB LLC (representing all of GST's ownership interest in GGB LLC) (collectively, the "**Membership Interests**"). The purchase price for the Membership Interests was paid by Coltec

9

through the issuance and delivery of the Coltec Note. Pursuant to the terms of an Amended and Restated Pledge Agreement dated January 1, 2010, the repayment of the Coltec Note is secured by a pledge of the Membership Interests.

Second, pursuant to an Asset Purchase Agreement dated March 11, 2005, Stemco Delaware LP, a Delaware limited partnership ("**Stemco DE**") sold certain assets to Stemco TX, and Stemco TX agreed to assume certain liabilities of Stemco DE, all in exchange for the issuance and delivery of the Stemco Note by Stemco TX. On December 31, 2006, Stemco DE merged with and into GST, with GST surviving the merger and becoming the holder of the Stemco Note. The payment and performance of Stemco TX's obligations under the Stemco Note are guaranteed by Coltec pursuant to the terms of an Amended and Restated Guaranty Agreement dated January 1, 2010 (the "**Coltec Guaranty**"). Additionally, as collateral security for the full and timely payment, performance and observance of Coltec's obligations under the Coltec Guaranty, Coltec has granted GST a security interest in the general partner interest in Stemco TX held by Coltec and in the common stock of Stemco Holdings, Inc., a Delaware corporation (a wholly-owned subsidiary of Coltec and the direct owner of the limited partnership interests in Stemco TX) pursuant to the terms of an Amended and Restated Pledge Agreement dated January 1, 2010.

GST has agreed to subordinate its rights of payment under the Coltec Note, the Stemco Note, and the Coltec Guaranty to final payment of all principal, interest, or other obligations under Coltec's senior credit facility, pursuant to the terms of subordination agreements by and among Bank of America, N.A., in its capacity as collateral and administrative agent ("**BofA**"), GST, Coltec, and Stemco TX dated as of April 26, 2006 (as amended, modified, restated, and supplemented). As of March 31, 2016, the outstanding balance due under Coltec's senior credit facility was $170.4 million.

The Stemco Note and the Coltec Note each provide that Coltec may set off against any principal or interest due under the Stemco Note or Coltec Note losses, damages or settlements paid to any asbestos claimant based on Stemco TX's (in the case of the Stemco Note) or Coltec's (in the case of the Coltec Note) alleged liability for asbestos containing products manufactured or sold by GST.

Since the Petition Date, Coltec has provided certain services and advanced certain costs to both GST and Garrison pursuant to Intercompany Services Agreements dated as of June 1, 2010, between Coltec and each of GST and Garrison. Under the terms of the Intercompany Services Agreements, the charges payable to Coltec are paid first by offset against the cash portion of the interest payable under the Coltec Note and the Stemco Note. Since the Petition Date, all charges payable to Coltec under the Intercompany Services Agreement have been paid in this manner. As of March 31, 2016, the aggregate principal amount outstanding under the Stemco Note and the Coltec Note, together, was $295.9 million.

### 2.3.4.2 GST/Garrison Grid Notes

On September 13, 1996, GST and Garrison entered into a reciprocal credit arrangement (the "**Letter Agreement**") under which GST agreed to provide Garrison with a line of credit of up to $200 million for working capital purposes, and Garrison agreed to loan GST any available

10

Cash held by Garrison in excess of its working capital requirements. Advances by GST to Garrison for working capital requirements are evidenced by a $200 million Revolving Note (the "**Garrison Note**"). Garrison advances of available Cash to GST are evidenced by a separate $200 million Demand Grid Note (the "**Demand Grid Note**"). Under the terms of the Letter Agreement, any transfers of available Cash by Garrison to GST are first applied to repay indebtedness under the Garrison Note, if any, before any transfer is considered a borrowing by GST under the Demand Grid Note. Conversely, any advances by GST to Garrison are first applied to the Demand Grid Note before constituting an advance to Garrison under the Garrison Note. In accordance with the Letter Agreement, whenever a disbursement is presented for payment in a Garrison account, GST funds the disbursement from a GST disbursement account on behalf of Garrison and charges Garrison for such disbursement through the Garrison Note. Whenever Garrison receives Cash in its lockbox account, the Cash is transferred to the GST funding/concentration account as a repayment of the Garrison Note. As of March 31, 2016, Garrison owed GST $158,074,954 under the Garrison Note, and there was no outstanding indebtedness under the Demand Grid Note.

### 2.3.4.3 Garrison/Anchor Notes

Pursuant to the terms of a Promissory Note dated July 2, 1998 (the "**Anchor Grid Note**"), Garrison provided Anchor a line of credit up to $10 million for Anchor's working capital requirements. Anchor repaid interest and principal owed on such note as Anchor received proceeds from insurance covering asbestos-related claims against Anchor. Anchor has no remaining insurance coverage. Since December 2004, there have been no advances or repayments respecting the Anchor Grid Note. As of March 31, 2016, Anchor's indebtedness to Garrison under the Grid Note was approximately $1,704,000.

Anchor also owes Garlock approximately $2 million in net open intercompany account balances. This intercompany account is not evidenced by a promissory note or other writing. There has been no activity on this account since 1998.

### 2.3.5 Claims and Causes of Action

#### 2.3.5.1 Avoidance Actions and Certain Related Claims Against Affiliates

During the pendency of these Bankruptcy Cases, the Committee and FCR have undertaken substantial document discovery of pre-petition transactions between the Existing Debtors, Coltec, and other Non-Debtor Affiliates. On April 30, 2012, the Committee and the FCR filed a Joint Motion of the Official Committee of Asbestos Personal Injury Claimants and the Future Claims Representative for Leave to Control and Prosecute Certain Claims as Estate Representatives (the "**Motion for Leave**" and the proposed complaint attached as Exhibit A thereto, the "**Proposed Complaint**") (Docket No. 2150) and a Joint Motion to Modify Preliminary Injunction in Order to Permit Certain Claims to Proceed[6] (the "**Motion for Modification**" and, together with the Motion for Leave, the "**ACC/FCR Motions**").

---

[6]     Adv. Proc. No. 10-03145 (Docket No. 33).

The allegations of the Proposed Complaint focus on the 2005 Corporate Restructuring, which gave rise to the Coltec and Stemco Notes, and the amendments to those notes that occurred shortly before the 2010 bankruptcy filings of the Existing Debtors. *See* Section 2.3.4.1, *The Coltec and Stemco Notes and 2005 Corporate Restructuring*, *supra*. The Proposed Complaint alleges that the transfer of the businesses under the 2005 Corporate Restructuring and subsequent amendments to the Coltec and Stemco Notes injured GST Asbestos Claimants by hindering their ability to recover damages for their alleged injuries from GST. The Proposed Complaint names as defendants EnPro, Coltec, and Stemco TX (the "**Corporate Defendants**") and three former managers of GST, Donald G. Pomeroy, John Mayo, and Paul Baldetti (the "**Former Managers**"), and includes causes of actions for (1) alleged fraudulent transfers against the Corporate Defendants under both state law and the Bankruptcy Code; (2) breach of fiduciary duty against the Former Managers and the Corporate Defendants; (3) aiding and abetting breach of fiduciary duty against the Corporate Defendants; (4) unjust enrichment against the Corporate Defendants; (5) conspiracy to defraud against the Corporate Defendants; (6) successor liability against the Corporate Defendants; and (7) piercing the corporate veil separating GST from the Corporate Defendants.

On May 11, 2012, the Existing Debtors filed their Motion for Order (A) Authorizing the Debtors to (I) Enter Into the Affiliate Tolling Agreement and (II) Enter Into the Proposed Managers Tolling Agreement Pursuant to 11 U.S.C §§ 105(a) and 363 and Bankruptcy Rule 6004 and (B) Authorizing the Debtors to Abandon Non-Affiliate Preference Claims Pursuant to 11 U.S.C. §§ 105(a) and 554(a) and Bankruptcy Rule 6007 (the "**Tolling Agreement Motion**") (Docket No. 2194).

The Bankruptcy Court granted the Tolling Agreement Motion by order entered on June 4, 2012 (Docket No. 2281), and denied without prejudice the ACC/FCR Motions by order entered on June 7, 2012 (Docket No. 2292).[7]

The Debtors, the Corporate Defendants, and the Former Managers have continued to toll the alleged causes of action in the Proposed Complaint (the "**Tolled Claims**"), by way of tolling agreements entered into after the Bankruptcy Court granted the Tolling Agreement Motion and a series of orders subsequently entered with the consent of the Corporate Defendants, the Former Managers, the Committee, and the FCR.

As part of the Comprehensive Settlement the Plan provides that the Tolled Claims will be settled, released and extinguished. Also to be released pursuant to the Comprehensive Settlement and the Plan (in addition to other claims) are (i) any Avoidance Actions the Existing Debtors or Coltec may have against any of their Affiliates, (ii) Avoidance Actions that the Existing Debtors, Coltec, or their Estates might otherwise be able to assert against personal injury claimants or their attorneys, and (iii) any claims that Coltec might otherwise be able to assert against any of the Existing Debtors for indemnity or contribution related to Asbestos Claims.

In addition, since the Petition Date the Existing Debtors have investigated potential causes of action against certain parties in interest who received payments prior to the Petition

---

[7]     Adv. Proc. No. 10-03145 (Docket No. 51).

Date. As a partial result of those investigations, the Existing Debtors filed their Motion for Order (A) Authorizing the Debtors to (I) Enter Into the Affiliate Tolling Agreement and (II) Enter Into the Proposed Managers Tolling Agreement Pursuant to 11 U.S.C §§ 105(a) and 363 and Bankruptcy Rule 6004 and (B) Authorizing the Debtors to Abandon Non-Affiliate Preference Claims Pursuant to 11 U.S.C. §§ 105(a) and 554(a) and Bankruptcy Rule 6007 (Docket No. 2194) (the "**Motion to Abandon**"). In the Motion to Abandon, the Existing Debtors sought court authorization to abandon all potential causes of action arising under Section 547 of the Bankruptcy Code against trade vendors who are not Affiliates of the Existing Debtors, the Existing Debtors' asbestos litigation defense counsel, and personal injury claimants who received payments from the Existing Debtors within ninety days prior to the Petition Date. The Court approved the Motion to Abandon, entering the Order (A) Authorizing the Debtors to (I) Enter into the Affiliate Tolling Agreement and (II) Enter into the Proposed Managers Tolling Agreement Pursuant to 11 U.S.C. §§ 105(a) and 363 and Bankruptcy Rule 6004 and (B) Authorizing Debtors to Abandon Non-Affiliate Preference Claims Pursuant to 11 U.S.C. §§ 105(a) and 554(a) and Bankruptcy Rule 6007 (Docket No. 2281) (the "**Abandonment Order**").

The Debtors believe all Avoidance Actions not settled through the Plan have either been abandoned pursuant to the Abandonment Order or the limitations period for any such claims has expired. To the extent any such Avoidance Actions exist and have not been abandoned pursuant to the Abandonment Order or settled or released through the Plan, such Avoidance Actions shall be retained by the Reorganized Debtors. The Existing Debtors' Statement of Financial Affairs sets forth all transfers by the Existing Debtors within ninety (90) days of the Petition Date, as well as all transfers to Affiliates within one year prior to the Petition Date. The Reorganized Debtors shall have the exclusive right to prosecute, waive or settle any unresolved Avoidance Actions after the Effective Date without need for Court authorization or approval.

### 2.3.5.2   GST Recovery Actions

Additionally, as a result of the Existing Debtors' Post-Petition investigations, GST and Garrison have filed lawsuits against several law firms who represented personal injury claimants to whom GST and Garrison paid money prior to the Petition Date as a result of settlements that GST and Garrison contend were fraudulently obtained. Information regarding these lawsuits follows:

| Case Caption | Case Number and Jurisdiction |
| --- | --- |
| *Garlock Sealing Technologies LLC, et al. v. Chandler, et al.* | 12-03137, United States Bankruptcy Court for the Western District of North Carolina |
| *Garlock Sealing Technologies LLC, et al. v. Shein Law Center Ltd, et al.* | 3:14-cv-00137, United States District Court for the Western District of North Carolina |
| *Garlock Sealing Technologies LLC, et al. v. Belluck & Fox, LLP, et al.* | 3:14-cv-00118, United States District Court for the Western District of North Carolina |

| Case Caption | Case Number and Jurisdiction |
|---|---|
| *Garlock Sealing Technologies LLC, et al. v. Simon Greenstone Panatier Bartlett, A Professional Corporation, et al.* | 3:14-cv-00116, United States District Court for the Western District of North Carolina |
| *Garlock Sealing Technologies LLC, et al. v. Estate of Ronald C. Eddins, et al.* | 3:14-cv-00130, United States District Court for the Western District of North Carolina |

The Plan refers to these pending suits as "GST Recovery Actions." The Plan also uses the term "GST Recovery Actions" to refer to any other cause of action, claim, demand, or suit that might otherwise be asserted or filed in the future by Coltec, GST, Garrison, or any of their respective Affiliates, predecessors, or assigns against asbestos personal injury claimants or the attorneys and law firms that represent or have represented such claimants, which action, claim, demand, or suit is based on acts, omissions, or conduct by claimants, their attorneys, or law firms in connection with an action or suit for asbestos-related injury or wrongful death before the Confirmation Date. The Plan excludes GST Recovery Actions from the definition of Retained Causes of Action. As required by the Comprehensive Settlement, the Plan constitutes a motion to approve the settlement of the pending GST Recovery Actions under Bankruptcy Rule 9019, pursuant to which such actions and any claims, counterclaims, or countersuits the respective parties actually asserted or could have asserted therein shall be dismissed with prejudice in exchange for mutual general releases and mutual waivers of costs and attorneys' fees. In addition, the Plan provides that the Debtors, Reorganized Debtors, and their Affiliates, predecessors, successors, and assigns shall be deemed to release, waive, and permanently extinguish their rights to file or assert in the future any GST Recovery Action.

As part of the Comprehensive Settlement, the Term Sheet calls for the resolution and dismissal of the pending GST Recovery Actions on the foregoing terms effective upon the exchange of settlement documents by the parties to those lawsuits, and those lawsuits have been stayed pending confirmation of the Plan. As they have acknowledged in the Term Sheet, the Debtors, the Committee, the Ad Hoc Coltec Committee, and EnPro agreed that the settlement of those lawsuits on such terms was necessary in order for the Plan to be confirmed and succeed and therefore is in the best interests of the Debtors, their Estates, and present and future Asbestos Claimants. They have also acknowledged in the Term Sheet that (1) the defendants in the pending GST Recovery Actions have been represented by their respective independent counsel in connection with the proposed resolution of the pending GST Recovery Actions, and (2) the Plan funding negotiated by EnPro and the Plan Proponents has not been, and shall not be, reduced in respect of those proposed resolutions.

The Reorganized Debtors retain their respective rights to continue, commence, and pursue any and all "Retained Causes of Action" but, as required by the Comprehensive Settlement, the Plan excludes GST Recovery Actions from the definition of Retained Causes of Action. To the extent the Debtors have not commenced litigation with respect to any Retained Cause of Action prior to the Effective Date, one or more of the Reorganized Debtors may pursue them after the Effective Date. The Debtors have listed material, known Retained Causes of

Action on **Exhibit F** to the Plan. Retained Causes of Action will not be limited in any way by failure to list any Retained Cause of Action on Exhibit F.

In addition, it is possible that there are numerous unknown causes of action. The failure to list any such unknown causes of action above is not intended to limit the rights of the Reorganized Debtors to pursue any of these actions to the extent the facts underlying such unknown causes of action become known to the Debtors or the Reorganized Debtors.

### 2.3.5.3 Maintenance of Causes of Action and Preservation of All Causes of Action Not Expressly Settled or Released

Except as settled or released under the Plan, or otherwise provided in the Plan, the Reorganized Debtors are retaining all of the Debtors' respective rights to commence and pursue, as appropriate, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases, any and all causes of action, whether such causes of action accrued before or after the Petition Date.

Except as otherwise provided in the Plan, in accordance with Section 1123(b)(3) of the Bankruptcy Code, any Claims, rights, and causes of action, including the Retained Causes of Action, that GST, Garrison, and Coltec may hold against any Entity will vest in Reorganized GST, Reorganized Garrison, and Reorganized Coltec, respectively, and Reorganized GST, Reorganized Garrison, and Reorganized Coltec respectively, will retain and may exclusively enforce any and all such Claims, rights, or causes of action, including Retained Causes of Action, and commence, pursue, and settle the causes of action in accordance with the Plan. Reorganized GST, Reorganized Garrison, and Reorganized Coltec will have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Claims, rights, and causes of action, including Retained Causes of Action, without the consent or approval of any third party and without any further order of the Court.

Unless a Claim or Retained Cause of Action against a Claimant or other Entity is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order, the Debtors expressly reserve such Claim or Retained Cause of Action (including any Unknown Causes of Action) for later adjudication by the Reorganized Debtors. Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or other), or laches will apply to such Claims or Retained Causes of Action upon or after the Confirmation Date or Effective Date of the Plan based on this Disclosure Statement, the Plan, or the Confirmation Order, except where such Claims or Retained Causes of Action have been expressly released in the Plan or other Final Order. In addition, the Debtors, the Reorganized Debtors, and their successors expressly reserve the right to pursue or adopt any Claim alleged in any lawsuit in which the Debtors are defendants or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits.

Except with respect to (i) Claims expressly waived, relinquished, released, compromised, or settled under the Plan, (ii) any Avoidance Actions subject to the Abandonment Order, and (iii) GST Recovery Actions, any Entity that has incurred an obligation to the Debtors (whether on account of services, purchases or sales of goods, or otherwise), or who has received services

15

from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors, should assume that such obligation, transfer, or transaction may be reviewed by the Debtors or Reorganized Debtors, and may, if appropriate, be the subject of an action after the Effective Date, whether or not (1) such Entity has filed a proof of Claim against the Debtors in the Chapter 11 Cases, (2) such Claimant's proof of Claim has been objected to, (3) such Claimant's Claim was included in the Debtors' Schedules, or (4) such Claimant's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as a Disputed Claim, a Contingent Claim, or an Unliquidated Claim.

## 2.4 LIABILITIES OF GST, GARRISON, AND ANCHOR

### 2.4.1 Non-Asbestos Related Liabilities of GST, Garrison, and Anchor

#### 2.4.1.1 Administrative Claims

Coltec asserts a Claim in the approximate amount of $106.3 million for repayment of taxes paid on account of GST's income after the Petition Date. In addition, Bank of America holds a post-petition Administrative Claim for contingent obligations arising from the Existing Debtors' use of Bank of America banking products and certain letters of credit issued on the Existing Debtors' behalf, pursuant to the DIP Release/Cash Collateral Order (Docket No. 1557) (defined below). This Administrative Claim is secured by approximately $3,037,112.00 in Cash held in a BofA account, as of March 31, 2016.

Other Entities also hold various Claims entitled to administrative priority pursuant to Section 503 of the Bankruptcy Code, which the Debtors will continue to pay in the ordinary course of business, including trade debt arising from GST and Garrison's continued operations after the Petition Date, as well as Fee Claims. The Existing Debtors believe they have paid, pursuant to orders of the Bankruptcy Court, all Claims entitled to administrative expense priority pursuant to Section 503(b)(9) of the Bankruptcy Code.

Debtors do not currently believe there will be any Allowed Priority Tax Claims.

#### 2.4.1.2 Secured Claims

Several creditors have asserted relatively small Secured Claims against the Debtors. The most significant is an asserted Secured Claim by Niagara Bank related to financing for a chiller located in GST's Palmyra, New York facility. The Existing Debtors have assumed the contract related to this chiller and therefore believe the Claim has been cured and has been or will be paid in full in the ordinary course of business.

#### 2.4.1.3 Priority Claims

Several creditors have asserted relatively small Priority Claims against the Existing Debtors. Filed Priority Claims total approximately $70,000. The Existing Debtors anticipate they will file objections to many of these Claims on various grounds, including that some are duplicates, some have been paid pursuant to prior orders of the Bankruptcy Court, some are not entitled to priority, and others for other reasons.

#### 2.4.1.4   GST General Unsecured Claims

Creditors have filed in the aggregate approximately $3.7 million in GST General Unsecured Claims (excluding claims the Existing Debtors believe to be duplicates). Debtors anticipate they will object to a number of these Claims for various reasons.

#### 2.4.2   Estimated Liability of GST, Garrison, and Anchor for Asbestos-Related Claims

The validity and value of GST Asbestos Claims have been the most contentious and litigated issues in the Chapter 11 Cases. The Committee and the FCR contended that GST's aggregate liability for present and future GST Asbestos Claims based on mesothelioma alone exceeded $1 billion. GST contended that its liability for such mesothelioma claims was no more than $125 million and that any liability it had for non-mesothelioma claims was *de minimis*.

After a lengthy contested estimation hearing, on January 10, 2014, the Bankruptcy Court entered the Estimation Opinion adopting GST's position and determining that a reasonable and reliable estimate of the amount sufficient to satisfy GST's obligation for all current and future mesothelioma claims is $125 million. The mesothelioma trial and Estimation Opinion is described in greater detail in Section 3.1.7, *infra*. The Committee took the position that the Estimation Opinion was incorrect, interlocutory, and subject to appeal.

No estimate of claims against GST for diseases other than mesothelioma (including lung cancer, other cancers, asbestosis, or other non-malignant conditions) was litigated or has been made by the Bankruptcy Court. The Existing Debtors, Coltec, the Committee, and the FCR have all recognized and agreed that mesothelioma claims account for the bulk of GST's overall liability for GST Asbestos Claims.

Finally, at the Committee's request, with the concurrence of the Debtors, the FCR, and Coltec, the Bankruptcy Court excluded from the scope of the contested estimation proceeding, and thus declined to estimate, the aggregate value of present and future asbestos claims against Anchor and derivative claims, if any, against GST based on Anchor's liabilities. *See* Order Granting Motion of the Official Committee of Asbestos Personal Injury Claimants for Order Clarifying Scope of Estimation to Exclude Claims Against Anchor and Derivative Claims Against Garlock Based on Anchor's Liabilities, Oct. 30, 2012 (Docket No. 2587). GST has never paid a derivative claim based on Anchor's liabilities.[8]

---

[8] All derivative claims against GST, Garrison, and Coltec based on third parties' alleged asbestos liabilities, including such claims based on Anchor's liabilities, are included in the Comprehensive Settlement. Under the Plan, those derivative claims will be subject to the Asbestos Channeling Injunction, and GST, Garrison, and Coltec will be discharged of those claims to the fullest extent provided by law. *But cf.* Plan § 8.6 (providing that "notwithstanding any provision to the contrary, nothing contained in this Plan, any Plan Document, the Confirmation Order, the Bankruptcy Code (including Section 1141 of the Bankruptcy Code), or any other document Filed in the Chapter 11 Cases shall be construed to discharge, enjoin, release, or channel to the Asbestos Trust any liability or obligation of a non-Debtor Entity not derived from that of a Debtor, including, without limitation, any independent liability of a non-Debtor Entity that is not an Affiliate of, successor of, successor-in-interest to, merger partner of, or transferor of assets to a Debtor as of the Petition Date."). No EnPro Affiliate other than GST, Garrison, Coltec, and Anchor is known to have any alleged non-derivative liability for asbestos claims.

### 2.4.3 GST's Asbestos Litigation History

For decades prior to the Petition Date, GST received thousands of claims each year from individuals who alleged they suffered from asbestos-related disease caused in part by GST's products. Since 1975, plaintiffs have named GST in approximately 900,000 asbestos cases. GST has disputed its liability for all of these asbestos claims and has never admitted liability for any claim.

Throughout its history, GST has resolved the vast majority of asbestos claims filed against it by dismissal or settlement rather than by verdict. Out of the 900,000 cases, only approximately 250 cases have resulted in verdicts, the majority of those in GST's favor.

GST also acquired four companies that sold sealing products substantially equivalent to products made and sold by GST, all of which were eventually merged into GST (Belmont Rubber & Packing Co. ("**Belmont**"), Crandall Packing Company, Dealers' Steam Packing Company, and U.S. Gasket Company). Garrison received approximately 8,500 complaints naming Belmont, despite its merger into GST in 1968. Nearly all of these complaints were filed before 2004, and all but 62 also named GST. None of the Belmont claims were resolved by payment, but were resolved only by dismissal or in connection with payments on claims against GST itself.

#### 2.4.3.1 GST's Asbestos-Containing Products

GST's asbestos litigation has principally involved two asbestos-containing sealing products: compressed asbestos sheet gaskets and asbestos packing.

A gasket is a thin piece of material (usually 1/32" to 1/8" thick) used to create a seal between metal surfaces that would otherwise leak, such as a flange where two metal pipes connect, or where a pipeline attaches to equipment like pumps and valves. Compressed asbestos gaskets were manufactured in sheets and reached the consumer in one of two forms: (1) sheet gasket material that often came in rolls out of which the purchaser cut gaskets to size and (2) pre-cut gaskets that the purchaser ordered to requested sizes and shapes either directly from GST or from a gasket supply company that engaged in custom gasket cutting. GST's asbestos gaskets were a mixture of asbestos fibers, curing agents, reinforcing fillers, and elastomers (natural rubber plastic having the elastic qualities of rubber). Although GST offered many styles of non-asbestos gaskets and packing, customers historically needed asbestos gaskets and packing for certain high-temperature or corrosive environments.

Packing is braided yarn that is wrapped around the shafts of valves and other equipment to prevent leaks. GST asbestos packing was made with asbestos yarn impregnated and coated with lubricants, such as Teflon or graphite.

### 2.4.4 Pending GST Asbestos Claims

As of the Petition Date, there were approximately 95,000 asbestos claims pending against GST in state and federal courts across the country. Approximately 82,000 of these claims alleged non-malignant conditions or did not indicate an alleged disease or condition. Approximately 13,000 claims alleged mesothelioma, lung cancer, or other cancer.

18

On April 10, 2015, the Bankruptcy Court entered a bar date order, establishing October 6, 2015 as the deadline for filing proofs of claim for GST Asbestos Claims based on an asbestos-related disease diagnosed on or before August 1, 2014 for which lawsuits against any defendant or claims against any trust were filed on or before August 1, 2014.[9] Proofs of claim for GST Asbestos Claims arising after August 1, 2014 were permitted but not required to be filed.

Proofs of claim for approximately 170,260 current GST Asbestos Claims were filed. 129,525 of these were cast as ballots on the Second Amended Plan (in which claimants specified their asbestos-related diseases) and 40,735 were filed on Official Form 10 (in which claimants were not required to provide disease information, but sometimes chose to provide it).

Of the ballot claims, 8,749 alleged mesothelioma; 15,869 alleged lung cancer; 855 alleged laryngeal cancer; 103,989 alleged asbestosis; and 63 did not specify an alleged disease.

| Disease | Class 4 ballot | B-10 POC | Total |
|---|---|---|---|
| Mesothelioma | 8,749 | 1,236 | 9,985 |
| Lung cancer | 15,869 | 3,235 | 19,104 |
| Other cancer | 855 | 1,886 | 2,741 |
| Non-malignant | 103,989 | 28,865 | 132,854 |
| Unknown | 63 | 5,513 | 5,576 |
| **Total** | **129,525** | **40,735** | **170,260** |

In addition, certain pending GST Asbestos Claims against GST are the subject of settlements or judgments. Prior to the Petition Date, GST entered into settlement agreements with certain GST Asbestos Claimants that were not paid prior to the Petition Date. Many assertedly settled GST Asbestos Claims were identified on Debtors' schedules of creditors that were filed in these cases. Additionally, as further detailed in Section 4.2 below, the Court entered an order requiring that settled GST Asbestos Claimants (unless scheduled and not disputed) file proofs of claim in these cases. Excluding duplicates and other administrative filing errors, and considering both scheduled settled GST Asbestos Claims and those asserted through filed proofs of claim, approximately 2,357 settled GST Asbestos Claims were asserted against GST asserting liability totaling $17,094,274.

The Debtors' review of asserted Settled GST Asbestos Claims to date has identified approximately 209 Settled GST Asbestos Claims claiming $4,830,900 in payments that are not disputed by Debtors. During the course of these cases, approximately 632 Settled GST Asbestos Claimants claiming $598,921 in payments withdrew their claims or their counsel indicated that the claims would be withdrawn or were not valid. Presently, approximately 1,516 claims asserting settlements totaling $11,664,464 are the subject of Debtors' objections and are disputed.

Finally, three judgments that were entered against GST prior to the Petition Date remain unsatisfied.

---

[9]     *See* Order Approving Disclosure Statement and Establishing Asbestos Claims Bar Date and Procedures For Solicitation, dated April 10, 2015 (Docket No. 5134).

The first, *Garlock Sealing Technologies LLC v. Clephas* is a judgment from the Jefferson Circuit Court in the Commonwealth of Kentucky, dated November 27, 2007, in the amount of $150,125.00. GST noticed an appeal of the judgment, and the case was stayed when GST filed its Petition. The appeal remains unresolved, pending before the Kentucky Court of Appeals. GST posted a bond in the amount of $204,180 to stay execution of the judgment while the case was on appeal. Should the judgment be upheld, GST's liability on the judgment, including post-judgment interest and excluding costs, will total (as of June 1, 2016) approximately $394,556.13.

The second judgment, *Garlock Sealing Technologies LLC v. Torres*, is a judgment from the District Court of Cameron County, Texas in the amount of $1,300,000. GST noticed an appeal of the judgment, and the case was stayed when GST filed its Petition. GST's motion to lift the stay to prosecute its appeal was denied by the Bankruptcy Court. The appeal remains unresolved, pending before the Texas Court of Appeals, 13th District. GST did not post a bond in the matter. Should the judgment be upheld, GST's liability on the judgment, including post-judgment interest and excluding costs, as of June 1, 2016, was approximately $1,826,477.21.

The third judgment, *Garlock Sealing Technologies LLC v. Dexter*, is a judgment from the Marshall Circuit Court in the Commonwealth of Kentucky dated February 22, 2006 in the amount of $874,507.33. GST appealed the judgment, but the judgment was affirmed. Coltec purchased the judgment from the plaintiff and now has a claim against GST for the amount of the bond ($1.1 million) that is accruing interest at 11% per annum.

Of the claimants holding these judgment claims, only the *Torres* claimants appear to have filed proofs of claim under the October 6, 2015 bar date. As described above, to be paid by the Asbestos Trust, Pre-Petition Judgment GST Asbestos Claims must have filed a proof of claim on or before the Asbestos Claims Bar Date (or else obtain relief from the Bankruptcy Court). Moreover, the Asbestos Trust will have the right to appeal those judgments, which will only be paid as judgments if the Asbestos Trust decides not to appeal or the appeal is unsuccessful. The holders of these Claims may, however, pursue the Claims as non-judgment Claims subject to all applicable conditions prescribed by the CRP, including the requirement that they previously filed a proof of claim on or before the Asbestos Claims Bar Date (or else obtain relief from the Bankruptcy Court). Judgment claims will also be subject to a payment percentage, calculated as described in Section 3.5 of the CRP.

## 2.5 ASSETS AND LIABILITIES OF COLTEC

### 2.5.1 Assets and Liabilities of Coltec

As discussed in Section 2.2.3.2 *Results of Coltec's Combined Business Operations*, *supra*, Coltec either directly (through its divisions) or indirectly (through its direct and indirect foreign and domestic subsidiaries) owns all of the business operations of EnPro other than certain assets and liabilities held directly by the parent entity.

The following table presents condensed consolidating balance sheets (unaudited) as of March 31, 2016 (the "**Consolidating Balance Sheet**") for: (i) the Parent, (ii) Coltec and its direct and indirect subsidiaries (excluding the Existing Debtors and their subsidiaries) on a combined

basis and (iii) the eliminations necessary to arrive at the consolidated results of EnPro on a consolidated basis.

The Consolidating Balance Sheet is not intended to reflect a fair market value of Coltec and its subsidiaries or present the financial condition thereof for any purpose other than to set forth certain information regarding the combined material assets and liabilities of Coltec and its direct and indirect foreign and domestic subsidiaries (other than the Existing Debtors and their subsidiaries) for purposes of this Disclosure Statement.

**CONDENSED CONSOLIDATING BALANCE SHEETS (UNAUDITED)**
**As of March 31, 2016**
**(in millions)**

| | EnPro Industries, Inc. | Coltec and Certain of Its Subsidiaries* | Remaining Subsidiaries of Coltec* | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current assets | | | | | |
| Cash and cash equivalents | $ — | $ — | $ 110.8 | $ — | $ 110.8 |
| Accounts receivable, net | — | 150.6 | 64.7 | — | 215.3 |
| Intercompany receivables | — | 9.8 | 8.3 | (18.1) | — |
| Inventories | — | 125.6 | 54.9 | — | 180.5 |
| Prepaid expenses and other current assets | 5.8 | 11.9 | 11.4 | (4.7) | 24.4 |
| Total current assets | 5.8 | 297.9 | 250.1 | (22.8) | 531.0 |
| Property, plant and equipment, net | 0.2 | 136.2 | 76.3 | — | 212.7 |
| Goodwill | — | 167.6 | 28.8 | — | 196.4 |
| Other intangible assets | — | 158.4 | 27.0 | — | 185.4 |
| Investment in GST | — | 236.9 | — | — | 236.9 |
| Intercompany receivables | 35.6 | 10.0 | 1.4 | (47.0) | — |
| Investment in subsidiaries | 673.9 | 248.0 | — | (921.9) | — |
| Other assets | 15.9 | 156.8 | 18.9 | — | 191.6 |
| Total assets | $ 731.4 | $ 1,411.8 | $ 402.5 | $ (991.7) | $ 1,554.0 |
| **LIABILITIES AND EQUITY** | | | | | |
| Current liabilities | | | | | |
| Short-term borrowings from GST | $ — | $ — | $ 27.5 | $ — | $ 27.5 |
| Notes payable to GST | — | 295.9 | — | — | 295.9 |
| Current maturities of long-term debt | — | 0.1 | — | — | 0.1 |
| Accounts payable | 1.3 | 52.1 | 34.6 | — | 88.0 |
| Intercompany payables | — | 8.3 | 9.8 | (18.1) | — |
| Accrued expenses | 18.3 | 46.1 | 51.1 | (4.7) | 110.8 |
| Total current liabilities | 19.6 | 402.5 | 123.0 | (22.8) | 522.3 |
| Long-term debt | 293.5 | 120.6 | — | — | 414.1 |
| Intercompany payables | — | 36.8 | 10.2 | (47.0) | — |
| Other liabilities | 11.9 | 178.0 | 21.3 | — | 211.2 |

21

| | | | | | |
|---|---|---|---|---|---|
| Total liabilities | 325.0 | 737.9 | 154.5 | (69.8) | 1,147.6 |
| Shareholders' equity | 406.4 | 673.9 | 248.0 | (921.9) | 406.4 |
| Total liabilities and equity | $ 731.4 | $ 1,411.8 | $ 402.5 | $ (991.7) | $ 1,554.0 |

*Excludes the Existing Debtors and their subsidiaries

### 2.5.1.1 Long-Term Debt

*Senior Notes*. In September 2014, EnPro completed an offering of $300 million aggregate principal amount of 5.875% Senior Notes due 2022 (the "**Senior Notes**"). The Senior Notes were issued net of an original issue discount of $2.4 million. The Senior Notes are unsecured, unsubordinated obligations of EnPro that mature on September 15, 2022.

While the Senior Notes are a direct obligation of EnPro (and reflected as "Long-Term Debt" of EnPro in the Consolidating Balance Sheet), the Senior Notes are fully and unconditionally guaranteed on an unsecured, unsubordinated, joint and several basis by Coltec and certain of its subsidiaries (which do not include the Existing Debtors or their subsidiaries).

*Revolving Credit Facility*. EnPro and Coltec have a $300 million senior secured revolving credit facility (the "**Revolving Credit Facility**"), as reflected in the "Long-Term Debt" of Coltec and certain of its subsidiaries in the Consolidating Balance Sheet. Borrowings under the Revolving Credit Facility bear interest at an annual rate of LIBOR plus 2% or base rate plus 1%, although the interest rates under the Revolving Credit Facility are subject to incremental increases or decreases based on a consolidated total leverage ratio. In addition, a commitment fee accrues with respect to the unused amount of the Revolving Credit Facility.

EnPro and Coltec are the permitted borrowers under the Revolving Credit Facility. Each of the domestic, consolidated subsidiaries of EnPro (other than the Existing Debtors and their respective subsidiaries, for so long as they remain unconsolidated for financial reporting purposes) are required to guarantee the obligations of EnPro and Coltec under the Revolving Credit Facility, and each of the existing domestic, consolidated subsidiaries (which does not include the domestic entities of the Existing Debtors) has provided such a guarantee.

Borrowings under the Revolving Credit Facility are secured by a first-priority lien on certain of the assets of Coltec and its subsidiaries.

### 2.5.1.2 Affiliate Notes

As described in detail in Section 2.3.3.1, supra, in 2005 Coltec issued the Coltec Note to GST and Stemco TX issued the Stemco Note to GST. The Coltec Note and the Stemco Note are reflected, on a combined basis, as "Notes Payable to GST" in the Consolidating Balance Sheet.

### 2.5.1.3 Investment in Subsidiaries

The Consolidating Balance Sheet reflects investments in subsidiaries of the respective combined group using the equity method of accounting. Coltec's investment in the membership interests of GST is reflected as "Investment in GST" on such basis.

#### 2.5.1.4  Coltec Insurance

Coltec purchased a number of primary and excess general liability insurance policies that were in effect from December 31, 1950 and thereafter. The policies provide coverage for "occurrences" happening during the policy periods and cover losses associated with product liability claims against Coltec and certain of its subsidiaries. As previously described, the Available Shared Insurance is the remaining coverage in the portion of the block of these insurance policies that included GST as an insured. That block ran from January 1, 1976, the year after Coltec purchased GST, to July 1, 1984, when Coltec's insurance policies began excluding asbestos-related losses from coverage (the "**Garlock Coverage Block**"). *See* Section 2.3.3 Insurance, *supra*.  For insurance policies purchased by Coltec prior to January 1, 1976 ("**Pre-Garlock Coverage Block**"), GST was not an insured because it was not a Coltec subsidiary then. The aggregate face amount of primary and excess coverage in the Pre-Garlock Coverage Block is $308,366,000.

The table below shows policy periods and total products hazard aggregate limits of each primary policy in the Pre-Garlock Coverage Block.

**Primary Policies**
**1951-1974**

| Carrier | Policy Number | Begin Date | End Date | Total Limits |
|---|---|---|---|---|
| American Motorists Ins. Co. (insolvent) | OYM 199451 | 12/31/1950 | 12/31/1951 | $100,000 |
| American Motorists Ins. Co. | 1YM 202149 | 12/31/1951 | 12/31/1952 | $100,000 |
| American Motorists Ins. Co. | 2YM 205156 | 12/31/1952 | 12/31/1953 | $1,000,000 |
| American Motorists Ins. Co. | 3YM 208198 | 12/31/1953 | 12/31/1954 | $1,000,000 |
| American Motorists Ins. Co. | 4YM 208198 | 12/31/1954 | 12/31/1955 | $1,000,000 |
| American Motorists Ins. Co. | 5YM 208198 | 12/31/1955 | 12/31/1956 | $1,000,000 |
| American Motorists Ins. Co. | 6YM 208198 | 12/31/1956 | 12/31/1957 | $1,000,000 |
| American Motorists Ins. Co. | 7YM 208198 | 12/31/1957 | 12/31/1958 | $1,000,000 |
| American Motorists Ins. Co. | 8YM 208198 | 12/31/1958 | 12/31/1959 | $1,000,000 |
| Zurich Insurance Co. | 8055900 | 7/1/1959 | 7/1/1960 | $1,000,000 |
| Zurich Insurance Co. | 8263000 | 7/1/1960 | 7/1/1961 | $1,000,000 |
| Zurich Insurance Co. | 8306800 | 7/1/1961 | 7/1/1962 | $2,000,000 |
| Zurich Insurance Co. | 8261650 | 7/1/1962 | 7/1/1963 | $2,000,000 |
| Zurich Insurance Co. | 8359650 | 7/1/1963 | 7/1/1964 | $2,000,000 |
| Zurich Insurance Co. | 8448350 | 7/1/1964 | 7/1/1965 | $2,000,000 |
| Insurance Company of North America | LAB 16365 | 7/1/1965 | 7/1/1966 | $2,000,000 |
| Insurance Company of North America | LAB 16384 | 7/1/1966 | 7/1/1967 | $10,000,000 |
| Insurance Company of North America | LAB 21616 | 7/1/1967 | 7/1/1968 | $10,000,000 |
| Insurance Company of North America | LAB 21641 | 7/1/1968 | 7/1/1971 | $30,000,000 |
| Insurance Company of North America | ALB 47227 | 7/1/1971 | 7/1/1973 | $20,000,000 |
| Insurance Company of North America | ALB 47272 | 7/1/1973 | 7/1/1974 | $10,000,000 |
| Aetna Casualty & Surety Co. | 01 AL 246450 SCA | 7/1/1974 | 7/1/1975 | $1,000,000 |
| **Total Excess Limits** | | | | **$100,200,000** |

23

The following table shows policy periods and total products hazard aggregate limits of each excess insurance policy in the Pre-Garlock Coverage Block.

Excess Policies
1965-1974

| Carrier | Policy Number | Begin Date | End Date | Total Limits | Attachment Point |
|---|---|---|---|---|---|
| Appalachian Insurance Co. | XL 11063 | 7/19/1966 | 7/1/1969 | $30,000,000 | $10,000,000 |
| Citizens Casualty Co. | XP 8024 | 8/4/1966 | 7/1/1967 | $5,000,000 | $20,000,000 |
| London Companies And Lloyds | 526-577454 | 7/1/1967 | 7/1/1968 | $5,000,000 | $20,000,000 |
| London Companies And Lloyds | 605/12138 | 7/1/1968 | 7/1/1969 | $5,000,000 | $20,000,000 |
| Home Insurance Company (insolvent) | HEC 9 30 48 10 | 12/9/1968 | 7/1/1971 | | $25,000,000 |
| London Companies And Lloyds | 410/12422 | 7/1/1969 | 8/1/1972 | $30,000,000 | $10,000,000 |
| North Star Reinsurance Corp. | NSX 7955 | 7/1/1969 | 7/1/1972 | $15,000,000 | $20,000,000 |
| *Insurance Co. Of North America | XPL 9166 | 7/1/1969 | 7/1/1970 | $10,000,000 | $35,000,000 |
| Home Insurance Company (insolvent) | HEC 9 91 99 79 | 7/1/1971 | 7/1/1974 | | $25,000,000 |
| Aetna Casualty & Surety Co. | 01 XN 265 WCA | 7/1/1972 | 7/1/1975 | $44,166,000 | $10,000,000 |
| Aetna Casualty & Surety Co. | 01 XS 1860 SCA | 7/1/1974 | 7/1/1975 | $9,000.000 | 1,000,000 |
| Aetna Casualty & Surety Co. | 01 XN 590 SCA | 7/1/1974 | 7/1/1975 | $5,000,000 (quota share) | $10,000,000 |
| North River | XS 3704 | 2/4/1975 | 7/1/1975 | $50,000,000 | $51,000,000 |
| **Total Excess Limits** | | | | **$208,166,000** | |

Because Coltec has not made an indemnity payment for a Coltec Asbestos Claim, it has not made an indemnity claim against a policy in the Pre-Garlock Coverage Block. Coltec did obtain reimbursement from certain primary carriers within that block for approximately $7 million in defense costs Coltec incurred defending Coltec Asbestos Claims. The payment of those defense costs did not erode any policy limits.

Many of the Pre-Garlock Coverage Block insurance carriers also issued policies in the Garlock Coverage Block. Prior to these Chapter 11 Cases, proceeds from such carriers' Garlock Coverage Block policies were used to pay a significant portion of the indemnity and defense payments made to resolve GST Asbestos Claims. To obtain continued funding of losses related to GST Asbestos Claims, GST and Coltec periodically entered into settlement agreements with insurance carriers between 1981 and 2004. A 1993 settlement between Coltec, Garlock, and INA resolved claims by Garlock under its own excess liability policies with INA, which were in effect from 1962-65. In exchange for payment of those limits (and some defense costs), Coltec released INA from asbestos claims under all "INA policies," which were broadly defined to include policies INA had issued to Coltec in the Pre-Garlock Coverage Block. In addition, GST and Coltec settled with the London Market Insurers to resolve coverage under policies such carriers issued or subscribed in the Garlock Coverage Block, which also had the effect of releasing coverage in the Pre-Garlock Coverage Block. The settlement agreements with INA and the London Market Insurers include indemnity provisions that purport to require Coltec to defend and indemnify the settling carriers for specified post-settlement claims that might be asserted by third parties against such carriers relating to settled insurance policies. INA issued $82 million of approximately $100.2 million of total primary insurance in the Pre-Garlock Coverage Block but any rights to indemnity INA may have against Coltec are limited to $9.75 million. The London Market Insurers issued $40 million of approximately $208 million of the total excess coverage.

24

The Debtors contend that any indemnity right against Coltec claimed by a settling carrier is a Coltec Asbestos Claim.

By virtue of the following corporate history, SPX Corporation ("**SPX**") succeeded to the asbestos liabilities and insurance rights related to the Fairbanks Morse Pump business.

- Prior to 1985, Fairbank Morse Pump was a division of Colt Industries Operating Corp. ("**CIOC**"), which was a wholly-owned subsidiary of Colt Industries, Inc., which later changed its name to Coltec Industries Inc.

- In 1985, CIOC sold the assets of the Fairbanks Morse Pump Division to FMPD Purchasing Corporation, which was subsequently renamed Fairbanks Morse Pump Corporation. Under the asset purchase agreement, Fairbanks Morse Pump Corporation assumed Fairbank Morse Pump's product liabilities (including those resulting from the pre-closing sale of asbestos-containing pump products) and acquired the right to secure defense and indemnity coverage under Coltec's pre-closing insurance policies with respect to the acquired liabilities. After the asset sale, CIOC merged with and into Coltec, with Coltec surviving the merger.

- In 1995, Fairbanks Morse Pump Corporation merged with and into a subsidiary of General Signal Corporation ("**General Signal**"), thereby becoming a wholly-owned subsidiary of General Signal. The surviving subsidiary of General Signal continued to operate under the name Fairbanks Morse Pump and retained products liabilities arising from the sale of pre-closing products and the right to claim insurance coverage for such liabilities under general liability policies issued to Coltec.

- In 1997, Fairbanks Morse Pump Corporation, General Signal, and certain other affiliates sold substantially all the assets and liabilities of the Fairbanks Morse Pump business to Pentair Inc. ("**Pentair**"). General Signal retained Fairbanks Morse Pump's asbestos liabilities and insurance rights for products sold prior to 1997.

- In 1998, SPX acquired General Signal and in 2003 General Signal merged with SPX.

Because neither Fairbanks Morse Pump Corporation, General Signal, SPX, nor Pentair is party to any settlement agreement resolving rights against policies in the Pre-Garlock Coverage Block, any rights that SPX or Pentair may have against the limits remaining under such policies are not affected by any such agreements.

Prior to these Chapter 11 Cases, SPX received Coltec Asbestos Claims related to Fairbanks Morse Pump, either directly or through Pentair. In light of SPX's rights to the Shared Available Insurance, Garrison assumed the defense of Fairbanks Morse Pump cases in order to preserve coverage in the Garlock Coverage Block for GST Asbestos Claims. In doing so, Garrison obtained dismissals of Fairbanks Morse Pump claims without payment, often as part of a settlement of GST Asbestos Claims.

To continue protecting the Available Shared Insurance during these Chapter 11 Cases, the Existing Debtors filed an adversary proceeding complaint and a motion for preliminary

injunction seeking an order barring claimants from pursuing asbestos claims against, among other parties, Coltec, any Non-Debtor Affiliate, or any successor to the Fairbanks Morse Pump division. The Bankruptcy Court issued the requested injunction. *See* Section 3.1.3 Adversary Proceeding Obtaining Stay of Asbestos-Related Litigation Against Non-Debtor Affiliates, *infra*.

Under the Comprehensive Settlement, Coltec and the Existing Debtors retain ownership of all of their rights respecting insurance policies, including any rights they may have to seek reimbursement under the policies for the $480 million in aggregate contributions they make to the Trust under the Plan. Coltec and the Existing Debtors have the sole right to sue for and compromise claims against insurance carriers. Coltec and the Existing Debtors are entitled to collect, as reimbursement for their pre-petition asbestos claim payments or contributions to the Trust, 100% of (a) the full aggregate amount of any settlements and judgments related to insurance policies in the Garlock Coverage Block and (b) the first $25 million of any settlements and judgments related to insurance policies in the Pre-Garlock Coverage Block. Amounts Coltec may collect in excess of $25 million related to insurance policies in the Pre-Garlock Coverage Block will be shared equally by Coltec and the Trust. In addition, in connection with any compromise or settlement with an Asbestos Insurance Entity or successor Entity before entry of the Confirmation Order, the Debtors and Reorganized Debtors will, subject to the right of the Committee and FCR to object, add such Asbestos Insurance Entity to Exhibit E and/or successor Entity (including SPX and Pentair) to Exhibit D. The Committee and FCR will have the right to object to addition of an Asbestos Insurance Entity to Exhibit E or successor Entity to Exhibit D if they reasonably believe in good faith that (a) the terms of such compromise or settlement, (b) the addition of such Asbestos Insurance Entity to Exhibit E or successor Entity to Exhibit D, or (c) the extension of the Asbestos Channeling Injunction to such Asbestos Insurance Entity or successor Entity would (i) result in the channeling or transfer to, or assumption by, the Asbestos Trust of any Claims, Demands, duties, obligations, or liabilities (A) that are not Asbestos Claims or Asbestos Trust Expenses or (B) that are not otherwise contemplated to be the responsibility of the Asbestos Trust under this Plan; or (ii) result in or impose undue burden or expense on the administration of the Asbestos Trust or the Asbestos Trust Assets. Before making any such addition to Exhibit D or Exhibit E, the Debtors are required to disclose to the FCR and the Asbestos Claimants Committee the terms of the underlying compromise or settlement and sufficient information concerning the relevant Asbestos Insurance Entity or successor Entity to enable the FCR and the Asbestos Claimants Committee to evaluate the proposed addition under the criteria specified in the preceding sentence. The Bankruptcy Court will hear and determine any such objection.

### 2.5.1.5 Other Assets and Liabilities

For additional information regarding the consolidated assets and liabilities of EnPro, please see the EnPro Quarterly Report on Form 10-Q for the three months ended March 31, 2016 and the EnPro Annual Report on Form 10-K for the year ended December 31, 2015. These documents are available online at http://www.enproindustries.com/sec-filings.

### 2.5.2 Asbestos Claims Against Coltec Industries Inc

Claimants first began suing Coltec in approximately 1992. Plaintiffs named either Coltec or businesses for whose conduct Coltec or one of its predecessors was alleged to be responsible,

including "Fairbanks Morse," "Fairbanks Morse Engine," "Fairbanks Morse Pump," "Quincy Compressor," "Central Moloney," "France Compressor," "Delavan," and "Farnam." Though Coltec received tens of thousands of such claims, and has spent approximately $7.9 million in defense costs on claims naming Coltec or Coltec-related businesses, Coltec has never made an indemnity payment on an asbestos claim. Any Asbestos Claims against Coltec or any other Asbestos Protected Parties involving allegations about these businesses—or any other businesses or products for which Coltec is alleged to be responsible, including derivative GST Asbestos Claims—are in Class 5, will be channeled to the Asbestos Trust, and will be subject to the Asbestos Channeling Injunction.

*Fairbanks Morse.* Plaintiffs named "Fairbanks Morse" or "Fairbanks Morse Engine" ("**FME**") in complaints, alleging exposure to asbestos from components, principally gaskets, in engines and locomotives. Some of these gaskets were likely manufactured by GST, although not all of them were.

The Fairbanks Morse business was founded in the nineteenth century. From the 1930s, the business manufactured engines at its Beloit, WI plant. For example, during World War II, Fairbanks Morse engines were used in submarines for the U.S. Navy, as well as in destroyers and landing ships. Fairbanks Morse engines were also used in power plants and locomotives.

Coltec's predecessor acquired control over Fairbanks Morse & Co. in 1958, and Coltec owned it as a subsidiary until 1986, when the successor to Fairbanks Morse merged with Coltec (then known as Colt Industries Inc.). Fairbanks Morse is currently a Coltec division. As part of the Coltec Restructuring, Fairbanks Morse will become a separate legal entity and will not continue as a division of Coltec.

The following table summarizes the total number of asbestos claims naming FME for each disease category (where available); the number of those claims that were dismissed; and the number of those claims that are still open:

| Alleged disease | Dismissed | Open | Total |
|---|---|---|---|
| Mesothelioma | 202 | 122 | 324 |
| Lung Cancer | 139 | 42 | 181 |
| Other Cancer | 35 | 3 | 38 |
| Non-malignant | 5,023 | 1,346 | 6,369 |
| No specified disease | 6,932 | 381 | 7,313 |
| **Total** | **12,331** | **1,894** | **14,225** |

No indemnity was ever paid for an FME asbestos claim. The FME claims were resolved only by dismissal or in connection with payments on GST asbestos claims. About two-thirds of the FME claims also named GST.

*Fairbanks Morse Pump.* Plaintiffs named "Fairbanks Morse Pump" ("**FMP**") alleging exposure to asbestos from components in pumps, principally gaskets and packing. Some of the gaskets and packing were likely manufactured by GST, although not all of them were. The Fairbanks Morse business described above also had a pump division, which manufactured water-based pump systems in Kansas City, KS. The Fairbanks Morse business was in a Coltec

27

subsidiary in 1985 when, as described in more detail above in Section 2.5.1.4, that subsidiary sold the assets of the FMP division to FMPD Purchasing Corporation (renamed Fairbanks Morse Pump Corporation ("**FMPC**")). Fairbanks Morse Pump Corporation assumed FMP's product liabilities (including any resulting from the pre-closing sale of asbestos-containing pump products), and obtained rights against Coltec's insurance. The Coltec subsidiary merged with Coltec in 1986. FMPC was acquired by General Signal Corporation in 1995, which sold the FMP assets to Pentair Inc. in 1997, while retaining any liability for FMP asbestos claims. SPX acquired General Signal in 1998 and merged with General Signal in 2003, retaining any liabilities for FMP asbestos claims and corresponding rights against Coltec insurance. Garrison continued to receive and defend the FMP asbestos claims.

The following table summarizes the total number of claims naming FMP for each disease category (where available); the number of those claims that were dismissed; and the number of those claims that are still open:

| Alleged disease | Dismissed | Open | Total |
|---|---|---|---|
| Mesothelioma | 796 | 707 | 1,503 |
| Lung Cancer | 436 | 341 | 777 |
| Other Cancer | 198 | 93 | 291 |
| Non-malignant | 8,272 | 3,190 | 11,462 |
| No specified disease | 15,043 | 1,451 | 16,494 |
| **Total** | **24,745** | **5,782** | **30,527** |

No indemnity was ever paid for an FMP asbestos claim. The FMP claims were resolved only by dismissal or in connection with payments on GST asbestos claims. Over three-fourths of the FMP claims also named GST.

*Quincy Compressor.* Plaintiffs named "Quincy Compressor" ("**Quincy**"), alleging exposure to asbestos from components in compressors, principally gaskets. Some of those gaskets were likely manufactured by GST, although not all of them were.

Coltec's predecessor acquired Quincy Inc in 1966, and the successor of that subsidiary eventually merged into Coltec, with Quincy thereafter operated as a division of Coltec. In December 2009, Coltec sold the assets of the Quincy division to Fulcrum Acquisition LLC, retaining any liability for asbestos claims.

The following table summarizes the total number of asbestos claims naming Quincy for each disease category (where available); the number of those claims that were dismissed; and the number of those claims that are still open:

| Alleged disease | Dismissed | Open | Total |
|---|---|---|---|
| Mesothelioma | 40 | 34 | 74 |
| Lung Cancer | 41 | 46 | 87 |
| Other Cancer | 16 | 6 | 22 |
| Non-malignant | 1,970 | 201 | 2,171 |
| No specified disease | 5,355 | 129 | 5,484 |

| Total | 7,422 | 416 | 7,838 |

No indemnity was ever paid for a Quincy asbestos claim. The Quincy claims were resolved only by dismissal or in connection with payments on GST asbestos claims. Over 40% of the Quincy claims also named GST.

*Central Moloney.* According to Garrison's database, plaintiffs named "Central Moloney" as a defendant in three cases. Garrison believes the suits alleged that transformers Central Moloney manufactured contained asbestos gaskets. At certain points in time, Coltec or its predecessors operated a division named Central Moloney Transformer or owned a subsidiary named Central Transformer Corporation, Central Transformer Inc, or Central Moloney Inc.

No indemnity was ever paid for a Central Moloney asbestos claim. The three claims remain open, according to Garrison's records. Two of the three claims also name GST.

*France Compressor.* Plaintiffs have named "France Compressor" as a defendant, alleging exposure to asbestos from components in compressors. Divisions named France Products and France Compressor Products were, at various times, operated by GST, and then after 1995, as a subsidiary of Coltec. In fact, the various entities or businesses known as France Compressor made parts for compressors, not compressors, and never marketed or manufactured any asbestos-containing products.

According to Garrison's database, plaintiffs named "France Compressor" 47 times in asbestos litigation, all in 1994, 1995, or 2000. Five of the suits alleged lung cancer, forty alleged non-malignant conditions, and two did not specify an alleged disease. According to the database, 25 of the claims remain open. No indemnity was ever paid for a France Compressor asbestos claim, and the claims were resolved only by dismissal or in connection with payments on asbestos claims against GST. All of the suits named GST as well.

*Delavan.* According to Garrison's database, plaintiffs named "Delavan" (or sometimes "Delevan" or "Delavan Instruments") collectively 3,711 times, all between 1999 and 2002. The allegations in these lawsuits appear to have involved equipment that allegedly had asbestos-containing components. At certain points in time, Coltec or its predecessors operated divisions named Delavan Gas Turbine Products, Delavan Spray, Delavan-Carroll, Delavan Steel Treating and Delavan Power Generation and owned subsidiaries named Delavan Inc, Delavan-Carroll Inc., Delavan-Delta, Inc., and Delavan Spray, LLC.

The following table summarizes the number of claims naming Delavan for each disease category (where available); the number of those claims that were dismissed; and the number of those claims that are still open:

| Alleged disease | Dismissed | Open | Total |
|---|---|---|---|
| Mesothelioma | 16 | 10 | 26 |
| Lung Cancer | 19 | 11 | 30 |
| Other Cancer | 11 | 1 | 12 |
| Non-malignant | 1,077 | 584 | 1,661 |
| No specified disease | 1,779 | 152 | 1,931 |

29

| | | Total | 2,902 | 758 | 3,660 |
|---|---|---|---|---|---|

No indemnity was ever paid for a Delavan asbestos claim, and the claims were resolved only by dismissal or in connection with payments on asbestos claims against GST. All but 70 of the suits named GST as well.

*Farnam.* According to Garrison's database, plaintiffs have named "Farnam" as a defendant 209 times, all in 1994, 2003, and 2004. Garrison believes the claims alleged Farnam was a regional distributor of asbestos-containing products, including gaskets, or manufactured asbestos-containing gaskets. At certain points in time, Coltec or its predecessors operated a division named Farnam Sealing Systems or owned a subsidiary named F. D. Farnam Co., F.D. Farnam Inc, or Farnam Sealing Systems Inc.

The following table summarizes the number of claims naming Farnam for each disease category (where available); the number of those claims that were dismissed; and the number of those claims that are still open:

| Alleged disease | Dismissed | Open | Total |
|---|---|---|---|
| Mesothelioma | 0 | 0 | 0 |
| Lung Cancer | 8 | 0 | 8 |
| Other Cancer | 5 | 1 | 6 |
| Non-malignant | 169 | 21 | 190 |
| No specified disease | 0 | 5 | 5 |
| Total | 182 | 27 | 209 |

No indemnity was ever paid for a Farnam asbestos claim, and the claims were resolved only by dismissal or in connection with payments on GST asbestos claims. All but one of the suits named GST as well.

*Coltec or EnPro.* Finally, plaintiffs from time to time named Coltec or EnPro in complaints directly, usually without any particular product allegations, but presumably on the basis of allegations involving either GST or one or more of the businesses listed above. EnPro itself has never manufactured or sold any asbestos-containing products. The following table summarizes the number of claims naming Coltec or EnPro rather than one of the businesses above for each disease category (where available), the number of those claims that were dismissed; and the number of those claims that are still open:

| Alleged disease | Dismissed | Open | Total |
|---|---|---|---|
| Mesothelioma | 428 | 314 | 742 |
| Lung Cancer | 864 | 639 | 1,503 |
| Other Cancer | 608 | 74 | 682 |
| Non-malignant | 10,822 | 11,377 | 22,199 |
| No specified disease | 44,288 | 4,729 | 49,017 |
| Total | 57,010 | 17,133 | 74,143 |

30

No indemnity was ever paid for an asbestos claim against Coltec or EnPro, and the claims were resolved only by dismissal or in connection with payments on GST asbestos claims. More than 85% of the suits named GST as well.

For purposes of the Plan, claimants who allege and can establish contact as required by the CRP with asbestos-containing components of any of the products of Fairbanks Morse Engine, Fairbanks Morse Pump, Quincy Compressor, Central Moloney, France Compressor, Delavan, Farnam, or any other Coltec business operation will be able to establish Coltec/GST Product Contact as defined by the CRP. Such claimants will be entitled to present only a single claim for payment, however, and not multiple claims (and will not receive any additional payment on account of any contact with GST asbestos-containing products), just as GST Asbestos Claimants will be entitled to present only a single claim for payment even if they also had contact with Coltec products.

### 2.5.3 Coltec Restructuring and Assets and Liabilities of Filing Entity OldCo, LLC

The Coltec Restructuring is an essential part of the Comprehensive Settlement that was carefully negotiated and vetted by the Plan Proponents prior to entering into the Comprehensive Settlement. The restructuring is necessary to an expeditious implementation of the Comprehensive Settlement and to avoid disruption and damage to EnPro's businesses. The Comprehensive Settlement would not have been reached and cannot be consummated without the Coltec Restructuring. If Coltec Industries Inc were to file for Chapter 11 reorganization without first consummating the Coltec Restructuring, it would not provide any additional compensation to pay Asbestos Claims under the Plan, and Coltec would not have agreed to the Comprehensive Settlement absent agreement that the Coltec Restructuring would occur.

As explained in more detail following, the Coltec Restructuring involves (i) a contribution of an operating division of Coltec Industries Inc, *Fairbanks Morse*, to a new, wholly-owned subsidiary of Coltec Industries Inc and, subsequently, (ii) the merger of Coltec Industries Inc with and into a new wholly-owned indirect subsidiary of EnPro, OldCo, LLC, a North Carolina limited liability company and (iii) a distribution of certain assets and liabilities of the former Coltec Industries Inc (including all of the ownership interests in the former subsidiaries of Coltec Industries Inc as acquired in the merger but excluding the Learning System assets and operations and the Garrison Equity Interests) to a new, wholly-owned direct subsidiary of EnPro, New Coltec, Inc., a North Carolina corporation ("**New Coltec**"). OldCo (as successor to Coltec Industries Inc) will then file a Chapter 11 petition to implement the Comprehensive Settlement, together with GST and Garrison, through the Plan.

Accordingly, except for Learning System and Garrison, the businesses operated by Coltec Industries Inc and its direct and indirect subsidiaries owned prior to the Coltec Restructuring will not be subject to the bankruptcy case. However, New Coltec will commit to provide sufficient cash to OldCo (as successor to Coltec Industries Inc), to fund OldCo's post-petition operations and administrative expenses and meet its obligations under the Plan and will enter into a keepwell agreement (the "**Keepwell**") in favor of OldCo as more fully described later in this section.

The Coltec Restructuring will take place in two stages:

The first stage commenced shortly after the execution and announcement of the Comprehensive Settlement and is projected to be completed prior to acceptance of the Plan by the Asbestos Claimants. Coltec Industries Inc has formed a direct, wholly-owned subsidiary, Fairbanks Morse, LLC, a North Carolina limited liability company ("**New Fairbanks Morse**"). Coltec Industries Inc will contribute all of the assets and liabilities related to the operation of its Fairbanks Morse division to New Fairbanks Morse during the fourth calendar quarter of 2016. New Fairbanks Morse will not be part of OldCo when that company's Chapter 11 petition is eventually filed.

During this initial stage, in preparation for the second stage, EnPro will also form New Coltec, and certain administrative and general corporate functions will migrate from Coltec Industries Inc to New Coltec. After its formation, New Coltec will itself form OldCo. Upon completion of this first stage, the simplified organizational structure of EnPro will be as follows:



The second stage of the Coltec Restructuring will not occur unless and until the Balloting Agent files the Voting Certification confirming that Asbestos Claimants have accepted the Plan in requisite numbers and amounts. This stage will not be consummated unless at least 75% of the voting Asbestos Claimants holding at least two-thirds of the claim amounts vote to accept the Plan. If that condition is met, Coltec Industries Inc will then merge with and into OldCo, with OldCo being the surviving entity of the merger, as depicted below.



As a result of this merger, OldCo (as the successor to Coltec Industries Inc) will be a direct, wholly-owned subsidiary of New Coltec, with the ownership of all of the direct subsidiaries of Coltec Industries Inc transferring by merger to OldCo, as set forth in the following simplified organizational structure.



OldCo will then distribute and transfer all of its assets and ownership interests in its direct subsidiaries (including all of the ownership interests in the former subsidiaries of Coltec Industries Inc as acquired in the merger), except for Learning System, the Garrison Equity Interests, and certain insurance rights and assets, to its parent, New Coltec. As part of this distribution, New Coltec will assume all of OldCo's liabilities except for obligations related to Coltec Asbestos Claims and GST Asbestos Claims. The assumed liabilities will include OldCo's obligations (as successor to Coltec) under the Coltec Note, the Coltec Guaranty, and related documents, and GST will request the Bankruptcy Court to enter an order releasing OldCo from its obligations under the Coltec Note and Coltec Guaranty and permitting substitution of New Coltec as the obligor under those instruments.

In connection with the distribution, New Coltec will also commit to contribute cash to Coltec in an amount which will be sufficient to fund Coltec's $30 million cash contribution to the Asbestos Trust on the Effective Date and, as reasonably estimated by EnPro, OldCo's anticipated cash needs during the administration of its Chapter 11 case. In addition, New Coltec will enter into the Keepwell in favor of OldCo committing to make further contributions to OldCo as necessary to maintain its solvency and to provide for its financial stability. In consideration of the Keepwell, OldCo will agree not to incur indebtedness other than ordinary course business expenses of Learning System and the costs and expenses of administration of its Chapter 11 case.

Learning System will then be merged with and into OldCo, with OldCo being the surviving entity of the merger.

Upon completion of the distribution and the merger of Learning System, the simplified organizational structure of EnPro will be as follows:

33



OldCo (as successor to Coltec Industries Inc) will then file a Chapter 11 petition to implement the Comprehensive Settlement, together with GST and Garrison, through the Plan. As a result of the Coltec Restructuring and as of the Coltec Petition Date, the filing entity OldCo will hold or will have access to more than $30 million in cash, will own and operate the *Learning System* business as an operating division, will own the Garrison Equity Interests and will have certain access to capital from New Coltec under the Keepwell, which will provide for OldCo's solvency and financial stability during the pendency of the Chapter 11 proceedings following the Coltec Petition Date. OldCo (as successor to Coltec Industries Inc) will be responsible for any liability associated with Coltec Asbestos Claims, but will agree to incur no other liabilities except those incurred in the ordinary course of business of its Learning System division. OldCo (as successor to Coltec Industries Inc) may continue to have secondary liability for certain of its legacy non-asbestos liabilities assumed by New Coltec as part of the distribution described above, but New Coltec will have primary responsibility for all such liabilities and contractual obligations to OldCo with respect to such liabilities.

## 3.  THE CHAPTER 11 FILINGS

### 3.1  SIGNIFICANT EVENTS DURING THE COURSE OF THE CHAPTER 11 CASES

There have been many pleadings filed with the Bankruptcy Court, and many hearings have been conducted in connection with such pleadings.  A general description of significant events related to Asbestos Claims during the Chapter 11 Cases follows. Pleadings referenced below may be obtained from the Bankruptcy Court for review. The docket for each case should be consulted to obtain a complete list of pleadings filed and events scheduled.

### 3.1.1 Appointment of Official Creditors Committees and the Future Claimants' Representative

#### 3.1.1.1 Official Committee of Unsecured Creditors

The Official Committee of Unsecured Creditors ("**Unsecured Creditors' Committee**") was formed by order of the Court entered June 17, 2010 (Docket No. 104).

#### 3.1.1.2 Asbestos Claimants Committee

The Committee was formed by order of the Court entered on June 16, 2010 (Docket No. 101), and the makeup of the Committee was modified by order entered on July 20, 2010 (Docket No. 260). The current members of the Committee are the following (listed with the law firm representing each member):

| Committee Member | Law Firm |
|---|---|
| Diane Allen | Kazan, McClain, Satterley & Greenwood, PLC |
| William Ames Warren | Simmons Hanly Conroy |
| Timothy Koeberle | Waters & Kraus, LLP |
| Madonna Guzzo | Lipsitz & Ponterio, LLC |
| Robert Wirwicz | Thornton & Naumes, LLP |
| Charles and Loretta Willis | Simon Greenstone Panatier Bartlett, PC |
| Gary Terry | Cooney & Conway |
| Deborah Papaneri | Paul, Reich & Myers, PC |
| Sheri Hoover | Motley Rice LLC |
| Ellen Fox | Weitz & Luxenberg |
| Denis Burns | Belluck & Fox, LLP |
| Joseph D. Boyer | The Jaques Admiralty Law Firm, PC |

#### 3.1.1.3 Representative for Future Asbestos Claimants

The Court entered an order appointing Joseph W. Grier, III as the FCR (Docket No. 512) on September 16, 2010.

### 3.1.2 Employment of Professionals

The Debtors, the Unsecured Creditors' Committee, the Committee and the FCR have employed the following professionals in the Chapter 11 Cases with the Bankruptcy Court's approval (except for the Debtors' Ordinary Course Professionals that were employed by separate orders and disclosures):

**EMPLOYED PROFESSIONALS**

| Professional | Scope of Representation | Date Approved |
|---|---|---|
| Rayburn, Cooper & Durham, P.A. | Bankruptcy Counsel to the Debtors | 07/12/10 (Docket No. 200) |
| Robinson Bradshaw & Hinson, P.A. | Special Corporate and Litigation Counsel to the Debtors | 07/12/10 (Docket No. 201) |
| Covington & Burling, LLP | Special Insurance Counsel to the Debtors | 07/12/10 (Docket No. 202) |
| Del Sole Cavanaugh | Special Asbestos Defense Counsel to the Debtors | 07/12/10 (Docket No. 203) |
| Schachter Harris, LLP | Special Asbestos Defense Counsel to the Debtors | 07/21/10 (Docket No 264) |
| Bates White, LLC | Asbestos Claim Valuation Consultant to the Debtors | 07/21/10 (Docket No. 265) |
| Grant Thornton, LLP | Audit Accountants for the Debtors | 10/01/10 (Docket No. 577) and 9/30/11 (Docket No. 1537) |
| Forman, Perry, Watkins, Krutz & Tardy, LLP | Special Asbestos Defense Counsel to the Debtors | 12/23/11 (Docket No. 971) |
| Katten Muchin Rosenman, LLP | Counsel to the Unsecured Creditors' Committee | 09/16/10 (Docket No. 514) |
| FSB FisherBroyles | Substituted Counsel to the Unsecured Creditors' Committee | 05/12/11 (Docket No. 1332) |
| Caplin & Drysdale, Chartered | Counsel to the Committee | 08/16/10 (Docket No. 392) |
| Hamilton Moon Stevens Steele & Martin, PLLC | Former Co-Counsel to the Committee | 08/06/10 (Docket No. 314) |
| Moon Wright & Houston, PLLC | Substituted Co-Counsel to the Committee | 04/21/11 (Docket No. 1287) |
| Charter Oak Financial Consultants, LLC | Financial Advisors to the Committee | 08/25/10 (Docket No. 423) |
| Legal Analysis Systems, Inc. | Asbestos Claim Valuation Consultant to the Committee | 08/25/10 (Docket No. 424) |
| Orrick, Herrington & Sutcliffe, LLP | Counsel to the FCR | 10/06/10 (Docket No. 580) |
| Grier, Furr & Crisp, P.A. | Co-Counsel to the FCR | 09/30/10 (Docket No. 569) |
| Hamilton Rabinovitz & Associates, Inc. | Asbestos Claim Valuation Consultant to the FCR | 12/09/10 (Docket No. 850) |
| Lincoln Partners Advisors, LLC | Financial Advisor to the FCR | 12/17/10 (Docket No. 896) |
| FTI Consulting, Inc. | Financial Advisors to the Debtors | 12/02/11 (Docket No. 1679) |
| Motley Rice LLC | Special Litigation Counsel to the Committee | 07/03/12 (Docket No. 2343) |

36

| EMPLOYED PROFESSIONALS | | |
|---|---|---|
| **Professional** | **Scope of Representation** | **Date Approved** |
| Waters & Kraus LLP | Special Litigation Counsel to the Committee | 07/03/12 (Docket No. 2343) |
| A. M. Saccullo Legal, LLC | Delaware Counsel to the Committee | 08/22/12 (Docket No. 2467) |
| Grossman & Moore PLLC | Kentucky Counsel to the Committee | 12/04/12 (Docket No. 2660) |

### 3.1.3 Adversary Proceeding Obtaining Stay of Asbestos-Related Litigation Against Non-Debtor Affiliates

On June 7, 2010, the Existing Debtors filed an adversary proceeding complaint, *Garlock Sealing Technologies LLC, et al. v. Those Parties Listed on Exhibit B to Complaint and Unknown Asbestos Claimants* (Adversary Proceeding No. 10-03145, United States Bankruptcy Court for the Western District of North Carolina), and a motion for preliminary injunction seeking an order barring asbestos claimants from pursuing claims against Coltec or any Non-Debtor Affiliate. On June 7, 2010, the Bankruptcy Court issued a temporary restraining order (Docket No. 9) and on June 21, 2010, a preliminary injunction (Docket No. 14) granting the requested relief.

On April 30, 2012, the Committee and the FCR filed their Joint Motion to Modify Preliminary Injunction in Order to Permit Certain Claims to Proceed in conjunction with their Joint Motion of the Official Committee of Asbestos Personal Injury Claimants and the Future Claims Representative for Leave to Control and Prosecute Certain Claims as Estate Representatives. This motion sought leave to pursue claims against Coltec and certain Non-Debtor Affiliates as more specifically described in Section 2.3.5.1 above. The Court denied the Committee and FCR's motion for leave without prejudice in the Order Denying Leave (Adv. Proc. No. 10-03145, Docket No. 51).

### 3.1.4 Extensions of Exclusivity Period

The Court entered three orders extending the Existing Debtors' exclusive periods to file and solicit acceptances of a Chapter 11 plan. By order of the Court entered on May 20, 2011 (Docket No. 1349), the Court granted the Existing Debtors' final extension of (i) the exclusive period to file a reorganization plan (or plans) through November 28, 2011 and (ii) the exclusive period to solicit acceptances of a plan through and including January 26, 2012. The Existing Debtors filed a Plan of Reorganization (Docket No. 1664) on November 28, 2011 (the "**Initial Plan**"), prior to the termination of their exclusive period to file a reorganization plan, but did not solicit acceptances of the Initial Plan. Therefore, as of January 26, 2012, the Existing Debtors' exclusive periods to file and solicit acceptances to a Chapter 11 plan have expired, and any party in interest may file an alternative Chapter 11 plan and seek permission of the Bankruptcy Court to solicit acceptances for such a plan. As of the filing of this Disclosure Statement, no other party in interest has filed a plan. The Existing Debtors filed their First Amended Plan of

Reorganization on May 29, 2014 and their Second Amended Plan of Reorganization on January 14, 2015.

### 3.1.5   December 9, 2010 Discovery Order

On December 9, 2010, the Bankruptcy Court entered an order (Docket No. 853) (the "**December 9 Order**") establishing a six-month period for "conducting preliminary discovery related to estimation, for purposes of formulating a plan of reorganization, of the Debtors' liability for pending and future asbestos-related claims for personal injury and wrongful death." The December 9 Order also permitted the Committee and FCR to conduct a six-month period of discovery regarding pre-petition related party transfers and the 2005 Corporate Restructuring that produced the Coltec Note and the Stemco Note.

### 3.1.6   Order Granting the Existing Debtors' Motion for Estimation of Mesothelioma Claims

On December 2, 2011, the Existing Debtors moved the Bankruptcy Court to estimate the aggregate number and amount of allowed current and future mesothelioma claims against Debtors GST and Garrison pursuant to Bankruptcy Code Section 502(c) (Docket No. 1683) (the "**Estimation Motion**"). On April 13, 2012, the Bankruptcy Court entered the Order for Estimation of Mesothelioma Claims (Docket No. 2102) (the "**Estimation Order**") granting the Estimation Motion and setting the scope and purpose of the estimation proceeding.   The Bankruptcy Court concluded that it would hold a trial to estimate allowed mesothelioma claims pursuant to Bankruptcy Code Section 502(c) for the purpose of determining the feasibility of any Chapter 11 plan of reorganization that might be proposed in the Cases. The Bankruptcy Court initially scheduled the estimation trial to commence on December 3, 2012 but eventually continued the trial to July 22, 2013.

In the Estimation Order, the Bankruptcy Court ruled that it would consider properly supported evidence based upon both the "settlement approach," which the Committee and FCR proposed to employ for the estimation of mesothelioma claims, and the "legal liability approach," which Debtors proposed to employ.

### 3.1.7   Estimation Trial and Order Estimating Aggregate Mesothelioma Liability

For more than two years before the estimation trial, the Existing Debtors, Coltec, the Committee, and the FCR engaged in contentious, time-consuming, and expensive litigation regarding the proper scope of discovery of evidence supporting their respective theories of estimation. Discovery permitted by the Bankruptcy Court, often over the objection of one or more of the parties, included:

- A questionnaire issued to Asbestos Claimants who asserted pending mesothelioma claims against GST, requiring such claimants to provide basic information about their claims, including: asbestos exposure information relating to GST's and third parties' products; facts about their lawsuits in the tort system; tort defendants against which they had asserted claims and the status of such

claims; and bankruptcy trusts against which they had asserted claims and the status of such claims.

- Two supplemental questionnaires issued to different samples of pending mesothelioma claimants, seeking information about known exposures to asbestos and aggregate data regarding claimants' settlement and other recoveries from tort defendants and from bankruptcy trusts.

- Subpoenas by the Existing Debtors for ballots from other bankruptcy cases, seeking copies of ballots cast by or on behalf of asbestos personal injury claimants in those cases.

- A subpoena by the Existing Debtors to the Delaware Claims Processing Facility, seeking data regarding claims filed by persons whose mesothelioma claims GST and Garrison settled between 1999 and 2010.

- Subpoenas by the Existing Debtors to six law firms who represented plaintiffs in fifteen resolved mesothelioma cases, seeking documents and testimony pertaining to those plaintiffs' asbestos exposures.

- Extensive discovery by the Committee and FCR issued to Debtors and certain third parties, pertaining to the history of asbestos litigation against the Debtors.

- Settlement approval and trial evaluation forms containing privileged communications between GST, Garrison, and their in-house lawyers and outside defense lawyers that contained evaluations of certain cases that GST settled, which were produced before and during the estimation hearing pursuant to the Court's finding of a limited waiver of privilege.

- Dozens of fact and expert witness depositions taken by Debtors, the Committee, the FCR, and Coltec.

From July 22 to August 22, 2013, over seventeen trial days, the Bankruptcy Court conducted an evidentiary hearing pursuant to the Estimation Order to determine a reliable aggregate estimate of GST's present and future mesothelioma claims. The Existing Debtors' experts projected Garlock's aggregate mesothelioma liability at not more than $125 million, and the Committee and FCR offered opinions from each of their experts estimating that GST's aggregate liability for mesothelioma claims exceeded $1 billion.

That trial culminated in entry on January 10, 2014 of the 65-page Estimation Opinion, in which the Bankruptcy Court estimated GST's aggregate liability for present and future mesothelioma claims at $125 million. *See In re Garlock Sealing Technologies LLC*, 504 B.R. 71, 97 (Bankr. W.D.N.C. 2014). The Committee took the position that the Estimation Opinion was interlocutory, and stated its intention to appeal from that decision once it became a final order or otherwise ripe for appellate review. The Debtors maintain that the Estimation Opinion is correct and is the law of the case.

Because of the great magnitude of mesothelioma claims in comparison to claims based on other allegedly asbestos-related diseases, the parties agreed and the Bankruptcy Court ordered that the estimation proceeding would not include any estimated liability for non-mesothelioma claims. *Id.* at 75. As noted above, the Bankruptcy Court also excluded asbestos-related claims against Anchor from its estimate.

### 3.1.8 Committee's Motion to Reopen Estimation Record

On June 4, 2014, the Committee moved the Bankruptcy Court to reopen the record of the estimation proceeding to permit the Committee to present supplemental evidence after taking additional discovery from the Existing Debtors and then to seek modification of the Estimation Opinion based on such additional evidence. (Docket Nos. 3725 and 3726). The Existing Debtors and Coltec objected. (Docket Nos. 3725 and 3726). On December 4, 2014, the Bankruptcy Court denied the Committee's motion. (Docket. Nos. 4260 and 4274; 12/4/2014 transcript).

### 3.1.9 Committee Discovery Regarding Pre-Petition Transactions

Pursuant to the December 9 Order authorizing discovery from the Existing Debtors, Coltec, and other affiliates relating to the 2005 Corporate Restructuring and other pre-petition insider transactions, the Committee and FCR propounded multiple interrogatories and requests for production of documents on the Existing Debtors, Coltec, other non-debtor affiliates, and certain third parties. The respondents produced voluminous documents. The discovery obtained eventually resulted in decisions by the Committee and the FCR to file their Joint Motion for Leave, Proposed Complaint, and Motion for Modification seeking to assert breach of fiduciary duty claims against the Former Managers and fraudulent transfer, unjust enrichment, conspiracy to defraud, successor liability, alter ego, and other claims against the Corporate Defendants. *See supra*, Section 2.3.5.1 (Avoidance Actions).

### 3.1.10 The Debtors' Initial Plan of Reorganization

On November 28, 2011, the Debtors filed their Initial Plan (Docket No. 1664), as well as the Disclosure Statement for Debtors' Joint Plan of Reorganization (Docket No. 1666) (the "**First Disclosure Statement**") and the exhibit book related to the Initial Plan (Docket No. 1665). The Debtors filed a supplemental exhibit book on December 16, 2011 (Docket No. 1722). The Committee and FCR each filed objections to approval of the First Disclosure Statement (Docket Nos. 1806 and 1808), to which the Debtors responded (Docket No. 1823). The Court did not hold a hearing on approval of the First Disclosure Statement.

### 3.1.11 The Debtors' First Amended Plan of Reorganization

On May 29, 2014, the Existing Debtors filed the Debtors' First Amended Plan of Reorganization (Docket No. 3708), as well as the Disclosure Statement for Debtors' First Amended Plan of Reorganization (Docket No. 3710) (the "**Second Disclosure Statement**") and the exhibit book related to the Debtors' First Amended Plan of Reorganization (Docket No. 3709). The Committee filed objections to approval of the Second Disclosure Statement (Docket Nos. 3961 and 4107), to which the Debtors responded (Docket No. 4094). The Court did not hold a hearing on approval of the Second Disclosure Statement.

### 3.1.12 The Settlement Agreement with the Future Claimants' Representative Regarding the Second Amended Plan

Following entry of the Estimation Opinion on January 10, 2014, the Existing Debtors met on numerous occasions with the FCR and the Committee to negotiate terms of a plan of

reorganization that would be agreeable to both the FCR and the Committee. The negotiations failed to result in a consensual plan.

The Debtors simultaneously and separately discussed with the FCR and Committee the terms of plans that would be agreeable to each. On January 9, 2015, Debtors and the FCR reached an agreement in principle on a plan that the FCR would support, resolving all GST Asbestos Claims. On January 13, 2015, the Debtors and the FCR reached substantial agreement on the Second Amended Plan, which incorporated the agreement with the FCR.

Although the Second Amended Plan retained the fundamental structure of the First Amended Plan, to support the Plan, the FCR requested, and the Debtors agreed to provide, increased funding for GST Asbestos Claimants (including increased funding for a Settlement Facility that would extend settlement offers to qualifying GST Asbestos Claimants, as well as increased contingent funding for the litigation of GST Asbestos Claims), as well as various changes to the CRP to benefit GST Asbestos Claimants.

Neither the Initial Plan, the First Amended Plan, nor the Second Amended Plan sought to resolve and treat Coltec Asbestos Claims in their entirety as a class.

### 3.1.13 Preliminary Confirmation Proceedings on the Now-Superseded Second Amended Plan

Confirmation proceedings on the now-superseded Second Amended Plan commenced and progressed through preliminary stages. On January 26, 2015, on motions made or supported by the Debtors and the FCR, and over the objections or limited objections of the Committee, the Bankruptcy Court granted the Asbestos Claims Bar Date, established certain solicitation and confirmation procedures, and approved a disclosure statement for the Second Amended Plan.

The voting deadline on the Second Amended Plan was October 6, 2015. On December 4, 2015, the Balloting Agent reported that the holders of current GST Asbestos Claims in Class 4 had rejected the Second Amended Plan by a large margin. As they had previously stated, however, the Existing Debtors announced that they would ask the Bankruptcy Court to confirm the Second Amended Plan, despite Class 4's rejection of it, in accordance with the "cramdown" provisions of the Bankruptcy Code. On October 6, 2015 and December 18, 2015, the Committee filed objections to the Second Amended Plan, contending that the plan was unconfirmable on various grounds, as did certain persons who described themselves as being at risk of malignancies and therefore as potential future GST Asbestos Claimants. (Docket Nos. 4883, 4885, 5160).

As of January 2016, discovery pertaining to the Second Amended Plan and the objections thereto was underway, and the parties were preparing for a contested confirmation hearing that was scheduled to commence on June 20, 2016. Additionally, the Bankruptcy Court was scheduled to hear argument, commencing on January 6, 2016, on certain cross-motions for summary judgment that the parties had filed and briefed. These cross-motions for summary judgment raised certain threshold issues going to whether or not the Second Amended Plan was confirmable under the Bankruptcy Code or could be "crammed down" over objections. *See* Committee's Motion For Summary Judgment Denying Confirmation Based on Plan's Failure to

Comply with Bankruptcy Code Section 524(g) (Docket No. 5071) and Motion for Partial Summary Judgment That Class 4 Claims Are Impaired and the FCR Has No Authority to Vote on the Plan (Docket No. 5069); Debtors' and FCR's Motion for Partial Summary Judgment That Section 524(g) Is Not Exclusive and the FCR Has Authority to Vote (Docket No. 5072); Opposition of the Official Committee of Asbestos Personal Injury Claimants to the Debtors and Future Claims Representative's Motion for Partial Summary Judgment (Docket No. 5159); Debtors' and FCR's Opposition to Committee Motion for Summary Judgment on 524(g) and FCR Authority To Vote (Docket No. 5161); Debtors' Opposition to Committee Motion for Partial Summary Judgment That Class 4 Is Impaired (Docket No. 5162).

### 3.1.14 Litigation Moratorium

On January 5, 2016, the Existing Debtors, the Committee and the FCR jointly requested the Bankruptcy Court to order a suspension of litigation on confirmation issues related to the Second Amended Plan in order to accommodate negotiations on a fully consensual plan of reorganization. This request for a litigation stay followed several months of negotiations between the Committee and the FCR on claims resolutions procedures that would be an integral part of any fully consensual settlement. Based on the progress made in the negotiations regarding the claims resolution procedures, the Committee proposed negotiations involving four parties—the Debtors, the Committee, the FCR, and Coltec—that would address all terms of a plan of reorganization and that would fully resolve asbestos claims against Coltec as well as those against GST.

The Bankruptcy Court continued the hearing on the parties' cross motions for summary judgment from January 6, 2016 to March 1, 2016 and the parties agreed to a 30-day moratorium on discovery in the confirmation proceedings. The Bankruptcy Court also continued the hearing on the proposed confirmation of the Second Amended Plan to August 15, 2016. As negotiations progressed, EnPro joined the discussions, and the parties agreed to extend the moratorium twice and to continue the summary judgment hearings, first until March 10, 2016, and then indefinitely.

### 3.1.15 Ad Hoc Coltec Asbestos Claimants Committee and Discussions Resulting In Comprehensive Settlement

In mid-February 2016, the parties reached an understanding that, for purposes of the negotiations, an *ad hoc* committee should be established for Coltec Asbestos Claimants and that an *ad hoc* legal representative for holders of future Coltec Asbestos Claims should also participate. The Ad Hoc Coltec Committee was formed consisting of attorneys from each of the following plaintiffs' law firms: Belluck & Fox; Cooney & Conway; The Jaques Admiralty Law Firm; Simon, Greenstone, Panatier & Bartlett; Thornton & Naumes; and The Lanier Law Firm. Each of these, other than The Lanier Law Firm, already represented and continues to represent an Asbestos Claimant against GST on the Committee. All of the aforementioned law firms, including The Lanier Law Firm, represent Coltec Asbestos Claimants and filed claims on behalf of those individuals before the litigation was stayed in 2010. The Committee and the Ad Hoc Coltec Committee thereafter functioned in unison in the negotiations and continue to do so with respect to the Plan, based on the overlapping claims histories and essential unity of interests as between GST Asbestos Claimants and Coltec Asbestos Claimants.

42

Also in mid-February 2016, Joseph W. Grier, III, the current FCR in the Chapter 11 Cases, agreed to serve as the *ad hoc* legal representative for future Coltec Asbestos Claimants. Mr. Grier thereafter participated in the negotiations in both capacities, and continues to act in both capacities with respect to the Plan, based on the overlapping claims histories and essential unity of interests as between GST Asbestos Claimants and Coltec Asbestos Claimants.

On March 17, 2016, EnPro and the Plan Proponents entered into the Comprehensive Settlement by signing the Term Sheet for Permanent Resolution of All Present and Future GST Asbestos Claims and Coltec Asbestos Claims. *See* Exhibit 2 hereto. Each of the parties agreed to recommend that Asbestos Claimants accept and vote in favor of the Plan, which incorporates the Comprehensive Settlement, and to use their best efforts to prepare and obtain the entry of orders of the Bankruptcy Court and the District Court confirming such a plan and issuing the injunctions described in the Plan and this Disclosure Statement.

## 4.    IMPORTANT BAR DATES AND DEADLINES

### 4.1    NON-ASBESTOS CLAIMS BAR DATE

On September 7, 2011, the Bankruptcy Court entered the Bar Date Order (Docket No. 1478) (the "**Non-Asbestos Claims Bar Date Order**"), which established December 12, 2011 as the bar date for Non-Asbestos Claims against the Existing Debtors. Pursuant to the Non-Asbestos Bar Date Order, absent relief from the Bankruptcy Court, **any Holder of a Non-Asbestos Claim against GST, Garrison, or Anchor that failed to file such a timely proof of Claim to the extent required by such Order, applicable Bankruptcy Code sections or Bankruptcy Rules, or other orders of the Bankruptcy Court with the Bankruptcy Court on or before such time shall have their Claim be deemed a Disputed Claim against any of the Existing Debtors or alternatively, shall be deemed to have such Claim as was listed in the Schedules of Assets and Liabilities, as may be amended, filed by an Existing Debtor in the amount scheduled so long as the Claim was not scheduled as disputed, contingent or unliquidated. Pursuant to the terms of the Non-Asbestos Bar Date Order, the Plan, and the Confirmation Order, any such Claim and the Holder thereof will be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim other than to seek to have such Claim determined to be an Allowed Claim in the Bankruptcy Court.**

### 4.2    SETTLED GST ASBESTOS CLAIMS BAR DATE

On April 28, 2014, Debtors filed a Motion for an Order (A) Establishing a Bar Date for Filing Settled GST Asbestos Claims, (B) Approving the Proof of Claim Form and (C) Approving the Form of and Procedures for Notice to Settled GST Asbestos Claims (Docket No. 3590) (the "**Settled Claims Bar Date Motion**"). On July 9, 2014, over objections filed by the Committee, the Court entered its Order on Debtors' Motion to Establish Bar Date for Settled Asbestos Claims and Related Relief, setting September 30, 2014 as the Settled Claims Bar Date, by which holders of settled GST Asbestos Claims that were unscheduled or were scheduled as disputed were required to file their proofs of claim.

On October 20, 2014, the Debtors moved to disallow certain disputed settled GST Asbestos Claims because the Holders of such settled GST Asbestos Claims failed to file proofs of claim by the Settled Claims Bar Date. (Docket Nos. 4168-4171). On December 9, 2014, the Court entered orders disallowing such claims (Docket Nos. 4261-4264).

Under the terms of the Plan and CRP, settled GST Asbestos Claims that were not scheduled as undisputed and did not file their claims on or before the Settled Claims Bar Date will not be entitled to payment as settled GST Asbestos Claims unless they obtain relief from the Bankruptcy Court. Claimants who did not meet the Settled Claims Bar Date may pursue their claims against the Asbestos Trust as unsettled Asbestos Claims, subject to all other CRP criteria.

### 4.3     BAR DATE FOR CERTAIN GST ASBESTOS CLAIMS

On November 26, 2014, the FCR filed a Motion for an Asbestos Claims Bar Date and Related Relief (Docket No. 4247), seeking a bar date for manifested but unliquidated asbestos personal injury claims. Over the objections of the Committee, the Bankruptcy Court entered the Asbestos Claims Bar Date and Solicitation Order, which established a bar date of October 6, 2015 (the "**Asbestos Claims Bar Date**") for certain GST Asbestos Claims. GST Asbestos Claimants were subject to the Asbestos Claims Bar Date if their Claim is based on an asbestos-related disease that was diagnosed on or before August 1, 2014, for which a lawsuit against any defendant or a claim against any asbestos trust was filed on or before August 1, 2014, excluding any settled GST Asbestos Claim for which a proof of claim was filed on or before September 30, 2014, but including any GST Asbestos Claims based on pre-petition judgments or any Settled GST Asbestos Claim seeking treatment as an unliquidated GST Asbestos Claim because a proof of claim was not filed for such Settled GST Asbestos Claim on or before the Settled Claims Bar Date, September 30, 2014.

Under the Plan and CRP, Asbestos Claimants who were subject to the Asbestos Claims Bar Date but did not timely file a ballot or proof of claim will not be entitled to a payment from the Asbestos Trust unless they obtain relief from the Bankruptcy Court.

### 4.4     BAR DATE FOR CERTAIN COLTEC ASBESTOS CLAIMS

In connection with the Plan, and after Coltec commences its bankruptcy case, Coltec will request that the Court set a bar date for certain Coltec Asbestos Claims (the "**Coltec Asbestos Claims Bar Date**"). The bar date proposed will be March 2, 2017. If the Court grants Coltec's request, Coltec Asbestos Claimants will be required to file a proof of claim on or before the Coltec Asbestos Claims Bar Date if such claim is based on an asbestos-related disease that was diagnosed on or before August 1, 2014, and for which a lawsuit against any defendant or claim against any trust was filed on or before August 1, 2014, unless (i) such claimant filed a proof of claim on account of a GST Asbestos Claim, or (ii) such claimant submitted a Ballot in connection with the vote on the now-superseded Second Amended Plan, which will be treated as a proof of claim for purposes of the Coltec Asbestos Claims Bar Date. Such proofs of claim must be returned to the Balloting Agent by first-class mail or courier at the address in the Voting Procedures so as to be received on or before March 2, 2017.

Under the Plan and CRP Asbestos Claimants who are subject to the Coltec Asbestos Claims Bar Date but do not timely file a ballot on the Plan now proposed or proof of claim will not be entitled to a payment from the Asbestos Trust unless they obtain relief from the Bankruptcy Court.

### 4.5     ADMINISTRATIVE CLAIMS BAR DATE

All parties seeking payment of an Administrative Expense Claim that is not a Fee Claim must File with the Bankruptcy Court and serve upon the Debtors a request for payment of such Administrative Expense Claim prior to the applicable deadline set forth below. However, parties seeking payment of postpetition ordinary course trade obligations, postpetition payroll obligations incurred in the ordinary course of a Debtor's postpetition business, and amounts arising under agreements approved by the Bankruptcy Court or the Plan need not File such a request.

**All Holders of Administrative Expense Claims that are not Fee Claims must File with the Bankruptcy Court and serve on the Debtors a request for payment of such Claim so as to be received on or before 4:00 p.m. (Eastern Time) on the date that is the first Business Day after the date that is thirty (30) days after the Effective Date, unless otherwise agreed to by the appropriate Debtor or Reorganized Debtor, without further approval by the Bankruptcy Court. Failure to comply with these deadlines shall forever bar the holder of an Administrative Expense Claim from seeking payment thereof.**

**Any Holder of an Administrative Expense Claim that is not a Fee Claim that does not assert such Claim in accordance with Section 5.3.1 of the Plan shall have its Claim deemed Disallowed under this Plan and be forever barred from asserting such Claim against any of the Reorganized Debtors, the Debtors, their Estates or their assets. Any such Claim and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, recoup or recover such Claim.**

### 4.6     FEE CLAIM BAR DATE

All parties seeking allowance or payment of a Fee Claim must File with the Bankruptcy Court and serve upon the Debtors a motion or application for allowance or payment of such Fee Claim in accordance with the Fee Order by the date that is the first Business Day after the date that is ninety (90) days after the Effective Date. The Plan Proponents may extend that deadline by agreement without further order of the Bankruptcy Court. Failure to comply with the applicable deadline set forth herein shall forever bar the Holder of a Fee Claim from seeking payment thereof.

**Any Holder of a Fee Claim that does not assert such Claim in accordance with the Fee Order and the Plan shall have its Claim deemed Disallowed under this Plan and be forever barred from asserting such Claim against any of the Debtors, their Estates, or their assets. Any such Claim and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such claim.**

Any objection to a Fee Claim shall be Filed and served in accordance with a scheduling order to be entered by the Bankruptcy Court, at the request of the Plan Proponents. **Each of the Plan Proponents expressly reserves the right to object to any Fee Claim prior to, on, and after the Effective Date, subject to the provisions of this Plan and the aforementioned scheduling order.**

## 5. SUMMARY OF THE PLAN

### 5.1 OVERVIEW OF THE PLAN

The Plan's treatment of Asbestos Claims is described in detail in the preceding "Summary of the Plan of Reorganization and the Claims Resolution Procedures," and will not be repeated here. The following discussion instead summarizes other material terms of the Plan for the convenience of Holders of Claims and Interests.

THE SUMMARY OF THE PLAN SET FORTH BELOW IS NOT A COMPLETE RECITATION OF THE TERMS OF THE PLAN. THE DESCRIPTIONS OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT ARE PROVIDED FOR YOUR CONVENIENCE ONLY. IF THERE IS ANY VARIATION BETWEEN THIS SUMMARY AND THE PLAN ITSELF, THE TERMS OF THE PLAN CONTROL.

A TRUE AND CORRECT COPY OF THE PLAN IS ATTACHED AS <u>EXHIBIT 1</u> IN THE EXHIBIT BOOK. YOU ARE URGED TO READ THE PLAN AND THE EXHIBIT BOOK IN THEIR ENTIRETY SO THAT YOU MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

### 5.2 CLASSIFICATION AND TREATMENT OF CLAIMS

#### 5.2.1 Provisions for Payment of Administrative Expense Claims and Priority Tax Claims

Article 2 of the Plan deals with unclassified Claims. In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified and are excluded from the Classes set forth in Article 3 of the Plan.

Administrative Expense Claims are treated as follows:

(a) Administrative Expense Claims for goods sold or services rendered representing liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases involving customers, suppliers, or trade or vendor Claims shall be paid by the Debtors or the Reorganized Debtors in the ordinary course in accordance with the terms and conditions of any agreements relating thereto;

(b) Administrative Expense Claims for amounts necessary to cure executory contracts and unexpired leases assumed by the Debtors will be paid by the Debtors or Reorganized Debtors as soon as practicable after the Effective Date or as ordered by the Bankruptcy Court;

46

(c)      Amounts due Holders of other Allowed Administrative Expense Claims, including, without limitation, Allowed Fee Claims or Claims arising pursuant to Section 503(b)(9) of the Bankruptcy Code, will be paid as soon as practicable after the Effective Date or as ordered by the Bankruptcy Court, unless otherwise agreed between the Debtors and such Holders; and

(d)      Administrative Expense Claims of the Bankruptcy Administrator for fees pursuant to 28 U.S.C. § 1930(a)(6) and (7) will be paid in accordance with the applicable schedule for payment of such fees by Debtors.

The Debtors will be in a position to estimate the total of all Allowed Administrative Expense Claims on the Effective Date after the passage of the Administrative Claims Bar Date.

Allowed Priority Tax Claims will be paid 100% of the unpaid Allowed Amount of such Allowed Priority Tax Claim in Cash by the Reorganized Debtors on the Distribution Date, though any penalty relating to any Priority Tax Claim (other than a penalty of the type specified in Section 507(a)(8)(G) of the Bankruptcy Code) will be Disallowed and not paid. The Debtors estimate the total of all Allowed Priority Tax Claims on the Effective Date to be approximately one hundred fifty thousand dollars ($150,000).

### 5.2.2  Classified Claims

There are ten (10) Classes of Claims and Interests under the Plan, whose treatment is described in Article 3 of the Plan.

The unimpaired Classes of Claims and Interests are Priority Claims (Class 1), Secured Claims (Class 2), Workers' Compensation Claims (Class 3), Intercompany Claims (Class 4), GST General Unsecured Claims (Class 6), Coltec General Unsecured Claims (Class 7), Anchor Claims (Class 8), and Other Debtor Equity Interests (Class 10). The impaired Classes of Claims and Interests are Asbestos Claims (Class 5) and GST/Garrison Equity Interests (Class 9).

### 5.2.2.1  Class 1.      Priority Claims

Class 1 consists of all Priority Claims against the Debtors, defined as any Claim against GST, Garrison, or Coltec other than an Administrative Expense Claim or Priority Tax Claim to the extent such Claim is entitled to priority in right of payment under Section 507 of the Bankruptcy Code (but excluding any Asbestos Claims). Each Holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim either (i) in full, in Cash, on the Distribution Date, or (ii) upon such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed Priority Claim and the Reorganized Debtors. Class 1 is unimpaired. The Holders of the Allowed Priority Claims in Class 1 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 5.2.2.2  Class 2.      Secured Claims

Class 2 consists of all Secured Claims, defined as a Claim against GST, Garrison, or Coltec that is:  (i) secured by a lien (as such term is defined in Section 101(37) of the Bankruptcy Code) on property in which the Debtors have an interest, which lien is valid, perfected, and

enforceable under applicable law or by reason of a Final Order, or (ii) entitled to setoff under Section 553 of the Bankruptcy Code, to the extent of (A) the value of the Claimant's interest in the Debtor's interest in such property or (B) the amount subject to setoff, as applicable, as determined pursuant to Section 506(a) of the Bankruptcy Code (but excluding any Asbestos Claims).

Secured Claims will be treated as follows:

(a)     Non-Tax Secured Claim. Subject to the provisions of Sections 502(b) and 506(d) of the Bankruptcy Code and the terms herein, each Holder of an Allowed Secured Claim other than an Allowed Secured Tax Claim shall, at the option of the Reorganized Debtors, receive treatment according to the following alternatives: (i) the Plan will leave unaltered the legal, equitable and contractual rights to which the Holder of such Claim is entitled, (ii) the Reorganized Debtors shall pay the Allowed Claim in full on the Effective Date or as soon thereafter as reasonably practicable; or (iii) the Reorganized Debtors shall provide such other treatment as is agreed to in writing between the Debtors or the Reorganized Debtors and the Holders of such Allowed Secured Claim.

(b)     Secured Tax Claim.  Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to a different treatment, each Holder of an Allowed Secured Tax Claim shall receive 100% of the unpaid amount of such Allowed Secured Tax Claim in Cash from the Debtors or Reorganized Debtors on the Distribution Date.

Class 2 is unimpaired. The Holders of the Allowed Secured Claims in Class 2 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 5.2.2.3   Class 3.        Workers' Compensation Claims

Class 3 consists of all Workers' Compensation Claims, defined as any Claim against GST, Garrison, or Coltec (a) for benefits under a state-mandated workers' compensation system, which a past, present, or future employee of GST, Garrison, Coltec, or their predecessors is receiving, or may in the future have a right to receive and/or (b) for reimbursement brought by any insurance company or state agency as a result of payments made by such insurance company or state agency for the statutory benefit owed (but not paid) by GST, Garrison, or Coltec to such employees under such a system and fees and expenses that are incurred and reimbursable under any insurance policies or laws or regulations covering such statutory employee benefit claims. Workers' Compensation Claims do not include any right of such employee or any other Entity that exists outside of such state workers' compensation system.

Each Workers' Compensation Claim shall be reinstated and shall have all legal, equitable, and contractual rights to which each such Workers' Compensation Claim entitles the Holder of such Workers' Compensation Claim.

Class 3 is unimpaired. The Holders of the Workers' Compensation Claims in Class 3 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 5.2.2.4 Class 4. Intercompany Claims

Class 4 consists of all Intercompany Claims, defined as any Claim by any Debtor against any other Debtor, or a Non-Debtor Affiliate against any Debtor, but excluding any Asbestos Claims or Anchor Claims. Each Intercompany Claim shall be reinstated and shall have all legal, equitable, and contractual rights to which each such Intercompany Claim entitles the Holder of such Intercompany Claim, except to the extent any such Claims are released pursuant to Section 8.4 of the Plan.

Class 4 is unimpaired. The Holders of Intercompany Claims in Class 4 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 5.2.2.5 Class 5. Asbestos Claims

Class 5 consists of all Asbestos Claims against GST, Coltec, or Garrison. As described in detail in the Summary of the Plan of Reorganization and the Claims Resolution Procedures above, Asbestos Claims will be resolved in accordance with the terms, provisions, and procedures of the Asbestos Trust Agreement and the CRP. All Asbestos Claims shall be paid by the Asbestos Trust solely from the Asbestos Trust Assets as and to the extent provided in the CRP. Asbestos Claims shall not be deemed Allowed or Disallowed, but rather shall be resolved by the Asbestos Trust pursuant to the terms of the CRP.

The sole recourse of the Holder of an Asbestos Claim on account of such Asbestos Claim shall be to the Asbestos Trust pursuant to the provisions of the Plan, the Asbestos Channeling Injunction, the Asbestos Trust Agreement, and the CRP.

Also as described in the Summary of the Plan of Reorganization and the Claims Resolution Procedures, Foreign Asbestos Claims will not be channeled to the Asbestos Trust for resolution or paid by the Asbestos Trust unless the Holder files a lawsuit in the United States, and the rights of Holders of Foreign Asbestos Claims to recourse and remedies under applicable foreign law outside the United States (to the extent such rights exist) will be unaffected by the Plan, without prejudice to the Reorganized Debtors' defenses against any such claims.

Class 5 is impaired. The Debtors are soliciting the votes of Holders of the Asbestos Claims in Class 5 to accept or reject this Plan in the manner and to the extent provided in the Confirmation Procedures Order.

### 5.2.2.6 Class 6. GST General Unsecured Claims

Class 6 consists of all GST General Unsecured Claims against the Debtors, defined as any Claim against GST or Garrison that is not an Administrative Expense Claim, Priority Tax Claim, Priority Claim, Secured Claim, Workers' Compensation Claim, Intercompany Claim, or Asbestos Claim.

Each Holder of an Allowed Class 6 Claim shall be paid the Allowed Amount of its GST General Unsecured Claim on the Distribution Date. Such payment shall be (i) in full, in Cash, plus post-petition interest at the federal judgment rate in effect on the Petition Date, or (ii) upon

such other less favorable terms as may be mutually agreed upon between the Holder of an Allowed GST General Unsecured Claim and the Reorganized Debtors.

Class 6 is unimpaired. Holders of the Allowed GST General Unsecured Claims in Class 6 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 5.2.2.7   Class 7.   Coltec General Unsecured Claims

Class 7 consists of all Coltec General Unsecured Claims against the Debtors, defined as any Claim against Coltec that is not an Administrative Expense Claim, Priority Tax Claim, Priority Claim, Secured Claim, Workers' Compensation Claim, Intercompany Claim, or Asbestos Claim.

Each Coltec General Unsecured Claim shall be reinstated and shall have all legal, equitable, and contractual rights to which each such Coltec General Unsecured Claim entitles the Holder of such Coltec General Unsecured Claim.

Class 7 is unimpaired. The Holders of Coltec General Unsecured Claims in Class 7 are deemed to have voted to accept this Plan and, accordingly, their separate vote will not be solicited.

### 5.2.2.8   Class 8.   Anchor Claims

Class 8 consists of all Anchor Claims, defined as any Claim against Anchor.  Each Holder of an Anchor Claim shall be entitled to assert such Claim against Anchor in accordance with the provisions of Article 14 of Chapter 55 of the North Carolina Business Corporation Act. However, Holders of Anchor Claims will receive nothing because Anchor, which has no material property, shall be liquidated and dissolved.

Class 8 is unimpaired. Holders of Anchor Claims in Class 8 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 5.2.2.9   Class 9.   GST/Garrison Equity Interests

Class 9 consists of the GST/Garrison Equity Interests. On the Effective Date, Class 9 GST/Garrison Equity Interests shall be retained, subject to the Lien described in Section 7.3.2 of the Plan.

Class 9 is impaired. The Debtors are soliciting the votes of Holders of the GST/Garrison Equity Interests in Class 9 to accept or reject the Plan in the manner and to the extent provided in the Confirmation Procedures Order.

### 5.2.2.10   Class 10.   Other Debtor Equity Interests

Class 10 consists of Other Debtor Equity Interests. The Plan leaves unaltered the legal, equitable, and contractual rights to which each such Other Debtor Equity Interest entitles the Holder of such Other Debtor Equity Interest.

Class 10 is unimpaired. The Holders of the Other Debtor Equity Interests in Class 10 are deemed to have voted to accept the Plan and, accordingly, their separate vote will not be solicited.

### 5.2.3 Resolution of Disputed Claims

Article 5 of the Plan sets forth provisions for treatment of Disputed Claims other than Asbestos Claims. Subject to the treatment provisions of this Plan, the Debtors or Reorganized Debtors, as applicable, may object to the allowance of any Plan Claims (other than Asbestos Claims) Filed with the Bankruptcy Court or to be otherwise resolved pursuant to any provisions of this Plan with respect to which they dispute liability, in whole or in part. Any such objections will be transferred to the Reorganized Debtors on the Effective Date for final resolution, and the Reorganized Debtors will have full authority to compromise, settle, or litigate such objections. This Article also describes the procedures for any such objections.

After the Confirmation Date, no Plan Claim may be Filed or amended to increase the amount or add or increase a lien or priority demanded unless otherwise provided by order of the Bankruptcy Court. Unless otherwise provided herein, any such new or amended Claim Filed after the Confirmation Date shall be disregarded and deemed Disallowed in full and expunged without need for objection, unless the Holder of such Claim has obtained prior Bankruptcy Court authorization for the filing.

Asbestos Claims will be resolved in accordance with the Asbestos Trust Agreement and the CRP.

### 5.2.4 Distribution on Account of Disputed Claims

Section 5.2 of the Plan describes how and under what circumstances Distributions shall be made to Holders of Disputed Claims. Disputed Claims shall be resolved in the manner described in Section 5.1 of the Plan and paid only when and to the extent that such Claims become Allowed.

### 5.3 IMPLEMENTATION OF THE PLAN

### 5.3.1 Vesting of Assets

Section 7.1 of the Plan describes the vesting of the assets and property of the Debtors in the appropriate Reorganized Debtors, which assets and property shall be free and clear of all Claims, Encumbrances, liens, and interests except as otherwise specifically provided in the Plan, in any of the Plan Documents, or in the Confirmation Order.

From and after the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, sell and otherwise dispose of property without supervision or approval of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the guidelines and requirements of the Bankruptcy Administrator, other than those restrictions expressly imposed by the Plan, the Plan Documents, or the Confirmation Order. The Plan reserves the right of the Reorganized Debtors to seek Bankruptcy Court approval for the sale, assignment, transfer, or other disposal of certain of the Reorganized Debtors' assets after the

Confirmation Date in the event that such Court approval is deemed to be necessary or appropriate.

### 5.3.2 Post-Confirmation Management and Corporate Governance Issues

Section 7.2.1 of the Plan provides that the Certificates of Incorporation, By-Laws, or Articles of Organization of the Debtors shall be amended as of the Effective Date as needed to effectuate the terms of the Plan and the requirements of the Bankruptcy Code, including prohibiting the issuing of nonvoting equity securities as required by Section 1123(a)(6) of the Bankruptcy Code.

Section 7.2.2 of the Plan describes the requirement for the Reorganized Debtors to maintain D&O and fiduciary liability tail coverage.

Section 7.11 of the Plan describes the management of Reorganized GST and Reorganized Garrison on and after the Effective Date. Key members of current management are expected to continue to be employed by the Reorganized Debtors.

### 5.3.3 The Asbestos Trust

Section 7.3 of the Plan provides for the creation and funding of the Asbestos Trust.

#### 5.3.3.1 Creation of the Asbestos Trust

Section 7.3.1 of the Plan describes the creation of the Asbestos Trust, which shall be a "qualified settlement fund" for federal income tax purposes within the meaning of the treasury regulations issued pursuant to Section 468B of the IRC. The purposes of the Asbestos Trust will be to, among other things, (i) assume the liabilities of the Debtors with respect to all Asbestos Claims except as provided in Sections 8.4.2 and 8.5 of the Plan (with the Reorganized Debtors and Asbestos Protected Parties having no responsibility whatsoever for such Asbestos Claims, apart from transferring the Asbestos Trust Assets to the Asbestos Trust in accordance with the Plan); (ii) process, liquidate, pay, and satisfy Asbestos Claims (other than Foreign Asbestos Claims asserted outside the judicial system of the United States) in accordance, as applicable, with the Plan, the Asbestos Trust Agreement and the CRP and in such a way that provides reasonable assurance that the Asbestos Trust will value, and be in a financial position to pay, present and future Asbestos Claims (including Demands that involve similar claims) in substantially the same manner and to otherwise comply with Section 524(g)(2)(B)(i) of the Bankruptcy Code; (iii) preserve, hold, manage, and maximize the assets of the Asbestos Trust for use in paying and satisfying Asbestos Claims entitled to payment; (iv) qualify at all times as a "qualified settlement fund" for federal income tax purposes within the meaning of the treasury regulations issued pursuant to Section 468B of the IRC; (v) pay Asbestos Trust Expenses from the Asbestos Trust Assets as incurred (with the Reorganized Debtors and Asbestos Protected Parties having no responsibility whatsoever for any Asbestos Trust Expenses, apart from transferring the Asbestos Trust Assets to the Asbestos Trust in accordance with this Plan), and (vi) otherwise carry out the provisions of the Asbestos Trust Agreement and any other agreements into which the Asbestos Trustee has entered or will enter in connection with this Plan.

52

### 5.3.3.2 Funding of the Asbestos Trust

Section 7.3.2 of the Plan describes the funding of the Asbestos Trust. On the day immediately preceding the Effective Date, (a) GST or Garrison shall transfer $370 million in Cash to the Asbestos Trust; (b) Coltec shall transfer $30 million in Cash to the Asbestos Trust, and (c) Coltec, EnPro, and the Asbestos Trust shall enter into the Option and Registration Rights Agreement substantially in the form attached as Exhibit H to the Plan. On or before the first anniversary of the Effective Date, Coltec shall transfer the full amount of the Deferred Contribution ($60 million) in Cash to the Asbestos Trust.

Effective on the Effective Date and immediately following the merger of Coltec with and into New Coltec as provided in Section 7.10 of the Plan, the Deferred Contribution will be guaranteed by EnPro, pursuant to a Guaranty substantially in the form attached to the Plan as Exhibit J, and secured by a possessory lien on or possessory security interest in 50.1% of the GST/Garrison Equity Interests, which Lien shall be granted by New Coltec (immediately after its merger with Coltec) on the Effective Date to, and held by, the Asbestos Trust pursuant to a Pledge Agreement substantially in the form attached as Exhibit I to the Plan. The Plan describes the details of this lien.

Coltec will be entitled to prepay all or part of the Deferred Contribution at any time without penalty. Once the Deferred Contribution has been paid in Cash and in full to the Asbestos Trust, or otherwise satisfied by agreement of the Reorganized Debtors and the Asbestos Trust, the Lien will be released in accordance with the terms of the Pledge Agreement and the Guaranty will be terminated in accordance with the terms of the Guaranty. The Reorganized Debtors and the Asbestos Trust will be free to negotiate or enter into an agreement that would permit payment of the Deferred Contribution before the first anniversary of the Effective Date at an agreed discount rate.

As described in Section 7.3.3, upon the transfer of the Asbestos Trust Assets to the Asbestos Trust, they will be indefeasibly and irrevocably vested in the Asbestos Trust free and clear of all claims, Equity Interests, Encumbrances, and other interests of any Entity, subject to the Asbestos Channeling Injunction and certain other provisions of the Plan.

### 5.3.3.3 Assumption of Claims and Demands by the Asbestos Trust

Section 7.3.4 of the Plan describes how, on the Effective Date, without any further action of any Entity, all liabilities, obligations, and responsibilities of any Asbestos Protected Party, financial or otherwise, with respect to all Asbestos Claims will be channeled to and assumed by the Asbestos Trust (except as provided in Sections 8.4.2 and 8.5 of the Plan), and the Reorganized Debtors and other Asbestos Protected Parties will have no liability or responsibility, financial or otherwise, for Asbestos Claims (except for Foreign Asbestos Claims asserted outside the judicial system of the United States), other than to transfer the Asbestos Trust Assets to the Asbestos Trust in accordance with the Plan.

Except as otherwise provided in the Plan, the Asbestos Trust Agreement, or the CRP, the Asbestos Trust shall have any and all of the actions, claims, rights, defenses, cross-claims, counterclaims, suits, and causes of action of the Debtors and the other Asbestos Protected

53

Parties, whether known or unknown, at law, in equity or otherwise, arising under the laws of any jurisdiction, that are based on or attributable to (a) all defenses to any Asbestos Claims; (b) with respect to any Asbestos Claims, all rights of setoff, recoupment, contribution, reimbursement, subrogation, or indemnity (as those terms are defined by the nonbankruptcy law of any relevant jurisdiction), and any other indirect claim of any kind whatsoever and whenever arising or asserted; and (c) any other claims or rights with respect to Asbestos Claims that any of the Debtors or other Asbestos Protected Parties would have had under applicable law if the Chapter 11 Cases had not occurred and the Holder of such Asbestos Claim had asserted it by initiating civil litigation against any such Debtor or other Asbestos Protected Party (together, the "**Asbestos Trust Causes of Action**"), and the Asbestos Trust shall thereby become the estate representative pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code with the exclusive right to enforce each of the Asbestos Trust Causes of Action, and the proceeds of the recoveries on any of the Asbestos Trust Causes of Action shall be deposited in and become the property of the Asbestos Trust. The Plan provides, however, that (a) the Asbestos Trust shall have no rights against the Reorganized Debtors or Asbestos Protected Parties other than the right to enforce the Plan or any of the other Plan Documents according to their respective terms, including the right to receive the Asbestos Trust Assets as provided in the Plan; (b) the Asbestos Trust Causes of Action shall not include any of the Asbestos Insurance Rights; (c) the Asbestos Trust Causes of Action shall not include any claim, cause of action, or right of the Debtors or any of them, under the laws of any jurisdiction, against any party, including the Asbestos Insurance Entities, for reimbursement, indemnity, contribution, breach of contract, or otherwise arising from or based on any payments made by the Debtors on account of asbestos claims prior to the Effective Date, (d) the Asbestos Trust Causes of Action shall not include any claims released, compromised, or settled under Section 8.4 of the Plan, and (e) for the avoidance of doubt, Asbestos Trust Causes of Action do not include any rights of the Debtors, the Reorganized Debtors, or the other Asbestos Protected Parties arising under the Asbestos Channeling Injunction or any of the other injunctions, releases, or the discharge granted under the Plan and the Confirmation Order.

### 5.3.3.4   Asbestos Trust Governance

Section 7.3.5 describes how the initial Asbestos Trustee will be Lewis R. Sifford, with any successor Asbestos Trustee appointed in accordance with the terms of the Asbestos Trust Agreement. It also describes the circumstances under which the Asbestos Trustee's employment will be deemed terminated.

Section 7.3.6 describes creation of the CAC and how it will be dissolved upon termination of the Asbestos Trust. Section 7.3.8 describes how the FCR will continue in service after the Effective Date, with his or her duties terminated upon termination of the Asbestos Trust.

### 5.3.3.5   Cooperation Agreement

Section 7.3.7 of the Plan describes how, on the Effective Date, the Reorganized Debtors and the Asbestos Trust will enter into a cooperation agreement substantially in the form included as Exhibit C to the Plan. This agreement will govern the Reorganized Debtors' obligations to share certain documents and other information pertaining to Asbestos Claims with the Asbestos Trust.

54

### 5.3.3.6  Asbestos Insurance Rights

Section 7.3.10 describes how the Debtors and Reorganized Debtors shall retain ownership of all their Asbestos Insurance Rights, including their rights to seek reimbursement for their contributions to the Asbestos Trust under the Plan. Exhibit E to the Plan identifies the Asbestos Insurance Entities that are Asbestos Protected Parties. Subject to the terms set forth in Section 7.3.10, the Debtors and Reorganized Debtors shall have the sole right to assert, and the sole discretion to compromise and settle, Asbestos Insurance Actions or any other Asbestos Insurance Rights, as well as settle with any successor Entities who may have insurance rights related to any of Coltec's former business divisions. In connection with any such compromise or settlement with an Asbestos Insurance Entity or successor Entity before entry of the Confirmation Order, the Debtors and Reorganized Debtors will, subject to Section 7.3.10 of the Plan, add such Asbestos Insurance Entity to Exhibit E and/or successor Entity to Exhibit D and thereby designate such Asbestos Insurance Entity and/or successor Entity as an Asbestos Protected Party. The Committee and FCR shall each have the right to object to any addition of an Asbestos Insurance Entity to Exhibit E or successor Entity to Exhibit D if they reasonably believe in good faith that (a) the terms of such compromise or settlement, (b) the addition of such Asbestos Insurance Entity to Exhibit E or successor Entity to Exhibit D, or (c) the extension of the Asbestos Channeling Injunction to such Asbestos Insurance Entity or successor Entity would (i) result in the channeling or transfer to, or assumption by, the Asbestos Trust of any Claims, Demands, duties, obligations, or liabilities (A) that are not Asbestos Claims or Asbestos Trust Expenses or (B) that are not otherwise contemplated to be the responsibility of the Asbestos Trust under this Plan; or (ii) result in or impose undue burden or expense on the administration of the Asbestos Trust or the Asbestos Trust Assets. The Bankruptcy Court will hear and determine any such objection. Before making any such addition to Exhibit D or Exhibit E, the Debtors will disclose to the Committee and the FCR the terms of the underlying compromise or settlement and sufficient information concerning the relevant Asbestos Insurance Entity or successor Entity to enable the Committee and the FCR to evaluate the proposed addition under the criteria specified in the previous sentence. Upon being added to Exhibit E or Exhibit D, any such Asbestos Insurance Entity or successor Entity will receive the benefits and protections of an Asbestos Protected Party under the Asbestos Channeling Injunction.

Any recovery by the Debtors or Reorganized Debtors of settlements or judgments related to Asbestos Insurance Policies will generally be for their own account as reimbursement for their pre-petition asbestos claim payments or contributions to the Trust. The exception is that Coltec's recoveries from any Additional Coltec Insurer and/or from any successor on account of the Additional Coltec Insurance will be allocated between the Asbestos Trust and Coltec as follows: Coltec will retain all recoveries up to the first $25 million and fifty percent (50%) of recoveries in excess of the first $25 million and will contribute to the Asbestos Trust (or have contributed directly to the Asbestos Trust) fifty percent (50%) of recoveries in excess of the first $25 million.

Section 12.2 of the CRP sets forth requirements for the Asbestos Trust to provide the Debtors, Reorganized Debtors, or settling Asbestos Insurance Entities certain information reasonably relating to Asbestos Claims submitted to and accepted and paid by the Asbestos Trust.

55

### 5.3.4 Distributions Under the Plan and Delivery of Distributions

Sections 7.4, 7.5, and 7.6 of the Plan describe payments and distributions under the Plan and procedures for delivering distributions and handling undeliverable distributions. All payments of Asbestos Claims and Asbestos Trust Expenses will be handled by the Asbestos Trust.

### 5.3.5 Dissolution of Anchor

As of the Effective Date, Anchor shall be dissolved under North Carolina General Statues §§ 55-14-01 et seq. Such dissolution shall occur as soon as reasonably practicable following the Effective Date.

Upon the Effective Date, Anchor, through its directors and officers, shall commence winding down its businesses and affairs, including, without limitation, marshaling its assets for the benefit of all constituencies. All Holders of Class 8 Anchor Claims shall be permitted, after the Effective Date, to assert and pursue claims against Anchor, and such claims shall be fully reinstated to the *status quo ante* as of the Petition Date. Claims against Anchor shall not be assumed or paid by the Asbestos Trust.

### 5.3.6 Conditions to the Consummation of the Plan, Right to Withdraw or Amend Plan

Without limitation, each of the conditions to Confirmation of the Plan and to the Plan's Effective Date as set forth in Sections 7.8 and 7.9 of the Plan, respectively, is required to have occurred or have been waived by the Plan Proponents for the Effective Date of the Plan to occur and the Plan and treatment of Claims described therein to become operative.

Debtors and EnPro have the right to waive certain conditions acting alone. One of those unilaterally waivable conditions is the achievement of a settlement (the "**Canadian Settlement**") between the Debtors, EnPro, and Garlock of Canada Ltd and the Canadian provincial workers' compensation boards (the "**Provincial Boards**") resolving all remedies the Provincial Boards may possess under Canadian law or in the United States under U.S. law against Garlock of Canada Ltd, Debtors, or any Affiliate of Debtors. The Provincial Boards are represented by Motley Rice LLC. A condition of confirmation of the Plan is that the Canadian Settlement shall have been agreed to by those parties and Debtors and the Bankruptcy Court shall have entered an order either approving the Canadian Settlement or concluding that the Bankruptcy Court's approval is not necessary and such order shall have become a Final Order. The Debtors will move for such an order if the settlement is agreed to, providing notice and an opportunity to object to the motion, with all rights of all persons with respect to such motion being preserved.

Debtors and EnPro, acting alone, may also waive the conditions pertaining to the qualified settlement fund status of the Asbestos Trust, and the condition providing that EnPro and Debtors have obtained amendments, consents, and waivers necessary under agreements binding on them or any subsidiary to permit the transactions and actions contemplated by the Term Sheet.

56

### 5.3.7 Merger of Coltec with New Coltec

Section 7.10 of the Plan provides that upon the effectiveness of the Asbestos Channeling Injunction on the Effective Date, Coltec will merge with and into New Coltec, with New Coltec as the survivor of such merger, pursuant to articles of merger substantially in the form attached as Exhibit K to the Plan. In such merger, the outstanding Capital Stock of Coltec will be cancelled and each outstanding share of Capital Stock of New Coltec will be converted into a share of common stock of the survivor. New Coltec will succeed to Coltec's obligations under this Plan. The Articles of Merger will provide that the merger will become effective at 12:02 a.m. Charlotte, North Carolina time on the Effective Date. On and after the Effective Date, New Coltec will be free to operate its business and use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or Bankruptcy Rules in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except for obligations under the Plan, the Plan Documents, and the Confirmation Order.

### 5.4 DISCHARGE, INJUNCTIONS, AND RELEASES

Article 8 of the Plan contains a discharge, certain injunctions, and releases and indemnifications.

### 5.4.1 Discharge

Section 8.1.1 of the Plan describes the discharge of GST, Garrison, and Coltec and the entry of the discharge injunction. It provides that except as otherwise provided in the Plan, on the Effective Date, all Claims against GST, Garrison, and Coltec, the Reorganized Debtors, or their Estates, assets, properties, or interests in property (the "**Discharged Debtors**") shall be discharged to the fullest extent permitted by law, regardless whether any such Claim is reduced to judgment, liquidated or unliquidated, contingent or non-contingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, known or unknown, that arose from any agreement of the Discharged Debtor entered into or obligation of the Discharged Debtor incurred before the Confirmation Date, or from any acts or omissions of the Discharged Debtor prior to the Effective Date, or that otherwise arose before the Effective Date, whether or not (i) a proof of claim was filed with respect to such Claim, (ii) such Claim is allowed under Section 502 of the Bankruptcy Code, or (iii) the Holder of such Claim has accepted the Plan, and including, without limitation, all interest, if any, on any such Claims, whether such interest accrued before or after the Petition Date.

The Reorganized Debtors shall not be responsible for any obligations of the Debtors or the Debtors in Possession except those expressly assumed by the Reorganized Debtors pursuant to the Plan. All Entities shall be precluded and forever barred from asserting against the Discharged Debtors or their assets, properties, or interests in property any other or further Claims or Plan Claims based upon any act or omission, transaction, or other activity, event, or occurrence of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date, except as expressly provided in the Plan.

With respect to any debts and liabilities discharged by operation of law under Sections 524(a) and 1141(d) of the Bankruptcy Code, the discharge of the Discharged Debtors will operate as an injunction against the commencement or continuation of an action, the employment of process, or any act, to collect, recover, or offset any such debt as a personal liability of the Discharged Debtors, whether or not the discharge of such debt is waived; *provided, however*, that the obligations and duties of the Reorganized Debtors under the Plan or any Plan Document will not be discharged.

### 5.4.2    Asbestos Channeling Injunction

Section 8.2 of the Plan describes the Asbestos Channeling Injunction. It provides that in order to supplement, where necessary, the injunctive effect of the discharge provided by Sections 1141(d), 524(a), and 105(a) of the Bankruptcy Code and as described in Section 8.1 of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Court under Section 524(g) of the Bankruptcy Code, as supplemented by Section 105(a) of the Bankruptcy Code, the Confirmation Order shall provide for issuance of the Asbestos Channeling Injunction to take effect on the Effective Date.

On and after the Effective Date, the sole recourse of the Holder of an Asbestos Claim shall be to the Asbestos Trust pursuant to the provisions of the Asbestos Channeling Injunction and the CRP, and such Holder shall have no right whatsoever at any time to assert its Asbestos Claim against the Debtors, the Reorganized Debtors, any other Asbestos Protected Party, or any property or interest (including any distributions made pursuant to the Plan) in property of the Debtors, the Reorganized Debtors, or any other Asbestos Protected Party. Without limiting the foregoing and except as provided in Section 8.5 of the Plan, from and after the Effective Date, the Asbestos Channeling Injunction shall apply to all present and future Holders of Asbestos Claims, and all such Holders shall be permanently and forever stayed, restrained, and enjoined from taking any and all legal or other actions or making any Claim or Demand against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party (including distributions made pursuant to the Plan), for the purpose of, directly or indirectly, claiming, collecting, recovering, or receiving any payment, recovery, satisfaction, or any other relief whatsoever on, of, or with respect to any Asbestos Claim, other than from the Asbestos Trust in accordance with the Asbestos Channeling Injunction and pursuant to the CRP, including:

a)    commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party, on account of any Asbestos Claim;

b)    enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party, on account of any Asbestos Claim;

c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party, on account of any Asbestos Claim;

d) setting off, seeking reimbursement of, indemnification or contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Asbestos Protected Party, or any property or interest in property of any Asbestos Protected Party, on account of any Asbestos Claim; and

e) proceeding in any other manner with regard to any matter that is subject to resolution by the Asbestos Trust in accordance with the Plan and related documents, except in conformity and compliance with the CRP.

Section 8.2.2 of the Plan describes certain reservations from the Asbestos Channeling Injunction, and Section 8.5 makes clear that Foreign Asbestos Claims asserted outside the judicial system of the United States are not subject to the Asbestos Channeling Injunction.

The identities of the Asbestos Protected Parties are given in the Plan. They are:

(a) GST, Garrison, and Coltec;

(b) the Reorganized Debtors;

(c) Anchor and Post-Bankruptcy Anchor (but only to the extent that the liability asserted against Anchor or Post-Bankruptcy Anchor derives from the conduct, operations, or products of GST or Coltec or is based on Anchor's relation to GST, Garrison, or Coltec as an Affiliate);

(d) any current or former Affiliate of each of the Debtors or Reorganized Debtors (including the Entities specified on Exhibit D to the Plan), to the extent that any liability is asserted to exist as a result of such Entity's being or having been such an Affiliate;

(e) Coltec's former divisions and their successor Entities specified on Exhibit D to the Plan, as well as any successor Entities added to Exhibit D as Asbestos Protected Parties pursuant to Section 7.3.10 of the Plan (but, in any case, the successor Entities only in their respective capacities as successors);

(f) the Asbestos Insurance Entities listed as Asbestos Protected Parties on Exhibit E to the Plan, as well as any Asbestos Insurance Entities added to Exhibit E as Asbestos Protected Parties pursuant to Section 7.3.10 of the Plan;

(g) any Entity that, pursuant to the Plan or otherwise on or after the Effective Date, becomes a direct or indirect transferee of, or successor to, any of the Debtors, the Reorganized Debtors, the Affiliates of the Debtors or Reorganized Debtors, or any of their respective assets, to the extent that any liability on account of GST Asbestos Claims or Coltec Asbestos Claims is asserted to exist as a result of its

59

becoming such a transferee or successor, including New Coltec (as described herein);

(h) any Entity that is alleged to be directly or indirectly liable for an Asbestos Claim by reason of such Entity's (i) ownership of a financial interest in a Debtor, a past or present Affiliate of a Debtor, or a predecessor in interest of a Debtor, (ii) involvement in the management of a Debtor or a predecessor in interest of a Debtor, or service as an officer, director or employee of a Debtor or a related party within the meaning of Section 524(g)(4)(A)(iii) of the Bankruptcy Code, or (iii) involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of a Debtor or a related party within the meaning of Section 524(g)(4)(A)(iii) of the Bankruptcy Code, including but not limited to involvement in the Coltec Restructuring;

(i) any Entity that makes a loan to any of the Reorganized Debtors, their Affiliates, the Trust, or to a successor to, or transferee of any of the respective assets of, the Debtors, the Reorganized Debtors, their Affiliates, or the Asbestos Trust, to the extent that any liability is asserted to exist as a result of its becoming such a lender or to the extent that any Encumbrance of assets made in connection with such a loan is sought to be invalidated, upset, or impaired, in whole or in part, as a result of its being such a lender;

(j) each future Affiliate of each of the Debtors, the Reorganized Debtors and the Affiliates of the Debtors or the Reorganized Debtors (but, in any case, only to the extent that any liability is asserted to exist as a result of its being or becoming such an Affiliate); and

(k) the Representatives of each of the Debtors, the Reorganized Debtors, and the Affiliates of the Debtors and Reorganized Debtors, respectively, but only to the extent that any liability is asserted to exist as a result of the Representative being, or acting in the capacity as, a Representative of one or more of the aforementioned Entities.

### 5.4.3 Releases and Indemnification

Section 8.4 of the Plan describes certain releases and indemnifications under the Plan.

#### 5.4.3.1 Settlement and Release by Debtors and Reorganized Debtors of Avoidance Actions and Other Estate Claims

Section 8.4.1 provides for the release of certain claims by the Debtors and Reorganized Debtors on the Effective Date, including (a) each and every Avoidance Action against an Asbestos Protected Party or its Representatives, (b) each and every Avoidance Action against a Holder of an Asbestos Claim (resolved or pending) or such Holder's Representatives; (c) any and all claims against any Asbestos Protected Party, Holder of an Asbestos Claim (resolved or pending), or any Representative of such Holder that are or would have been property of any Debtor's Estate or which any Debtor is or would have been entitled to prosecute as a Debtor in Possession arising under non-bankruptcy law or based on or attributable to any allegedly

60

preferential or fraudulent transfers or based on or attributable to any allegedly unlawful payments or transfers or distributions of property made by or on behalf of any Debtor; (d) any and all claims that are or would have been property of any Debtor's Estate or which any Debtor is or would have been entitled to prosecute as a Debtor in Possession, regardless of the legal theory upon which such claims may be predicated, for which any Asbestos Protected Party is asserted to be or to have been derivatively liable for any Asbestos Claim, including, without limitation, any claims based upon a legal or equitable theory of liability in the nature of veil piercing, alter ego, successor liability, vicarious liability, fraudulent transfer, malpractice, breach of fiduciary duty, waste, fraud, or conspiracy; and (e) any and all claims in (a)-(d) above where, in the absence of the Debtors' Chapter 11 Cases, such claims might, under substantive law of any jurisdiction, have been treated as claims maintainable not only by the Debtors or the Debtors' Estates themselves, but by creditors of or Claimants against the Debtors. Such released claims shall in no event be asserted against or paid by the Asbestos Trust.

### 5.4.3.2   Specific Release of Intercompany Asbestos Claims

Section 8.4.2 provides that on the occurrence of the Effective Date, each Debtor, Reorganized Debtor, and Non-Debtor Affiliate shall be deemed to have unconditionally waived, released, and extinguished any and all Asbestos Claims against each other Debtor, Reorganized Debtor, or Non-Debtor Affiliate, including all Asbestos Claims set forth in any and all proofs of claim filed by or on behalf of Coltec in the Chapter 11 Cases, and the Plan constitutes a motion to approve the resolution and release of the foregoing claims pursuant to Bankruptcy Rule 9019(a); *provided, however*, that this release shall not be construed to release, impair, or affect the rights of indemnification contained in Section 8.4.7 of the Plan. Section 8.4.2 further provides that notwithstanding anything else in the Plan, the Plan Documents, the Confirmation Order, or the Asbestos Channeling Injunction, the Asbestos Trust shall have no obligation, responsibility, or liability for any of the Asbestos Claims waived, released, and extinguished in accordance with that Section.

### 5.4.3.3   Settlement and Release by Debtors and Estate Parties

Section 8.4.3 provides for additional releases by each Debtor, in its individual capacity and as a Debtor in Possession for and on behalf of its Estate and its Affiliates, and each Reorganized Debtor on its own behalf and on behalf of its Estate and its Affiliates, and the respective successors and assigns of each such Debtor, Debtor in Possession, Estate, and Affiliate, is thereby deemed to settle and release, absolutely, unconditionally, irrevocably, and forever each and all of the Debtors' Representatives, their Non-Debtor Affiliates' Representatives, and their respective properties ("**Released Parties**"), from any and all claims, obligations, rights, suits, damages, remedies, liabilities, or causes of action in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the Debtors' property, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Cases, and the negotiation, formulation, or preparation of the Plan and the Disclosure Statement, or related agreements, instruments, or other documents, involving any act, omission, transaction, agreement, occurrence, or event taking place on or before the Effective Date, other than any act or omission of a Released Party that constitutes willful misconduct or lack of good

61

faith; *provided, however*, that the obligations and duties of any Released Party under the Plan or any Plan Document are not so settled and released. Any act or omission taken with the approval of the Bankruptcy Court will be conclusively deemed not to constitute willful misconduct or lack of good faith.

### 5.4.3.4 Settlement and Release of Certain Claims

As discussed above in Section 2.3.5.2 of this Disclosure Statement, Section 8.4.4 of the Plan provides, on specified terms and conditions, for the settlement and release of pending GST Recovery Actions against certain defendants. The Existing Debtors will seek approval of such settlements by motion pursuant to Bankruptcy Rule 9019(a). The Plan also provides that the Debtors, Reorganized Debtors, their Affiliates, predecessors, and assigns shall be deemed to release, waive, and permanently extinguish their rights to file or assert any GST Recovery Actions in the future.

### 5.4.3.5 No Actions on Account of Released Claims

Section 8.4.5 provides for an injunction that will prohibit enforcement of or any action whatsoever with respect to any of the claims released in Section 8.4 of the Plan, protecting and preserving, however, the right of Asbestos Claimants to proceed against the Asbestos Trust pursuant to the CRP.

### 5.4.3.6 Indemnification

Sections 8.4.6 and 8.4.7 contain certain indemnifications. In Section 8.4.6, the Reorganized Debtors undertake to protect, defend, indemnify, and hold harmless to the fullest extent permitted by applicable law, all Representatives of the Debtors, and all Representatives of the Non-Debtor Affiliates, on and after the Effective Date for all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever that are purported to be released pursuant to Section 8.4.3 of the Plan.

In Section 8.4.7, the Asbestos Trust undertakes to protect, defend, indemnify and hold harmless, to the fullest extent permitted by applicable law each of the Debtors, Reorganized Debtors, and other Asbestos Protected Parties from and against any and all losses (including, without limitation, attorney's fees and expenses) that occur after the Effective Date and are based on, arise from, or are attributable to any Asbestos Claim; *provided, however*, that the Asbestos Trust will have no duty to defend, indemnify, and hold harmless Debtors, Reorganized Debtors, and other Asbestos Protected Parties from any such losses that are based on, arise from, or are attributable to any Foreign Asbestos Claim, unless the Foreign Asbestos Claim is filed, asserted, or sought to be enforced in or before any court or tribunal within the judicial system of the United States.

In addition, on the Effective Date, the Asbestos Trust shall assume the Debtors' indemnification obligations to the "Indemnified Parties" identified in paragraph 5 of the Bankruptcy Court's Order Granting Debtors' Motion for Appointment of Joseph W. Grier, III as Future Asbestos Claimants' Representative (Docket No. 512), entered September 16, 2010, and upon such assumption the Debtors will be released from such obligations.

If there shall be pending any claim against the Asbestos Trust for indemnification under Section 8.4.7 of the Plan, the Asbestos Trust will maintain sufficient assets (as determined in good faith by the Asbestos Trustee) to fund any payments in respect of that claim for indemnification. The Reorganized Debtors will provide prompt notice to the Asbestos PI Trust upon becoming aware of the basis for any claim for indemnification under Section 8.4.7 of the Plan.

### 5.5    OTHER PLAN PROVISIONS

#### 5.5.1    Modification or Withdrawal of the Plan

Article 4 of the Plan sets forth the Plan Proponents' right, acting unanimously, to modify, amend or withdraw the Plan or the Plan Documents prior to the Confirmation Date, and the effect of any such withdrawal, which is to deem the Plan null and void. After the Confirmation Date, the Plan Proponents, acting unanimously, may alter, amend, or modify the Plan in accordance with Section 1127(b) of the Bankruptcy Code but only before its substantial consummation.

#### 5.5.2    General Reservation of Rights

Section 6.5.2 of the Plan contains a general reservation of rights, providing that should the Plan fail to be accepted by the requisite number and amount of the Holders of Plan Claims and Equity Interests required to satisfy Sections 524(g) and 1129 of the Bankruptcy Code, then, notwithstanding any other provision of the Plan to the contrary, the Plan Proponents reserve the right to amend the Plan.

#### 5.5.3    Retention of Jurisdiction

Article 10 of the Plan describes the matters over which the Bankruptcy Court will retain jurisdiction after the Effective Date, including interpreting and enforcing the Plan Documents; hearing and determining objections to Claims (other than Asbestos Claims); and compensating Professionals. The District Court will retain exclusive jurisdiction, without regard to the amount in controversy, to hear and determine any proceeding that involves the validity, application, construction, or modification of the Asbestos Channeling Injunction, or of Section 524(g) of the Bankruptcy Code with respect to the Asbestos Channeling Injunction.

#### 5.5.4    Exculpation

Section 11.7 contains an exculpation clause, exculpating the Reorganized Debtors, the Debtors, the Non-Debtor Affiliates, the FCR, the Committee (including each of its members and their respective counsel), the Unsecured Creditors Committee, the Ad Hoc Coltec Future Asbestos Claimants' Representative, the Ad Hoc Coltec Asbestos Claimants Committee (including each of its members and their respective counsel), or any of their respective Representatives from any liability to any Entity for any act or omission in connection with or arising out of the Chapter 11 Cases, including the administration of the Estates during the entirety of the Chapter 11 Cases, any work in connection with any plan of reorganization or proceedings in the Chapter 11 Cases, conduct during any contested matter in the Chapter 11 Cases, negotiation of the Plan or the settlements contained therein, the pursuit of confirmation of

this Plan, the consummation of the Plan or the settlements provided therein, or the administration of the Plan or the property to be distributed under the Plan so long as, in each case such action, or failure to act, did not constitute willful misconduct or lack of good faith. Excepted from the exculpation clause is any Fee Dispute Remedy, as defined in the Plan.

The exculpation clause further provides that in all respects, the Exculpated Parties will be entitled to rely upon the advice of counsel and financial and other experts or professionals employed by them with respect to their duties and responsibilities under the Plan, and such reliance shall conclusively establish good faith. Any act or omission taken with the approval of the Bankruptcy Court will be conclusively deemed not to constitute willful misconduct or lack of good faith. In any suit alleging willful misconduct or lack of good faith, the reasonable attorney's fees and costs of the prevailing party will be paid by the losing party, and, as a condition of going forward with such action, suit, or proceeding, at the onset thereof, all parties thereto shall be required to provide appropriate proof and assurances of their capacity to make such payments of reasonable attorney's fees and costs in the event they fail to prevail. Pursuant to its authority under Bankruptcy Code Section 105(a), in the Confirmation Order the Court will enter an injunction permanently enjoining commencement or continuation in any manner, any suit, action, or other proceeding, on account of or respecting any claim, obligation, debt, right, cause of action, remedy, or liability included within this exculpation clause.

## 6. **VOTING AND CONFIRMATION PROCEDURES**

### 6.1 **VOTING PROCEDURES**

All Classes of Claims other than Class 5 Asbestos Claims are unimpaired and therefore shall be deemed to have voted to accept the Plan, and will not be solicited. The voting procedures for Class 5 have been established in the Confirmation Procedures Order, and are also contained in the Voting Procedures enclosed in the Solicitation Package with this Disclosure Statement. Solicitation Packages with forms of Ballots for Holders of Class 5 Asbestos Claims will be distributed on August 1, 2016 in the manner described in the Voting Procedures, as well as thereafter in response to inquiries as a result of the publication notice that is part of the Notice Program attached to the Confirmation Procedures Order.

TO BE COUNTED, YOUR COMPLETED BALLOT OR MASTER BALLOT MUST BE RECEIVED BY THE BALLOTING AGENT AT THE ADDRESS CONTAINED IN THE BALLOTS AND VOTING PROCEDURES NO LATER THAN DECEMBER 9, 2016 (THE "**VOTING DEADLINE**").

Holders of Class 5 Asbestos Claims may vote using either an Individual Ballot or (through their attorneys) a Master Ballot. Asbestos Claims will be temporarily allowed, for voting purposes only, if the Claimant (or Claimant's attorney) submits a Ballot by the Voting Deadline and certifies, under penalty of perjury, that the following matters are true and correct to the best of the Claimant's (or such attorney's) knowledge, information, and reasonable belief:

    i.    the Claimant is the Holder of an Asbestos Claim (as defined in the Plan) that has not been dismissed with prejudice, has not been settled and paid, and is not known to be time-barred;

    ii.    the person upon whose injury the Asbestos Claim is based (the "**Injured Party**") was diagnosed with malignant mesothelioma, or lung cancer, colo-rectal cancer, laryngeal cancer, esophageal cancer, pharyngeal cancer, stomach cancer, severe asbestosis, disabling asbestosis, or non-disabling asbestosis (all such diseases other than malignant mesothelioma being hereafter referred to as "**Other Diseases**"), based on, or as evidenced in, medical records or similar documentation in the possession of the Claimant, his or her attorney, or the physician of the Claimant or Injured Party;

    iii.    the Injured Party was exposed to asbestos released from asbestos-containing gaskets or packing manufactured, produced, fabricated, distributed, supplied, marketed, included as a component part, or sold by Garlock or Coltec ("**Asbestos Exposure**"),[10] as indicated in the Individual Ballot or Master Ballot exhibit;

    iv.    if the Claimant asserts that his/her Claim has been liquidated by settlement or judgment, the Claimant (or his or her attorney) must certify that the Claim has been liquidated by settlement or judgment and provide the asserted liquidated amount; and

    v.    if these certifications are made by the Claimant's attorney, the attorney is authorized by such Claimant to vote on the Plan on his or her behalf, and to represent that the Injured Party has (or, if deceased, had) the disease noted on the Ballot and has Asbestos Exposure.

Unliquidated Asbestos Claims that meet the voting criteria and allege mesothelioma will be temporarily allowed for voting purposes in the amount of $10,000, while Asbestos Claims that meet the voting criteria and allege any of the Other Diseases will be temporarily allowed for voting purposes in the amount of $1. Asbestos Claims liquidated by settlement or judgment that meet the voting criteria will be temporarily allowed for voting purposes in the liquidated amounts of the Asbestos Claims. Asbestos Claims alleging more than one disease will be temporarily allowed for voting purposes based on the single disease that yields the higher voting amount. Asbestos Claimants who allege exposure to asbestos both from products for which Garlock is responsible and from products for which Coltec is responsible will receive a single vote in Class 5. The Voting Procedures contain additional rules regarding the tabulation of votes in Class 5.

---

[10] For purposes of this certification requirement, "Coltec" includes the following predecessors and former divisions that were named in Asbestos Claims before the litigation of such claims was stayed by order of the Bankruptcy Court: Fairbanks Morse Engine, Fairbanks Morse Pump, Quincy Compressor, Central Moloney, France Compressor, Delavan, and Farnam.

Asbestos Claimants who are unable to make the certifications above on or before the Voting Deadline will not be eligible to vote on the Plan unless they file a motion for temporary allowance for voting purposes that the Court grants. Any such motion for temporary allowance for voting purposes must be filed on or before December 9, 2016. In addition, no Entity named as a defendant in asbestos litigation shall be eligible to vote unless it files a proof of claim in the form of Official Bankruptcy Form No. 410 on or before any applicable bar date and files a motion for temporary allowance for voting purposes that the Court grants.

Class 5 will accept the Plan if two-thirds or more in amount and 75% or more in number of those who vote accept the Plan.

## 6.2 CONFIRMATION PROCEDURES

### 6.2.1 Confirmation Hearing

Bankruptcy Code § 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. Bankruptcy Code § 1128(b) provides that any party-in-interest may object to confirmation of the Plan.

The Bankruptcy Court has set the Confirmation Hearing for 10:00 a.m., Eastern Time on May 15, 2017, in the United States Bankruptcy Court, 401 West Trade Street, Charlotte, North Carolina 28202. The Confirmation Hearing may be adjourned, from time to time, without notice, other than an announcement of an adjourned date at such hearing or an adjourned hearing, or by posting such continuance on the Bankruptcy Court's docket.

### 6.2.2 Objections to Confirmation of the Plan

Responses and objections, if any, to the confirmation of the Plan or to any of the other relief sought by the Debtors in connection with confirmation of the Plan, must (a) state with particularity the legal and factual grounds therefor, (b) provide, where applicable, the specific text, if any, that the objecting party believes to be appropriate to insert into the Plan, and (c) describe the nature and amount of the objector's Claim or Equity Interest. Any objections to the adequacy of the FCR's representation of holders of future Asbestos Claims must also be raised at this time, in the same form as a Plan objection.

Holders of Claims against and Equity Interests in GST, Garrison, or Anchor must file any response or objection to the Plan with the Bankruptcy Court and serve such response or objection in a manner so as to be ***actually received*** by the Notice Parties (defined below) no later than December 9, 2016. Holders of Claims against and Equity Interests in Coltec must file any response or objection to the Plan with the Bankruptcy Court and serve such response or objection in a manner so as to be ***actually received*** by the Notice Parties no later than March 10, 2017.

The following parties are the "Notice Parties":

| **Debtors:** | GARLOCK SEALING TECHNOLOGIES LLC<br>c/o Elizabeth Barry, Chief Restructuring Officer<br>349 West Commercial St., Ste 3050<br>East Rochester, NY 14445 |
|---|---|
| **With a copy to:** | RAYBURN COOPER & DURHAM, P.A.<br>1200 Carillion, 227 West Trade Street<br>Charlotte, NC 28202<br>Telephone: (704) 334-0891<br>Attn: John R. Miller, Jr.<br><br>and<br><br>ROBINSON, BRADSHAW & HINSON, P.A.<br>101 North Tryon Street, Suite 1900<br>Charlotte, NC 28246<br>Telephone: (704) 377-2536<br>Attn: Garland S. Cassada<br><br>and<br><br>PARKER POE ADAMS & BERNSTEIN, LLP<br>Three Wells Fargo Center<br>401 South Tryon Street, Suite 3000<br>Charlotte, NC 28202<br>Telephone: (704) 335-9054<br>Attn: Daniel G. Clodfelter |
| **Committee:** | CAPLIN & DRYSDALE, CHARTERED<br>One Thomas Circle N.W., Suite 1100<br>Washington, DC 20005<br>Telephone: (202) 862-5000<br>Attn: Trevor W. Swett III |
| **FCR:** | GRIER FURR & CRISP, PA<br>101 North Tryon Street, Suite 1240<br>Charlotte, NC 28246<br>Telephone: (704) 375-3720<br>Attn: Joseph W. Grier, III |
| **With a copy to:** | ORRICK HERRINGTON & SUTCLIFFE, LLP<br>Columbia Center<br>1152 15th Street, N.W.<br>Washington, DC 20005<br>Telephone: (202) 339-8400<br>Attn: Jonathan P. Guy |

67

| **Unsecured Creditors' Committee:** | FSB FISHERBROYLES, LLP<br>6000 Fairview Road, Suite 1200<br>Charlotte, NC 28210<br>Telephone: (704) 464-6954<br>Attn: Deborah L. Fletcher |
|---|---|

UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND PROPERLY FILED WITH THE BANKRUPTCY COURT, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## 7. REQUIREMENTS FOR CONFIRMATION OF THE PLAN

### 7.1 BANKRUPTCY CODE § 1129 GENERALLY

At the Confirmation Hearing, the Court will determine whether the confirmation requirements of Bankruptcy Code § 1129 have been satisfied. If so, the Court will enter the Confirmation Order. The Plan Proponents believe that the Plan satisfies or will satisfy the applicable requirements for confirmation, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(1).

- The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(2).

- The Plan has been proposed in good faith and not by any means forbidden by law. *See* 11 U.S.C. § 1129(a)(3).

- Any payment made or promised by the Debtors, or by an Entity acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Court as reasonable. *See* 11 U.S.C. § 1129(a)(4).

- The Debtors will have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of Holders of Claims and Equity Holders and with public policy, and the Debtors will have disclosed the identity of any insider that will be employed or retained by any Reorganized Debtor, and the nature of any compensation for such insider. *See* 11 U.S.C. § 1129(a)(5).

- With respect to each Class of impaired Claims or Equity Interests, either each Holder of a Claim or Equity Interest of such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or Equity Interest

68

property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would so receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code; or if Bankruptcy Code § 1111(b)(2) applies to the Claims of such Class, each Holder of a Claim will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the value of such Holder's interest in the Debtors' Estates' interest in the property that secures such Claims. *See* 11 U.S.C. §1129(a)(7).

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan has either accepted the Plan or is not impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to section 1129(b) of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(8).

- Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Allowed Administrative Expense Claims and Allowed Priority Claims will be paid in full on the Effective Date, or as reasonably practicable thereafter, and that Allowed Priority Tax Claims will receive, on account of such Allowed Claims, payment in full on the Effective Date or as reasonably practicable thereafter. *See* 11 U.S.C. § 1129(a)(9).

- Debtors believe that Class 5, the only Class of impaired Claims, will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class. *See* 11 U.S.C. § 1129(a)(10).

- Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. *See* 11 U.S.C. § 1129(a)(11).

- The Plan provides that the quarterly fees required under 28 U.S.C. § 1930 have been paid or that they will be paid on the Effective Date of the Plan. *See* 11 U.S.C. § 1129(a)(12).

- The Plan provides for the continuation after the Effective Date of payment of all retiree benefits (as that term is defined in Bankruptcy Code § 1114) at the level established pursuant to Bankruptcy Code § 1114(e)(1)(B) or § 1114(g), at any time prior to confirmation of the Plan, for the duration of the period the Debtor has obligated itself to provide such benefits. *See* 11 U.S.C. § 1129(a)(13).

The Plan Proponents believe that the Plan satisfies all of the statutory requirements of Bankruptcy Code Section 1129. In addition, the Plan Proponents believe that the Plan satisfies all of the statutory requirements of Bankruptcy Code Section 524(g).

### 7.2 VOTE REQUIRED FOR CLASS ACCEPTANCE

Class 5 will be considered to have accepted the Plan when 75% or more in number and at least two-thirds (2/3) in dollar amount of the Claims that actually voted have voted in favor of the Plan.

If the Plan is confirmed, then Holders of Claims against, or Equity Interests in, Debtors, whether voting or non-voting and, if voting, whether accepting or rejecting the Plan, are bound by the terms of the Plan, including any injunction(s) under Bankruptcy Code §§ 524(a), 524(g), and/or 105(a).

### 7.3 FEASIBILITY OF THE PLAN

Section 1129(a)(11) of the Bankruptcy Code requires that, in order for the Bankruptcy Court to confirm the Plan, the Bankruptcy Court must find that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, except to the extent such liquidation or reorganization is called for by the Plan's terms.

The Debtors have the financial wherewithal and business prospects to satisfy their obligations under the Plan. Debtors anticipate having on the Effective Date Cash sufficient to fund in full the Plan's treatment of all Allowed Administrative Claims, Secured Tax Claims, and Claims in Classes 1 (Priority Claims) and 6 (General Unsecured Claims), which Debtors believe will not exceed in the aggregate $4 million. Debtors will also have sufficient Cash on the Effective Date to fund the Initial Asbestos Trust Assets and to make the Deferred Contribution and fulfill the terms of the Option within one year after the Effective Date. The Proforma Projections set forth in **Exhibit 3** to the Disclosure Statement, which show continued net operating income in years shown, as well as other income streams as described in the projections set forth on **Exhibit 3**, support the ability of Debtors to make the payments described by the Plan. **HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED TO REVIEW CAREFULLY THE DISCLAIMERS INCLUDED AT THE BEGINNING OF THIS DISCLOSURE STATEMENT AND THE ASSUMPTIONS INCLUDED IN THE PROJECTIONS IN CONNECTION WITH THEIR REVIEW OF THE SAME. AS NOTED THEREIN, ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE PROJECTED.**

### 7.4 "BEST INTERESTS" TEST

Another confirmation requirement is the "Best Interests Test" or "Hypothetical Liquidation Test" incorporated in Section 1129(a)(7) of the Bankruptcy Code. The test applies to individual Holders of unsecured Claims and Holders of Interests that are both (i) in impaired Classes under the Plan, and (ii) do not vote to accept the Plan. Section 1129(a)(7) of the Bankruptcy Code thus requires that Holders of Asbestos Claims in Class 5 who do not vote to accept the Plan will receive or retain an amount under the Plan as it relates to a particular Debtor not less than the amount that such Holders would receive or retain if such Debtor were to be liquidated under Chapter 7 of the Bankruptcy Code. (While Class 9 (GST/Garrison Equity Interests) is impaired under the Plan, the holder of those interests in Class 9, Coltec, will vote in favor of the Plan, thus rendering the Best Interests Test inapplicable to Class 9.)

70

The Debtors believe that the Plan meets the best interests test because the Bankruptcy Court estimated for plan confirmation purposes that the aggregate Allowed Amount of present and future Class 5 GST Asbestos Claims alleging mesothelioma is no more than $125 million, s*ee In re Garlock Sealing Technologies LLC*, 504 B.R. 71, 97 (Bankr. W.D.N.C. 2014), and the Plan would provide a multiple of that amount, $480 million, to resolve Asbestos Claims. Under the Plan, GST Asbestos Claimants would receive settlement amounts that exceed the estimated allowed amounts of their claims, which is all that claimants would be entitled to receive in a Chapter 7 case.

The Estimation Opinion did not include the Class 5 Allowed GST Asbestos Claims for diseases other than mesothelioma, but the Bankruptcy Court observed, and Debtors believe the evidence would prove, that the Allowed Amounts of any non-mesothelioma GST Asbestos Claims are relatively small compared to mesothelioma claims. These Asbestos Claimants also would receive under the Plan amounts that exceed the Allowed Amounts of their Asbestos Claims.

All Class 5 Asbestos Claims against Coltec are contingent and unliquidated, and the Allowed Amount of such Claims individually or in the aggregate also has not been estimated. Based on the nature of the products it manufactured, and its history of making no indemnity payments and suffering no adverse verdicts, Coltec believes the Allowed Amounts of Class 5 Asbestos Claims against Coltec are relatively small, both individually and in the aggregate. (See Section 2.5.2 above for a discussion of Coltec's claims history.) Under the Plan, Coltec Asbestos Claims will be channeled to the Asbestos Trust and paid according to the terms of the CRP. In consequence of these matters Coltec believes holders of Coltec Asbestos Claims would receive more under the Plan than they would likely receive in a liquidation of Coltec under Chapter 7.

The Committee and FCR disagree with Debtors' liquidation analyses and their reliance on the Estimation Opinion. The Committee and FCR believe the Estimation Opinion was incorrect. Further, the Committee and FCR do not believe the Estimation Opinion would apply to determine or limit the Debtors' liabilities to Asbestos Claimants in Chapter 7 liquidation proceedings; those liabilities would be determined, instead, under the rules, doctrines, and procedures of the tort system.

Nevertheless, the Committee and FCR agree with Debtors that the Plan serves the best interests of creditors because, measured as of the Effective Date of the Plan, meritorious Asbestos Claims will be paid no less under the Plan than if the Debtors were liquidated under Chapter 7. The Committee and FCR's conclusion rests on such considerations as (1) the number and nature of Asbestos Claims already pending against the Debtors and those predicted to arise against them over a period of several decades, (2) the high costs that would be sustained in attempting to resolve the Asbestos Claims in a Chapter 7 liquidation, (3) the inability of the trustee in a Chapter 7 proceeding to make any distributions to creditors until all assets of the Debtors' estates were reduced to cash and all of the estates' liabilities were liquidated, and the resulting time-value discounts that would apply, (4) the unavailability under Chapter 7 of a section 524(g) channeling injunction or other reliable and satisfactory means of making provision for future Asbestos Claimants, (5) the deep discounts that would be absorbed in

converting GST's assets to cash in a Chapter 7 liquidation (to the extent that those assets would be saleable at all under the cloud of potential successor liability), and (6) the unlikelihood that Coltec would contribute substantial funding to resolve GST Asbestos Claims or Anchor Claims in a Chapter 7 liquidation.

### 7.5 INFORMATION ABOUT CORPORATE GOVERNANCE, OFFICERS, AND DIRECTORS OF REORGANIZED DEBTORS

#### 7.5.1 Management Compensation and Incentive Program

The Debtors' current officers and directors are disclosed on the attached **Exhibit 4** to the Disclosure Statement. The Debtors anticipate that the officers and directors of the Reorganized Debtors will be the same as the current officers and directors of the Debtors, but unanticipated changes may occur. Pursuant to Bankruptcy Code § 1129(a)(5), the Debtors will disclose, prior to the Confirmation Hearing, the identity of any individuals proposed to serve, after confirmation of the Plan, as a director or officer of any Reorganized Debtor to the extent they differ from those shown on **Exhibit 4**.

Currently, the total compensation package that the Debtors' officers and key employees receive includes base salary, annual bonus opportunities, long-term Cash incentives and other benefits. These packages and benefits are described in more detail in the Debtors' motion for authorization to continue certain employee benefit programs (Docket No. 42).

Debtors anticipate that the total compensation for the Reorganized Debtors' directors, officers and key employees after confirmation will continue to include base salary, annual bonus and long-term stock and Cash incentives and other benefits in accordance with the ordinary business policies of the Debtors.

#### 7.5.2 Prospective Officer and Director Insurance

Pursuant to Section 7.2.2 of the Plan, the Reorganized Debtors shall continue in force, purchase and extend the coverage period of directors and officers liability insurance with regard to any liabilities, losses, damages, claims, costs and expenses they or any current or former officer or director of any of the Debtors may incur, including but not limited to attorneys' fees, arising out of or due to the actions or omissions of any of them or the consequences of such actions or omissions, including, without limitation, service as an officer or director or liquidating trustee of any subsidiary of a Debtor, other than as a result of their willful misconduct or lack of fraud. Each such policy shall cover each current and former officer or director of any of the Debtors. Further, pursuant to Section 7.2.2 of the Plan, the Reorganized Debtors have an obligation to indemnify these parties for certain payments covered by the tail insurance. Therefore, without such insurance, if the Reorganized Debtors' current and/or former directors, officers and/or employees were sued after the Effective Date, the Reorganized Debtors could be required to satisfy such indemnification claims.

### 8. IMPORTANT CONSIDERATIONS AND RISK FACTORS

Holders of Claims who are entitled to vote on the Plan should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement,

before deciding whether to vote to accept or reject the Plan. The following disclosures are not intended to be inclusive and should be read in connection with the other disclosures contained in this Disclosure Statement and the Exhibits hereto. ***You should consult your legal, financial, and tax advisors regarding the risks associated with the Plan and the distributions you may receive thereunder***.

## 8.1 RISKS RELATED TO THE DEBTORS' BUSINESS AND THESE CHAPTER 11 CASES

### 8.1.1 Certain Risks Associated with the Chapter 11 Cases

Creditors may object to the classification of their Claims and/or oppose Confirmation of the Plan. There can be no assurance that the requisite acceptances for confirmation of a Chapter 11 plan will be received or that the Bankruptcy Court will confirm the Plan. If the Plan is not confirmed, it is unclear what Distributions the Holders of Allowed Claims will receive with respect to their Allowed Claims, or the timing of receipt of such Distributions, as it is unclear whether a confirmable alternative plan can be proposed by another party to these Chapter 11 Cases. If the Plan is not confirmed, Debtors may propose the Second Amended Plan or another plan that treats Asbestos Claims less favorably. Or, if the Plan is not confirmed and an alternate reorganization plan is not confirmed, it is possible that Debtors would have to liquidate, in which case it is possible that the Holders of Allowed Claims or Asbestos Claims could receive substantially less favorable treatment than they would receive under the Plan.

### 8.1.2 Risks Relating to the Projections

The Debtors have prepared projections set forth on **Exhibit 3** to the Disclosure Statement in connection with the development of the Plan and to present the projected effects of the Plan and the projected results of operations following the Effective Date of the Plan. These projections assume the Plan and transactions contemplated thereby will be implemented in accordance with their terms. Although Debtors believe the projections are reasonable, based upon independent, third-party economic forecasts of the regions in which they sell their products, the assumptions and estimates underlying such projections are inherently uncertain and are subject to, among other factors, business, economic, legislative, and competitive risks and uncertainties that could cause actual results to differ materially from those projected. Such uncertainties and other factors include approval by the Bankruptcy Court of the Plan and potential objections of third parties. Accordingly, the projections herein are not necessarily indicative of the future financial condition, results of operations, or equity value of the Debtors, which may vary materially from those projections. Although the Financial Projections represent management's view based upon current known facts and assumptions about the future operations of the Reorganized Debtors, there is no guarantee by the Debtors, their advisors, or any other person that the Financial Projections will be realized. However, Debtors believe they can make all payments required under the Plan even if Debtors do not achieve the projected results. Based on the financial disclosures of the Debtors, Coltec, and EnPro, the Committee and the FCR believe it is very likely all payments required under the Plan can be made, even if the projections turn out to be optimistic.

### 8.1.3 Risks Relating to the Value of the Reorganized Debtors

Because of the nature of Debtors' industries, and a variety of other factors, including without limitation, those set forth below, the Reorganized Debtors' operations could be adversely affected, and the ultimate recovery to the creditors is uncertain and cannot be predicted. Risks facing the Reorganized Debtors' operations include, without limitation:

- cyclical markets affected by general global economic conditions, particularly in North America and Europe;

- a prolonged and severe downward economic cycle;

- pricing and other competitive pressures;

- significant increases in expenses, including raw material, energy, product development, sales and marketing and labor costs, including pension and healthcare expenses;

- a material adverse change in relations with employees and/or labor unions;

- deteriorations in relationships with key independent agents or distributors;

- the inability to invest adequately in the business or to develop new products;

- the inability to gain customer acceptance, or slower than anticipated acceptance, of new products or product enhancements;

- technological breakthroughs rendering a product, a class of products, or a line of business obsolete;

- the inability to adapt to other improvements made by direct or indirect competitors;

- the acquisition (through theft or other unlawful means) or use by others of the Reorganized Debtors' proprietary technology and other know-how;

- changes in the replacement cycle for certain products resulting from improved product quality or improved maintenance;

- significant increases in product liability claims or costs;

- political and economic instability in non-US markets;

- material adverse changes in currency exchange rates (in particular, the U.S. dollar to Euro exchange rate);

- consolidation of major customers, which could increase customer purchasing power, thereby putting pressure on operating profits;

- loss of senior management and other key employees;

74

- greater than expected liabilities for environmental remediation;

- difficulties collecting insurance; and

- numerous other risks, including rising healthcare costs, adverse changes in tax rates, environmental laws, or other regulatory requirements, acts of hostility or war, work stoppages or other unforeseen business interruptions.

As noted in Section 8.1.2, above, the Debtors believe they have ample assets from which to pay all amounts required under the Plan, even if one or more of the above risk factors adversely affects the performance of the Reorganized Debtors' business operations after the Effective Date.

### 8.1.4 Leverage, Liquidity, and Capital Requirements

The Debtors' principal sources of liquidity following their emergence from bankruptcy will be net proceeds generated by business operations, payments on the Coltec Note and the Stemco Note (in the case of Reorganized GST), and collection of insurance. While the Debtors believe that they will have adequate liquidity to meet Plan funding and operational requirements following the Effective Date of the Plan, no assurances can be had in this regard.

### 8.1.5 Certain Risks of Non-Occurrence of the Effective Date

The consummation of the Plan is subject to certain conditions. There can be no assurance that all of the conditions necessary for the Plan to become "Effective" will be met. If the Plan were not to be consummated or become "Effective," it is unclear whether the transactions outlined in the Plan could be implemented and what distribution Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests. If an alternative plan of reorganization could not be confirmed, it is possible that the Debtors could have to liquidate their assets.

### 8.1.6 Prolonged Continuation of the Chapter 11 Cases May Harm the Debtors' Business

The prolonged continuation of these Chapter 11 Cases may adversely affect the Debtors' business and operations. So long as the Chapter 11 Cases continue, senior management of the Debtors may be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations. In addition, the longer the Chapter 11 Cases continue without a confirmed plan, the more likely it is that the Debtors' employees, customers, and suppliers may lose confidence in the Debtors' ability to successfully reorganize their business and seek alternative commercial options. Further, so long as the Chapter 11 Cases continue without a confirmed plan, the Debtors will incur substantial costs for professional fees and expenses associated with the proceedings.

### 8.1.7 Risks Relating to Coltec's Chapter 11 Filing

In the event the requisite vote to accept the Plan is not received from the Class 5 Claimants, then the Coltec Restructuring will not be consummated, no Chapter 11 case will be

filed by OldCo, and the Plan's proposal for payment of Coltec Asbestos Claims will not be realized.

### 8.1.8    Risks of Non-Confirmation of the Plan

If the Plan is not confirmed, it is unclear what distributions, if any, the Holders of Allowed Claims would receive with respect to their Allowed Claims, or the timing of such distributions. If the Plan is not confirmed and an alternate reorganization plan could not be confirmed, it is possible that the Debtors would have to liquidate their Assets.

### 8.1.9    Risk of Post-Confirmation Default

At the Confirmation Hearing, the Court will be required to make a judicial determination that the Plan is feasible, but that determination does not serve as any guarantee that there will not be any post-confirmation defaults. The Debtors believe that the cash flow generated from operations, insurance proceeds, and Cash on hand will be sufficient to meet the Reorganized Debtors' operating requirements and other post-confirmation obligations under the Plan. The Reorganized Debtors' projected operating cash flow is set forth in the Debtors' prospective financial information that is included as **Exhibit 3** to the Disclosure Statement.

### 8.1.10   Objections to Claims

Except as otherwise provided in the Plan and the Final DIP Order (Docket No. 226), the Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest deemed Allowed under the Plan, except for Asbestos Claims. Asbestos Claims will not be subject to such objections because they will not be "Allowed." Rather, they will be channeled to the Asbestos Trust for processing and, if eligible, payment under the CRP. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is subject to an objection.

### 8.1.11   Risk Regarding the Solvent Insurance Carriers

Debtors' ultimate recovery of insurance proceeds may be affected by the financial status of the remaining solvent insurance carriers. In addition, it is uncertain whether or how much Debtors will be able to recover from the Additional Coltec Insurance.

### 8.2      **RISK FACTORS AFFECTING THE ASBESTOS TRUST**

The Trust will be funded with assets worth, in the aggregate, $480 million within one year after the Effective Date. The Maximum Settlement Values and Medical Information Factors along with other factors determine the settlement offers given to Asbestos Claimants under the CRP. Subject to the requirements of the Term Sheet and the CRP, the parties have agreed on preliminary Maximum Settlement Values and Medical Information Factors for Disclosure Statement purposes. The Asbestos Trustee, however, will have full authority to set Maximum Settlement Values and Medical Information Factors, in consultation with his own experts, before the Trust begins paying claims. Furthermore, the CRP permit the Trustee to adjust the Maximum Settlement Values and Medical Information Factors over time to ensure equal treatment of present and future Asbestos Claimants. Thus, there can be no guarantee that Asbestos Claimants

will receive the settlement offers implied by the Maximum Settlement Values and Medical Information Factors currently contained in the CRP attached to this Disclosure Statement. Conversely, it is possible that the Trustee could increase Maximum Settlement Values and Medical Information Factors over time, in which case Asbestos Claimants could receive settlement offers greater than those implied by the CRP attached to this Disclosure Statement.

## 9. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan Proponents believe that the Plan affords the Holders of Claims and Equity Interests the potential for the greatest realization on their Claims and Equity Interests and, therefore, is in the best interest of such Holders. If the Plan is not confirmed, however, the theoretical alternatives include (1) continuation of the pending Chapter 11 Cases, (2) alternative plans of reorganization, or (3) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

### 9.1 CONTINUATION OF THE CHAPTER 11 CASES

If the Debtors remain in Chapter 11 and the Plan, as currently proposed, is not confirmed within the time period projected, the Debtors could continue to operate their businesses and manage their properties as Debtors in Possession. However, the value of assets and cash flow could be affected by the expenses of operating under Chapter 11 of the Bankruptcy Code for a further extended period of time, and significant delay in recoveries for Claimants and Interest Holders could result under any future plan of reorganization.

### 9.2 ALTERNATIVE PLANS OF REORGANIZATION

If the Plan is not confirmed, it is possible that any other party in interest in the Chapter 11 Cases could attempt to formulate and propose a different plan or plans on such terms, as they may desire. Debtors might propose the Second Amended Plan or an alternative plan that treats Asbestos Claimants less favorably. Such alternative plan would still have to meet the requirements of confirmation. The Plan Proponents believe that the Plan provides the best and quickest potential return to both the Debtors' Claimants and Equity Interest Holders.

### 9.3 CHAPTER 7 LIQUIDATION

If the Plan is not confirmed, the Debtors may be forced to liquidate, either through conversion to a case under Chapter 7 of the Bankruptcy Code, or through a dissolution proceeding under state law, or both, since the Chapter 7 trustee may choose to liquidate the Debtors' assets through a proceeding under Chapter 7 of the Bankruptcy Code, and then commence a dissolution proceeding under North Carolina law.

## 10. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the Plan based upon the IRC, judicial authorities, and current administrative rulings and practices now in effect, all of which are subject to change at any time by legislative, judicial, or administrative action. Any such change could be retroactively applied in a manner that could

adversely affect the Debtors, Reorganized Debtors, the Asbestos Trust, Holders of Claims, and Holders of Equity Interests.

The tax consequences of certain aspects of the Plan are uncertain due to the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below. The Debtors have not requested a tax ruling from the IRS. The Debtors may obtain either (a) a private letter ruling establishing the Asbestos Trust is a "qualified settlement fund" pursuant to Section 468B of the IRC, or (b) an opinion of counsel regarding the tax consequences satisfactory to Debtors. However, there can be no assurance the treatment set forth in the following discussion will be accepted by the IRS. Further, the federal income tax consequences may be affected by matters not discussed below. For example, the following discussion does not address state, local or foreign tax considerations that may be applicable; further, it does not address the tax consequences of the Plan to certain types of Holders of Claims or Equity Interests, creditors, and stockholders (including foreign persons, financial institutions, life insurance companies, tax-exempt organizations, and taxpayers who may be subject to the alternative minimum tax) who may be subject to special rules not addressed herein.

The discussion set forth below is included for general information only. The Debtors and their counsel and financial advisors are not making any representations regarding the particular tax consequences of confirmation and consummation of the Plan, nor are they rendering any form of legal or tax advice on such tax consequences. The tax laws applicable to corporations in bankruptcy are extremely complex, and the following summary is not exhaustive.

Except where essential to the context, references to the "Debtors" in Article 10 herein refer to both the Debtors and Reorganized Debtors, collectively.

### 10.1 FEDERAL INCOME TAX CONSEQUENCES

#### 10.1.1 General Discussion

In general, the Debtors do not expect to incur any substantial tax liability as a result of implementation of the Plan and do not expect to realize any significant amount of cancellation of indebtedness income. Upon consummation of the Plan, the Debtors expect the EnPro consolidated group, which will include the Debtors, to have net operating losses (NOLs) available to carry back to prior years and to offset future taxable income. The Debtors expect the EnPro consolidated group's NOLs to be enhanced by the contributions to the Asbestos Trust provided for under the Plan.

#### 10.1.2 Deduction of Amounts Transferred to Satisfy Asbestos Claims

The tax treatment of transfers of property by Debtors to the Asbestos Trust will vary depending on the characterization of the trust, e.g., as a "grantor trust" as defined by Section 671 et seq. of the IRC, or as a "qualified settlement fund" ("**QSF**") as defined by Treasury Regulation Section 1.4681B-1 *et seq.* Debtors currently expect that the Asbestos Trust will be treated as a QSF for federal income tax purposes, meaning the Debtors should be entitled to an immediate deduction for cash and the fair market value of property contributed by the Debtors to the Asbestos Trust.

### 10.1.3  Cancellation of Debt Income

Under the IRC, a taxpayer generally recognizes gross income to the extent indebtedness of the taxpayer is cancelled for less than the amount owed by the taxpayer, subject to certain judicial or statutory exceptions. The most significant of these exceptions with respect to the Debtors is that taxpayers who are operating under the jurisdiction of a federal bankruptcy court are not required to recognize such income. In that case, however, the taxpayer must reduce its tax attributes, such as its NOLs, general business credits, capital-loss carryforwards, and tax basis in assets, by the amount of the cancellation of indebtedness income ("**CODI**") avoided.  Debtors do not expect to realize any significant CODI upon consummation of the Plan because the Debtors expect that Claimants entitled to Distributions under the Plan will receive cash equal to the total amount of their Allowed Claims (including accrued but unpaid interest), or, if they are Asbestos Claimants, will receive cash equal to the amounts they are entitled to under the CRP.

### 10.1.4  Net Operating Losses

As a result of deductions that will be generated by contributions to the Asbestos Trust, Debtors expect the EnPro consolidated group, of which Debtors will remain members, to have NOLs.  The extent to which a corporation is able to utilize its NOLs after emerging from bankruptcy often depends on Section 382 of the IRC, which generally imposes an annual limitation on a corporation's use of its NOLs (and may limit a corporation's use of certain built-in losses if such built-in losses are recognized within a five-year period following an "ownership change," as defined below) if a corporation undergoes an ownership change. In the instant case, however, there should be no such limit on the use of the EnPro group's NOLs because neither EnPro, GST, nor Garrison is expected to undergo an ownership change.

### 10.1.5  Alternative Minimum Tax

In general, a federal alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent AMT exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  In particular, a corporation generally is entitled to offset no more than 90 percent of its AMTI with NOL carrybacks and carryforwards (as recomputed for AMT purposes).  Accordingly, Debtors' use of their NOLs in both carryback and carryforward years may be subject to limitations for AMT purposes in addition to any other limitations that may apply.  Any AMT the Debtors pay generally will be allowed as a nonrefundable credit against their regular federal income tax liability in future years when they are no longer subject to AMT.

### 10.1.6  Federal Income Tax Consequences to Holders of Claims and the Asbestos Trust

#### 10.1.6.1  Holders of Asbestos Claims

To the extent payments from the Asbestos Trust to Claimants constitute damages on account of personal injuries, such payments should not constitute gross income to such

Claimants, except to the extent such payments are attributable to medical expense deductions allowed under Section 213 of the IRC for a prior taxable year.

### 10.1.6.2 Treatment of the Asbestos Trust

The Debtors expect the Asbestos Trust will be a QSF for federal income tax purposes. As a QSF, the Asbestos Trust will be subject to a separate entity level tax on its income at the maximum rate applicable to trusts and estates. In determining the taxable income of the Asbestos Trust, (a) any amounts contributed to the Asbestos Trust will not be taxable income, (b) any sale, exchange or distribution of property by the Asbestos Trust will result in the recognition of gain or loss equal to the difference between the fair market value of the property on the date of the sale, exchange or distribution and the adjusted tax basis of such property, (c) interest income and dividend income will be taxable income, and (d) administrative costs (including state and local taxes) will be deductible. In general, the adjusted tax basis of property received by the Asbestos Trust will be its fair market value at the time of receipt.

### 10.1.6.3 Consequences to Holders of GST General Unsecured Claims

Pursuant to the Plan, each Holder of a GST General Unsecured Claim will receive cash in full satisfaction and discharge of its Allowed Claim. The Holder of an Allowed GST General Unsecured Claim will recognize gain or loss equal to the difference between (i) the cash received that is not allocable to accrued interest, and (ii) the Holder's basis in the debt instrument constituting the surrendered Allowed GST General Unsecured Claim. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the debt constituting the surrendered Allowed GST General Unsecured Claim were held for more than one year. To the extent a portion of the cash received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income. See Section 10.1.6.3.1 (Accrued Interest).

#### 10.1.6.3.1 Accrued Interest

To the extent an amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued interest that was not previously included in the Holder's gross income, such amount should be taxable to the Holder as interest income.

#### 10.1.6.3.2 Market Discount

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of the gain realized by a Holder of a debt instrument constituting an Allowed Claim may be ordinary income (instead of capital gain) to the extent of market discount on the debt instrument. In general, a debt instrument is acquired with market discount if the Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest or (ii) in the case of a debt instrument issued with original issue discount of at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity), its adjusted issue price. Any gain recognized by a Holder on the disposition of surrendered debts (determined as described above) that had been acquired with market discount should be ordinary income to the extent of

80

the market discount that accrued while such debts were held by the Holder (unless the Holder elected to include market discount in income as it accrued).

### 10.1.7 U.S. Federal Information Reporting and Backup Withholding

All distributions under the Plan will be subject to applicable federal income tax reporting and withholding. The IRC imposes "backup withholding" (currently at a rate of 28 percent) on certain reportable payments, including interest, to certain taxpayers. A Holder of a Claim may be subject to backup withholding on distributions or payments made pursuant to the Plan unless the Holder (a) comes within certain exempt categories (which generally include corporations) and, when required, so demonstrates, or (b) provides at the applicable disbursing agent's request a completed IRS Form W-9 (or substitute therefore) on which the Holder includes a correct taxpayer identification number and certifies under penalty of perjury the taxpayer identification number is correct and the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional federal income tax but merely an advance payment that may be refunded to the extent it results in an overpayment of income tax. A Holder of a Claim may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding. Non-U.S. Holders may be required by the applicable disbursing agent to complete certain IRS forms to establish an exemption from, or a treaty-reduced rate of, withholding on interest distributed pursuant to the Plan.

## 11.   CONCLUSION AND RECOMMENDATION

If you are the Holder of an Asbestos Claim in Class 5, your vote on and support of the Plan is important. The Plan Proponents strongly recommend that you vote in favor and support confirmation of the Plan. The Plan Proponents strongly recommend that all other Holders of Claims and Interests support confirmation of the Plan.

[Signature Pages to Follow]

Respectfully submitted,

**GARLOCK SEALING TECHNOLOGIES LLC**:


By:     s/Elizabeth Barry
Name: Elizabeth Barry
Title:  Chief Restructuring Officer


**GARRISON LITIGATION MANAGEMENT GROUP, LTD.:**


By:     s/Elizabeth Barry
Name: Elizabeth Barry
Title:  General Manager, Vice President, Director
          of Finance, Treasurer and Assistant Secretary


**THE ANCHOR PACKING COMPANY:**


By:     /s/Elizabeth Barry
Name: Elizabeth Barry
Title:  Vice President and General Manager


**COLTEC INDUSTRIES INC (predecessor in interest to OldCo, LLC):**


By:     /s/Robert S. McLean
Name: Robert S. McLean
Title:  Vice Chairman and Secretary


[SIGNATURES CONTINUED ON NEXT PAGE]

82

**FUTURE ASBESTOS CLAIMANTS' REPRESENTATIVE:**

By:   /s/Joseph W. Grier, III
Name: Joseph W. Grier, III

**AD HOC COLTEC FUTURE ASBESTOS CLAIMANTS' REPRESENTATIVE:**

By:   /s/Joseph W. Grier, III
Name: Joseph W. Grier, III

**OFFICIAL COMMITTEE OF ASBESTOS
PERSONAL INJURY CLAIMANTS:**

By:   /s/Trevor W. Swett III
Name: Trevor W. Swett III
Firm:  Caplin & Drysdale, Chartered
Title:  Counsel to the Official Committee of Asbestos Personal Injury Claimants

**AD HOC COLTEC ASBESTOS CLAIMANTS COMMITTEE:**

By:   /s/Trevor W. Swett III
Name: Trevor W. Swett III
Firm:  Caplin & Drysdale, Chartered
Title:  Counsel to the Ad Hoc Coltec Asbestos Claimants Committee

[Signature Page to Disclosure Statement for Modified Joint Plan of Reorganization]