

FILED & JUDGMENT ENTERED
Steven T. Salata

August 23 2021

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| In re | Chapter 11 |
| ALDRICH PUMP LLC, et al.,[1] | No. 20-30608 (JCW) |
| Debtors, | (Jointly Administered) |
| ALDRICH PUMP LLC AND MURRAY BOILDER LLC, | |
| Plaintiffs, | Adversary Proceeding |
| v. | No. 20-03041 (JCW) |
| THOSE PARTIES TO ACTIONS LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000. | |
| Defendants. | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING ORDER: (I) DECLARING THAT THE AUTOMATIC STAY APPLIES TO CERTAIN ACTIONS AGAINST NON-DEBTORS, (II) PRELIMINARILY ENJOINING SUCH ACTIONS, AND (III) GRANTING IN PART DENYING IN PART THE MOTION TO COMEPL

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Aldrich Pump LLC (2290) and Murray Boiler LLC (0679). The Debtors' address is 800-E Beaty Street, Davidson, North Carolina 28036.

## I.     PROCEDURAL BACKGROUND

1.      The Debtor's predecessors are respectively, the former Trane Technologies Company LLC, successor by merger to Ingersoll-Rand Company (a former New Jersey corporation) (collectively, "Old IRNJ"), and the former Trane U.S. Inc. ("Old Trane"). These entities and their subsidiary companies were global manufacturers of climate control products for buildings, homes, and transportation.

2.      On May 1, 2020, Old IRNJ and Old Trane utilized a provision under Texas law to undergo divisional mergers. Old IRNJ divided itself into two companies: Trane Technologies Company LLC ("New TTC") and Aldrich, LLC ("Aldrich"). Old Trane similarly divided itself into two companies: Trane U.S. Inc. ("New Trane") and Murray Boiler LLC ("Murray").

3.      New TTC and New Trane are almost mirror images of Old IRNJ and Old Trane:  fully operating companies that retained all of their predecessor's employees, the bulk of their assets and business operations, and all of their non-asbestos creditors.  The other new entities, Aldrich and Murray, are quite different. The merger allocated to them no employees, no operations, and relatively few assets. However, in one respect the mergers were quite generous with Aldrich and Murray. The two new companies were allocated 100% of their respective predecessor's considerable asbestos liabilities.

4.      Seven weeks later, on June 18, 2020 (the "Petition Date"), Aldrich and Murray (together, the "Debtors") filed voluntary chapter 11 petitions (together, these "Chapter 11 Cases") in this bankruptcy court, and the complaint initiating this Adversary Proceeding.

5.      The complaint in turn was accompanied by a motion for a temporary restraining order, a preliminary injunction, and a request for declaratory relief (that the automatic

stay in 11 U.S.C. § 362 applied to such actions) (the "PI Motion") [Adv. Pro. Dkt. 2]. Through the PI Motion, the Debtors seek an indefinite, nationwide preliminary injunction that would protect the parties defined by the Debtors as "Protected Parties" from litigation involving any claim attributable to the Debtors' newly acquired asbestos liabilities. These non-debtor "Protected Parties" are 204 affiliates of the Debtors ("Non-Debtor Affiliates"), including TTC and New Trane, 15 unaffiliated entities that allegedly hold asbestos-related indemnification rights against the Debtors under prepetition sale and divestiture agreements ("Indemnified Parties") and 182 insurance companies ("Insurers" and collectively, the "Protected Parties").[2]

6.      On June 22, 2020, certain asbestos personal injury claimants filed objections to the Debtors' request for a temporary restraining order [Adv. Pro. Dkts. 17, 18, 20]. On that same day, an emergency hearing was held, and on June 25, 2020, the Court entered the *Temporary Restraining Order* [Adv. Pro. Dkt. 26] (the "TRO") to preserve the then-existing status quo. The TRO ran through and including July 6, 2020.  Following a second hearing held on July 6, 2020, the TRO was extended through July 23, 2020 [Adv. Pro. Dkt. 51].

7.      On July 15, 2020, a hearing was held to consider, among other things, the entry of an order that provided for a preliminary injunction through the date of a full hearing on the Motion.  On July 23, 2020, the Court entered an agreed order [Adv. Pro. Dkt. 58] in a form negotiated by the Debtors and the Official Committee of Asbestos Personal Injury Claimants (the "ACC"), which order continued the injunction imposed by the TRO pending a future hearing on the merits of the Motion.

---

[2] The Protected Parties are identified on Appendix B to the Motion, as revised [Adv. Pro. Dkt. 21] ("Revised Appendix B").

8.      After the appointments of the ACC   and   the   Future   Claimants'
Representative (the "FCR") as well as counsel therefor, the ACC, the FCR, the Debtors, and the
Non-Debtor   Affiliates engaged in extensive discovery in this Adversary Proceeding.

9.      On December 31, 2020, New TTC and New Trane filed a joint response in
support of the PI Motion [Adv. Pro. Dkt. 84] (the "TTC/New Trane Initial Response").

10.      On January 25, 2021, Aldrich and Murray filed the *Debtors' Motion for
Partial Summary Judgment That All Actions Against the Protected Parties to Recover
Aldrich/Murray Asbestos Claims Are Automatically Stayed by Section 362 of the Bankruptcy Code*
[Adv. Pro. Dkt. 90] (the "Summary Judgment Motion").

11.      On February 8, 2021, Joseph W. Grier, III, the FCR, joined the Summary
Judgment Motion [Adv. Pro. Dkt. 105]. On March 19, 2021, the FCR filed his initial submission
in support of the PI Motion [Adv. Pro. Dkt. 129] (the "FCR's Initial Submission").[3]

12.      On March 24, 2021 the ACC filed its *Motion of the Official Committee of
Asbestos Personal Injury Claimants to Compel the Debtors and Non-Debtor Affiliates to (I)
Provide Testimony Regarding Certain Matters and (II) Produce Certain Withheld Documents*
[Adv. Pro. Dkt. 141] (the "Motion to Compel").

13.      On April 2, 2021 the ACC filed its opposition [Adv. Pro. Dkt. 151] (the
"ACC Objection") to the PI Motion and declaratory relief and then on April 19, 2021, and after
the close of fact depositions, a supplemental memorandum in opposition [Adv. Pro. Dkt. 179] (the
"Supplemental ACC Objection") to the two Motions.

---

[3] The FCR's support of the Debtors' motions distinguishes this asbestos bankruptcy case from two similar pending cases in this District, *Bestwall*, and *DBMP*. In those cases, the FCR's oppose the preliminary injunction, as well as the bankruptcy case.

14.     On April 14, 2021 the Debtors filed *The Debtors' Objection to Official Committee of Asbestos Personal Injury Claimants' Motion to Compel* [Adv. Pro. Dkt. 173] and the Non-Debtor Affiliates filed the *Non-Debtor Affiliates' Objection to the Official Committee of Asbestos Personal Injury Claimants' Motion to Compel* [Adv. Pro. Dkt. 176].

15.     On April 23, 2021, the Debtors, New TTC/New Trane and the FCR,  filed replies in response to both the ACC Objection and the Supplemental ACC Objection: [Adv. Pro. Dkt. 187] (the "FCR's Reply"); [Adv. Pro. Dkt. 188] (the "Debtors' Reply"); and [Adv. Pro. Dkt. 193] (the "New TTC/New Trane Reply").

16.     The Motions were heard together upon a consolidated evidentiary record. Due to the COVID-19 Pandemic, and by consent, the hearing was conducted remotely via Microsoft Teams from May 5 through May 7, 2021 (the "Hearing"). The Court heard (a) opening statements  from the Debtors, the ACC, and the FCR; (b) live testimony from Allan Tananbaum (Chief Legal Officer and Secretary for each Debtor), Amy Roeder (Chief Financial Officer, Treasurer, and Member of the Board of Managers for each Debtor), and Chris Kuehn (Senior Vice-President, Chief Financial Officer and Board Member of New TTC and Vice-President of New Trane) and three expert witnesses, Laureen M. Ryan of Alvarez & Marsal and Dr. Charles H. Mullin of Bates White for the Debtors, and Matthew Diaz of FTI Consulting, Inc. for the ACC;[4] and (c) closing arguments from the Debtors, the ACC, and the FCR. Subject to reservations of evidentiary objections, the Court received proffers of the parties' evidence, including deposition designations and the parties' exhibits.

---

[4] The parties stipulated to, and the Court accepted, the qualifications of each of these witnesses to provide testimony as expert witnesses.

17.     On June 10, 2021, the parties filed an Evidentiary Stipulation that detailed their agreement on the admission into evidence of the testimony proffered at the Hearing, whether elicited live during the Hearing or submitted through deposition designations or the proffered exhibits.

18.     The Court has reviewed and considered the Motions, Responses, Replies, and all related briefing papers filed in connection with the Motions; the Court has reviewed and considered the testimonial and documentary evidence proffered at or in connection with the Hearing, and the Court has heard and considered the arguments of counsel presented during the Hearing.

**Holding:** By virtue of the Texas merger statutes, the asbestos claims of Old IRNJ and Old Trane that the ACC and the individual asbestos claimants would like to pursue in the tort system as against the Protected Parties, primarily New TTC and New Trane, are presently claims owed by Aldrich and/or Murray and no other party. Thus, they are subject to the automatic stay under Bankruptcy Code Sections 362(a)(1) and/or Section 105.

Due to the apparent negative effects of the Divisional Merger (and these ensuing bankruptcy filings) on the legal rights of Asbestos Claimants, that Merger and its allocations may constitute avoidable fraudulent transfers and/or be subject to attack under remedial creditor doctrines like alter ego and successor liability.  If so, New TTC and New Trane could eventually be held responsible for Old IRNJ and Old Trane's asbestos liabilities, in whole or in part.

However, the aforementioned apparent injuries are not specific to individual creditors but are instead "general" injuries—as to Aldrich/Murray as well as their respective asbestos claimants. With the Debtors in chapter 11, if such remedial actions lie, these causes are: (a)

bankruptcy estate property under Section 541 and/or (b) avoidance actions that, under the
Fourth Circuit's "first crack" doctrine, must be asserted by a bankruptcy trustee, and not
individual creditors. Thus, the causes of action by which the Divisional Merger might be
contested—and through which claims might be asserted against the Protected Parties—are
bankruptcy estate property under Section 541, and also subject to the automatic stay,
particularly Section 362(a)(3). Additionally, the Debtors' insurance coverage is estate
property and protected by the automatic stay.

Essentially, what the Representatives seek by their opposition to the Preliminary
Injunction is an end to this Chapter 11 Case. This is problematic because (1) there is no
pending motion to dismiss, and (2) as Judge Beyer's recent *Bestwall* decision reflects, due
to the Fourth Circuit's exacting *Carolin s*tandard, dismissal of a chapter 11 case—even one
potentially filed in bad faith—is difficult to obtain in the early stages of the bankruptcy case.[5]

Because dismissal is not directly obtainable at this point in the proceeding, nor may
it be had through indirect means—as by asserting Aldrich/Murray Asbestos Claims against
the Protected Parties and by permitting individual creditors to assert estate causes of action
for their sole benefit, as would occur if the preliminary injunction were to be denied.

At present, we have two pending chapter 11 reorganization cases.[6] Given the
potentially deleterious effects of the Divisional Merger on asbestos claimants, the necessity
of the Debtors reaching agreement on a Section 524(g) Plan and trust with a supermajority
of the asbestos claimants, and the need to establish "good faith" at confirmation, these
reorganization attempts may or may not bear fruit. However, under controlling Circuit
precedent, Aldrich/Murray are entitled to try to reorganize and to persuade the asbestos

---

[5] *In re Bestwall LLC, 605 B.R. at 48-51 (*citing *Carolin Corp., 886 F.2d at 700-01).
[6] These cases are jointly administered, and hereinafter are treated as a single reorganization.

claimants to join them in a Section 524(g) plan.  Clearly, reorganization will be impossible without the benefit of the automatic stay and the preliminary injunction.

The lingering Motion to Compel filed by the ACC seeks to obtain both testimony and written materials created and used by the Debtors during their Board of Managers meetings. The Debtors and Non-Debtor Affiliates objected to the Motion to Compel and made privilege assertions. Though many of these matters appear to in fact be privileged, the Debtors proceeded to testify about these topics to their advantage. However, the attorney client and work product privileges may not be used by the Debtors as both a 'shield and sword.' In lieu of this, the Court will ignore the testimony and look to the documentary evidence and the implications of the Debtors actions.

Accordingly, and without endorsing the prepetition actions of Old IRNJ, Old Trane, Aldrich and/or Murray, this Court concludes: (1) on undisputed determinative facts and as a matter of law, the Section 362(a) automatic stay applies to these actions such that the Summary Judgment motion should be **GRANTED**, (2) the Preliminary Injunction Motion should also be **GRANTED,** and the injunction maintained while this case proceeds, and (3) the ACC's Motion to Compel is **GRANTED** in part, **DENIED** in part.

To that end, and pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable to these proceedings by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure, enters the following Findings of Fact and Conclusions of Law in connection with that determination:

## II.    FINDINGS OF FACT[7]

### A.    The Parties and the Request for Relief

19.    The Plaintiffs in this Adversary Proceeding are Debtors Aldrich and Murray, North Carolina limited liability companies and debtors in possession in the Chapter 11 Cases. Aldrich and Murray are at present indirect subsidiaries of Trane Technologies plc ("Trane plc"). Trane plc is a publicly traded company with numerous subsidiaries and is a global manufacturer of residential and commercial climate products.

20.    The U.S. headquarters of Trane, New TTC, New Trane, and these Debtors are located in Davidson, North Carolina.[8]

21.    The Defendants are those parties listed on Appendix A to the PI Motion and John and Jane Does 1-1000 (collectively, the "Defendants"). The Defendants listed on Appendix A are named plaintiffs in the asbestos-related lawsuits against one or both of the Debtors (or for which either Debtor is responsible), who sought to hold, or may seek to hold, the Protected Parties liable for Aldrich/Murray Asbestos Claims. John and Jane Does 1-1000 are prospective plaintiffs who may, at any time while the Chapter 11 Cases are pending, seek to hold the Protected Parties liable for Aldrich/Murray Asbestos Claims.

22.    The Protected Parties are those parties identified in Revised Appendix B[9], along with Old IRNJ and Old Trane.[10] In addition to Old IRNJ and Old Trane, Revised Appendix B identifies as Protected Parties: (A) the Non-Debtor Affiliates, including New TTC and New Trane, all of which are corporate affiliates of the Debtors, to whom the Debtors owe various

---

[7] To the extent any of the following findings of fact constitute conclusions of law, they are adopted and treated as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted and treated as such.
[8] Hr'g Tr. 89:6-10, May 5, 2021.
[9] ACC Ex. 47.
[10] Neither of which currently exists.

indemnity obligations, detailed in paragraphs 33 and 60 of Revised Appendix B; (B) entities to which Aldrich's or Murray's predecessors divested businesses, in many cases in the distant past, in connection with which divestitures, those predecessors contractually agreed to indemnify and defend the purchasers of the divested businesses on account of asbestos liabilities relating to products manufactured pre-divestiture (now, Aldrich/Murray Asbestos Claims), or otherwise agreed to be responsible for any such liability (the "Indemnified Parties")[11]; and (C) insurers that issued legacy insurance coverage for Aldrich/Murray Asbestos Claims (the "Insurers")[12].

23.      "Aldrich/Murray Asbestos Claims" are asbestos-related claims against either Debtor, including all claims relating to asbestos or asbestos-containing materials asserted against, or that could have been asserted against, Old IRNJ or Old Trane. Aldrich/Murray Asbestos Claims include asbestos personal injury claims and other asbestos-related claims allocated to, respectively, Aldrich from Old IRNJ or Murray from Old Trane, in the corporate restructurings that Old IRNJ and Old Trane each completed on May 1, 2020 (together, and as further described below, the "2020 Corporate Restructuring").[13]

24.      In these Chapter 11 Cases, the Debtors have stated an intention to "finally and fairly"[14] resolve all Aldrich/Murray Asbestos Claims through the consummation of a plan of reorganization that includes the establishment of a trust under section 524(g) of title 11 of the United States Code (the "Bankruptcy Code").[15]

25.      In this Adversary Proceeding, the Debtors seek, pursuant to sections 105 and 362 of the Bankruptcy Code, an order prohibiting the Defendants from continuing or

---

[11] *See* Hr'g Tr. 123:10-125:2, May 5, 2021
[12] *See* Hr'g Tr. 125:3-126:17, May 5, 2021
[13] The Aldrich/Murray Asbestos Claims do not include asbestos-related claims for which the exclusive remedy is provided under workers' compensation statutes and similar laws.
[14] Adv. Pro. Dkt. 2 at p. 3.
[15] *See* Hr'g Tr. 135:9-12, 199:7-12, May 5, 2021.

commencing against any of the Protected Parties any action or claim asserting, on any theory of liability (whether direct, derivative, joint and several, successor liability, vicarious liability, fraudulent or voidable transfer or conveyance, alter ego, or otherwise), any Aldrich/Murray Asbestos Claim.

26.    In addition, the Debtors seek a declaration, pursuant to sections 362(a)(1) and 362(a)(3) of the Bankruptcy Code, that the automatic stay applies to the filing and continued prosecution of Aldrich/Murray Asbestos Claims. Partial summary judgment is sought on this issue.

27.    The FRC supports the Debtors' motions. However, the ACC is dismissive of the Debtors' avowed good intentions and objects. Given the prepetition Corporate Restructuring, the Divisional Merger, and the decision to have two of the resulting entities carry all of Old IRNJ and Old Trane's asbestos liabilities into bankruptcy, the ACC views these cases as a gross abuse of chapter 11. Further, and according to the ACC, the Injunction Motion is simply the last of several intentional actions by the Trane entities to isolate asbestos claimants and to impair their rights.

### B.    Corporate History

28.    Ingersoll Rock Drill Company opened its doors in 1871 and eventually took the name Ingersoll-Sargent Drill Company. Merging with Rand Drill Company in 1905, the resulting entity—Ingersoll-Rand—became a global provider of industrial equipment and technology. As part of its business, Ingersoll-Rand historically produced pumps and compressors that used asbestos-containing products such as gaskets and packing bought from suppliers.[16]

29.    In 2002, Old IRNJ engaged in a transaction in which the company's ultimate parent, Ingersoll-Rand plc ("IR plc"), incorporated in Bermuda. In June 2008, IR plc acquired

---

[16] *See* Informational Brief of Aldrich Pump LLC and Murray Boiler LLC, at 9, 3:20-bk-30608, Dkt. No. 5 ("Informational Brief").

HVAC supplier Trane U.S. Inc. (formerly known as American Standard Companies, Inc.)—*i.e.*, the former Trane—as well as the additional asbestos liabilities stemming from former Trane's asbestos-containing boilers and HVAC components.[17]

### C.    The Debtors' Relevant Products and Asbestos Litigation History

30.    Old IRNJ and Old Trane did not mine or use asbestos in manufacturing products.[18] Rather, the Debtors' predecessors made industrial equipment that, in some instances, incorporated certain asbestos-containing components manufactured and designed by third parties.[19]

31.    As a general matter, asbestos-related claims brought against Old IRNJ/Aldrich typically relate to exposure to asbestos from sealing products (*i.e.*, gaskets and some packing) incorporated into Old IRNJ pumps and compressors.[20] Generally, the asbestos used in such sealing product components was the chrysotile form of asbestos and was encapsulated.[21] Old IRNJ largely eliminated the use of asbestos-containing components by the mid-1980s.[22]

32.    Asbestos-related claims brought against Old Trane/Murray typically relate to climate control, or HVAC equipment, some railroad equipment, and some boiler equipment.[23] Again, these claims largely concern gaskets incorporated into Old Trane equipment.[24] In addition, limited claims have been asserted against Old Trane on account of boilers manufactured in the 1950s and prior thereto that were jacketed externally with asbestos-containing products.[25] Similar

---

[17] *Id.* at 11.
[18] Hr'g Tr. 92:8-93:23, May 5, 2021.
[19] Hr'g Tr. 91:24-93:23, May 5, 2021.
[20] Hr'g Tr. 92:8-17, May 5, 2021.
[21] *Id.*
[22] Hr'g Tr. 92:18-22, May 5, 2021.
[23] Hr'g Tr. 92:24-93:15, May 5, 2021.
[24] Hr'g Tr. 93:4-11, May 5, 2021.
[25] Hr'g Tr. 93:12-15, May 5, 2021.

to Old IRNJ, Old Trane largely eliminated asbestos-containing components from its  equipment

products by the mid-1980s.[26]

33.    Old IRNJ and Old Trane were served with their first asbestos complaints

in the 1980s.[27] The scope and magnitude of the asbestos litigation against Old IRNJ and Old Trane

(and most recently, Aldrich and Murray), has grown over time, particularly the volume of

mesothelioma claims, which drive the companies' indemnity costs.[28] Together, Old IRNJ and Old

Trane  paid less than $4 million to settle mesothelioma claims in the tort system from the mid-

1980s through 2000.[29]

34.    However, as the primary asbestos manufacturers, commonly known as the

"Big Dusties," began to file for bankruptcy protection in the early 2000s, the number of claims

filed against Old IRNJ and Old Trane increased dramatically.[30] By the late 2000s, over 2,500

mesothelioma claims were asserted against the Old IRNJ and Old Trane, annually.[31] Inclusive of

claims involving lung cancer and other diseases, approximately 5,000 asbestos-related claims

were asserted annually against Old IRNJ and Old Trane from 2015 to 2019.[32]

35.    During that period, Old IRNJ and Old Trane spent nearly $100 million

annually to defend and resolve asbestos claims.[33] In total, Old IRNJ and Old Trane have paid

nearly $2 billion in asbestos-related indemnity and defense costs.[34]

---

[26] Hr'g Tr. 93:18-23, May 5, 2021.
[27] Hr'g Tr. 94:2-5, May 5, 2021.
[28] Hr'g Tr. 94:2-95:4, May 5, 2021.
[29] Hr'g Tr. 94:11-18, May 5, 2021.
[30] *See* Hr'g Tr. 94:19, May 5, 2021; Debtors' Ex. 8 at 1-2.
[31] Debtors' Ex. 8 at 1-2.
[32] *See* Debtors' Ex. 8 at 1-2; Hr'g Tr. 94:19-22, May 5, 2021.
[33] Debtors' Ex. 9 at 3; Hr'g Tr. 94:23-95:2, 99:16-20, May 5, 2021.
[34] Hr'g Tr. 99:21-100:4, May 5, 2021.

36.    As of July 31, 2020, nearly 90,000 asbestos-related claims were pending against Old IRNJ and Old Trane (or the Debtors) in jurisdictions throughout the United States.[35] Nearly 50,000 of the claims are on active dockets.[36] As of December 31, 2019, IR plc has projected the current and future asbestos liabilities of Old IRNJ and Old Trane to be at least $547 million.[37]

37.    Absent these bankruptcy filings, it is likely that thousands of additional claims would have been filed against Aldridge/Murray, New TTC/New Trane, and the Other Affiliates for decades to come.[38]

38.    While defending against asbestos suits in the tort system, Old IRNJ and Old Trane used insurance receivables, including those received under settlements or certain "coverage-in-place" agreements, to fund or offset the defense and indemnity costs of their asbestos liabilities.[39] IR plc tracked the net annual "earnings" and "losses" related to asbestos liabilities by totaling the asbestos insurance receivables in a given year and subtracting the amounts it paid in asbestos defense and indemnity costs.[40] According to this metric, IR plc suffered net losses related to resolving asbestos claims of $11.9 million in 2017 and $56.5 million in 2018.[41] However, in 2019, settlements were reached with several insurance carriers related to asbestos claims. As a result, in 2019, IR plc saw net earnings of over $68 million related to asbestos liabilities.[42]

39.    Despite the insurance recoveries, IR plc still projected those asbestos liabilities would substantially exceed probable future insurance recoveries. In fact, at the end of

---

[35] *See* Debtors' Ex. 11 at 3; Hr'g Tr. 100:9-101:7, May 5, 2021.
[36] Debtors' Ex. 11 at 3.
[37] ACC Ex. 271, at F-46.
[38] Hr'g Tr. 103:14-104:2, May 5, 2021.
[39] *Id.* at F-46.
[40] *Id.*
[41] *Id.* at F-47.
[42] *Id.*

2019, IR plc projected that the current and future asbestos liabilities of Old IRNJ and Old Trane

would surpass their total projected insurance recoveries by almost $240 million.[43]

### D.      The "Reverse Morris Trust" Transaction

40.      On February 29, 2020, IR plc completed a spin-off of its industrial division in

a "Reverse Morris Trust" transaction ("RMT Transaction") with Gardner Denver Inc. ("Gardner

Denver"). Gardner Denver gave a combination of cash and stock to Ingersoll-Rand in exchange

for the latter's industrial division.[44]  Ingersoll-Rand then distributed the Gardner Denver stock to

IR plc,[45]  giving IR plc a controlling equity interest in Gardner Denver.[46] Gardner Denver changed

its name to Ingersoll Rand Inc. on March 1, 2020, and IR plc changed its name to Trane plc. Old

IRNJ remained incorporated in New Jersey as a subsidiary of IR plc.

### E.      Project Omega and the 2020 Corporate Restructuring

41.      Seeking a less expensive way of dealing with their asbestos liabilities, in

2020, Old IRNJ and Old Trane engaged in a series of transactions described herein (collectively

the "2020 Corporate Restructuring"), which led to the creation of Aldrich and Murray and their

Chapter 11 Cases.

42.      The 2020 Corporate Reorganization employed a series of transactions,

including a Texas state law divisional merger ("Divisional Merger"), whereby substantially all of

the operating assets of Old IRNJ and Old Trane were first separated from the asbestos liabilities,

and then the special purpose entities holding those liabilities, Aldrich and Murray, filed for

---

[43] *Id.* at F-46 (showing "total asbestos related liabilities" of $547 million and "total asset[s] for probable asbestos-related insurance recoveries" of $304 million).
[44] ACC Ex. 209, at 19.
[45] *Id.*
[46] *Id.*

bankruptcy. The planning and implementation of the 2020 Corporate Restructuring was kept confidential and, within Old IRNJ and Old Trane, bore the codename "Project Omega."

43. The genesis of Project Omega has been attributed to the general counsel of IR plc, Evan Turtz,[47] who is currently general counsel of Trane plc, the Debtors' ultimate parent holding company.[48] After Turtz became Old IRNJ's general counsel on April 4, 2019,[49] he received and read a brief filed in *Bestwall*, another asbestos manufacturer chapter 11 case pending in this judicial district. Turtz thought a bankruptcy resolution for the asbestos claims against Old IRNJ and Old Trane "would potentially be interesting."[50] Shortly thereafter, in the spring of 2019, Turtz contacted the Jones Day bankruptcy team,[51] and Project Omega was launched.[52]

44. Work on Project Omega began around June of 2019.[53] Jones Day was brought in at the early stages to assist with the project.[54] Project Omega was an attorney-created and implemented strategy.

45. Project Omega was also a secret endeavor. Before employees could work on Project Omega, they were required to sign nondisclosure agreements to keep the project confidential, even within the Trane organization.[55] The number of employees privy to Project Omega was initially limited and relatively small—initially as few as seven people, four of whom were in-house counsel[56]—but grew as Project Omega took shape and required the involvement of additional personnel.[57]

---

[47] Regnery Dep. 118:21-119:9, Mar. 12, 2021; Tananbaum Dep. 140:9-17.
[48] Turtz Dep. 21:15-22:4, Apr. 5, 2021.
[49] *Id*. at 23:16-22
[50] *Id*. at 57:6-14.
[51] *Id*. at 54:22-55:7; 57:24-58:2; 66:11-16.
[52] *See* Tananbaum Dep. 139:2-8.
[53] *Id*.; Hr'g Tr. 105:1-4, May 5, 2021 (Tananbaum Direct).
[54] Tananbaum Dep. 140:18-141:11; Pittard Dep. 39:21-40:12, Mar. 17, 2021.
[55] Tananbaum Dep. 161:13-162:8; Majocha Dep. 39:16-21, Mar. 18, 2021; Daudelin Dep. 138:4-7, Mar. 9, 2021; Roeder Dep. 63:20-23, Mar. 16, 2021.
[56] ACC Ex. 134, at TRANE_00014443; ACC Ex. 190.
[57] Tananbaum Dep. 149:7-151:6.

46.     Although knowledge of the project was kept to a relatively small number of employees, Project Omega had the attention and involvement of executives at the "highest levels of the organization," including the chief executive officer of IR plc (now Trane plc), Michael Lamach.[58] As time progressed, meetings among Project Omega team members took place with increasing frequency and included weekly "all hands" team meetings chaired by Old IRNJ's general counsel.[59] At all of these meetings (or at least the significant ones) both in-house lawyers and outside counsel were present.[60]

47.     The Debtors suggest that the goal of Project Omega was to evaluate whether a final resolution of the asbestos liabilities of Old IRNJ and Old Trane could be obtained through a bankruptcy filing. Old IRNJ and Old Trane never entertained a bankruptcy filing for themselves and all of their subsidiaries and affiliates (the "Trane Enterprise"). This was a profitable going concern whose assets significantly outweighed its combined operating and asbestos liabilities. For such an enterprise, a bankruptcy filing would have serious negative consequences.[61]

48.     Rather, the idea was a subsidiary with limited assets but all of the asbestos liabilities would be formed and would file bankruptcy. That entity could then seek Section 524(g) injunctive relief shielding the Trane Enterprise from Old IRNJ/Old Trane's asbestos liabilities. This strategy had been previously employed in the *Bestwall* and *DBMP* bankruptcy cases filed in this judicial district. In each of these cases, the Debtor corporation was represented by the Jones Day law firm.

---

[58] Brown Dep. 61:15-21; 132:14-133:20, Apr. 1, 2021; Turtz Dep. 145:24-146:15; 198:18-199:4.

[59] Tananbaum Dep. 149:7-151:6; Hr'g Tr. 153:2-13, May 5, 2021 (Tananbaum Cross-Exam).

[60] Tananbaum Dep. 149:7-151:6; Hr'g Tr. 153:2-155:9, May 5, 2021 (Tananbaum Cross-Exam).

[61] *See* Hr'g Tr. 240:4-254:16, May 6, 2021 (According to Ms. Ryan, subjecting the entirety of Old IRNJ and Old Trane to chapter 11 filings would have increased costs and risks such as disrupting the ability to get licenses and effectively compete with other bidders for contracts due to the potential reputational damage regarding their financial soundness. Additionally, employees could be concerned with wages and future employment, some could go to competitors, shareholders could file lawsuits, creditors could shorten their credit terms and increase the cost of doing business, and customers could have concern about Trane's ability to service their products etc.)

49.     According to Aldrich and Murray, such a filing was just one of several options to deal with these asbestos liabilities.[62]

50.     The weight of the evidence, however, reflects that a bankruptcy filing by a spinoff of the Trane Enterprise was the sole objective of Project Omega. For example, Turtz said he was not aware of any Project Omega "workflow stream document" pertaining to any non-bankruptcy "options."[63] Meanwhile, Project Omega team members expected and planned for a long-term bankruptcy prior to the 2020 Corporate Restructuring, which they estimated would last for five or more years.[64] Project Omega team members emailed each other and "hit the data information jackpot" regarding the *Bestwall* chapter 11 case.[65] They also circulated standard bankruptcy forms to one another that would have to be completed and filed after the chapter 11 filings.[66] And, long before the Petition Date, Project Omega team members explicitly discussed plans to merge the Debtors' operating subsidiaries, 200 Park and ClimateLabs, back into New TTC and New Trane after the Debtors' bankruptcies concluded.[67]

51.     Ultimately, the boards of Old IRNJ and Old Trane determined to move forward with the 2020 Corporate Restructuring. This was effectuated between April 30 and May 1, 2020, through a series of transactions, including two divisional mergers under Chapter 10, Subchapter A of the Texas Business Organizations Code (the "TBOC").

---

[62] Tananbaum 30(b)(6) Dep. 252:3-12; 253:15-254:7; *See* Debtors' Exs. 20, 22-25; Hr'g Tr. 115:23-118:21, 194:6-21, May 5, 2021.

[63] Turtz Dep. 127:25-129:2.

[64] ACC Ex. 18, at TRANE_00006711 (stating on December 4, 2019, that bankruptcy was estimated to last 2 to 5 years); ACC Ex. 192, at TRANE_00014949 (stating on March 5, 2020, that the Debtors expected to stay in bankruptcy for 5 to 8 years). Moreover, a number of the intercompany agreements have initial terms of five years, which supports the idea that the Debtors had planned for a multi-year bankruptcy. ACC Ex. 89, at DEBTORS_00001650 (five-year initial term); ACC Ex. 90, at DEBTORS_00003330 (same).

[65] ACC Ex. 52; Hr'g Tr. 211:18-20, May 5, 2021 (Roeder Cross-Exam).

[66] ACC Ex. 7; Hr'g Tr. 210:17-211:1, May 5, 2021 (Roeder Cross-Exam).

[67] ACC Ex. 18, at TRANE_00006711; ACC Ex. 192, at TRANE_00014949; Kuehn Dep. 239:15-241:16.

### F.      Implementing the Corporate Restructuring

52.      Old IRNJ and Old Trane took advantage of a corporate restructuring procedure under Texas law to put all of their asbestos liabilities into two companies, Aldrich and Murray, and virtually all of their assets and all of their non-asbestos liabilities, into two other companies, New TTC and New Trane. On March 26, 2020, Old IRNJ reserved the name Aldrich Pump LLC in North Carolina.[68]

53.      On April 30, 2020, the direct parent company of Old IRNJ incorporated Trane Technologies HoldCo Inc. ("TT HoldCo") in Delaware and contributed its stock in Old IRNJ to TT HoldCo.[69] TT HoldCo, in turn, formed TTC as a Texas limited liability company.[70] The next day, May 1, 2020, Old IRNJ, the holder of substantial asbestos liabilities, was merged into TTC, leaving TTC as the surviving company.[71] For clarity, we will still refer to this resulting entity as Old IRNJ.

#### i.    The Old IRNJ Divisional Merger

54.      That same day, Old IRNJ effected a divisional merger under Texas law, resulting in the dissolution of Old IRNJ and the formation of New TTC and Aldrich as Texas limited liability companies wholly owned by TT HoldCo.[72]

55.      Under the Old IRNJ Plan of Divisional Merger, New TTC received 99% of Old IRNJ's assets, while the remaining 1% of the assets were allocated to Aldrich.[73] Specifically, Aldrich received $26.2 million in cash, all equity interests in 200 Park, and rights to Old IRNJ's

---

[68] N.C. Application to Reserve a Business Entity Name for Aldrich Pump LLC, *available at* https://www.sosnc.gov/online_services/search/Business_Registration_Results (Mar. 28, 2021).
[69] ACC Ex. 245, at DEBTORS_00002488; ACC Ex. 279; Suppl. Decl. of Allan Tananbaum Supp. Debtors' Compl. ¶ 8, ECF No. 91 ("Tananbaum Supp. Decl.").
[70] Tananbaum Supp. Decl. ¶ 8.
[71] *Id.*; ACC Ex. 280, at DEBTORS_00001708.
[72] ACC Ex. 25 ("Aldrich Plan of Divisional Merger"); Tananbaum Supp. Decl. ¶ 9; ACC Ex. 281, at DEBTORS_00002410.
[73] Hr'g Tr. 396:11-18, May 6, 2021 (Diaz Direct).

asbestos-related insurance coverage.[74] Apart from its equity interest in the 200 Park subsidiary, Aldrich received no operating business.[75] The Old IRNJ Plan of Divisional Merger allocated all of Old IRNJ's asbestos liabilities to Aldrich and also required Aldrich to indemnify New TTC and all other non-debtor affiliates against, and hold them harmless from, "all Losses" related to those liabilities.[76]

56.     Later that same day, May 1, 2020, New TTC converted to a Delaware limited liability company,[77] and Aldrich converted to a North Carolina limited liability company.[78] All told, New TTC and Aldrich were Texas entities for less than 24 hours.[79] Table 1 below depicts, in condensed form, the organizational structure before and after the 2020 Corporate Restructuring: Table 1.[80]



---

[74] ACC Ex. 147 (Pittard Decl.), ¶ 16.
[75] Id.; Roeder Dep. 45:16-19.
[76] Aldrich Plan of Divisional Merger (ACC Ex. 25) ¶¶ 5, 9(b); Tananbaum Supp. Decl. ¶ 15.
[77] ACC Ex. 282, at DEBTORS_00003133; ACC Ex. 283, at DEBTORS_00003137.
[78] ACC Ex. 284, at DEBTORS_00002969; ACC Ex. 285, at DEBTORS_00002973.
[79] ACC Ex. 284, at DEBTORS_00002969; ACC Ex. 285, at DEBTORS_00002973. ACC Ex. 38, at DEBTORS_00050589-93 (showing the times for incorporating and reincorporating the entities in the Corporate Restructuring); Tananbaum Supp. Decl. ¶ 10.
[80] The corporate organizational charts represent a condensed version of the organizational charts marked as ACC Ex. 276.

ii.   The Old Trane Divisional Merger

57.     Meanwhile, on April 30, 2020, Old Trane formed ClimateLabs as a North Carolina limited liability company and Murray Boiler Holdings LLC ("Murray Holdings") as a Delaware limited liability company.[81] In addition, Old Trane's direct parent, Trane Inc., formed TUI Holdings Inc. ("TUI Holdings") as a Delaware corporation and contributed its stock in Trane to TUI Holdings.[82]

58.     The next day, May 1, 2020, Old Trane converted from a Delaware corporation to a Texas corporation.[83] Old Trane then effected a divisional merger under Texas law, resulting in the dissolution of Old Trane and the formation of New Trane as a Texas corporation and Murray as a Texas limited liability company.[84] Murray became a wholly owned subsidiary of Murray Holdings, which in turn is wholly owned by New Trane, which in turn is wholly owned by TUI Holdings.[85]

59.     Under the Old Trane Plan of Divisional Merger, New Trane received 98% of Old Trane's assets, while the remaining 2% of the assets were allocated to Murray.[86] Specifically, Murray received $16.1 million in cash, all equity interests in ClimateLabs, and rights to Old Trane's asbestos-related insurance coverage.[87]  Apart from its ClimateLabs subsidiary, Murray received no operating  business.[88] The Old Trane Plan of Divisional Merger allocated all of Old Trane's asbestos liabilities to Murray and also required Murray to indemnify New Trane and all other non-debtor affiliates against, and hold them harmless from, "all Losses" related to those

---

[81] ACC Ex. 249, at DEBTORS_00003407; ACC Ex. 239, at DEBTORS_00000261.
[82] ACC Ex. 237, at DEBTORS_00000211; ACC Ex. 238, at DEBTORS_00000220; Tananbaum Supp. Decl. ¶ 11.
[83] ACC Ex. 286, at DEBTORS_00000411; ACC Ex. 287, at DEBTORS_00000419..
[84] ACC Ex. 26 ("Murray Plan of Divisional Merger"); ACC Ex. 288, at DEBTORS_00000887; Tananbaum Supp. Decl. ¶ 12.
[85] ACC Ex. 59.
[86] Hr'g Tr. 394:1-3, May 6, 2021 (Diaz Direct).
[87] ACC Ex. 147 (Pittard Decl.), ¶ 16.
[88] *Id.*; Tananbaum Dep. 237:23-239:9.

liabilities.[89]  Later that same day, May 1, 2020, New Trane converted to a Delaware corporation,[90]

and Murray converted to a North Carolina limited liability company.[91] All told, New Trane and

Murray were Texas entities for less than 24 hours.[92] Table 2 below depicts, in condensed form, the

organizational structure before and after the 2020 Corporate Restructuring: Table 2.[93]



60.    Thus, in a matter of hours and without notice to any of their asbestos

creditors, Old IRNJ and Old Trane separated virtually all of their business operations, assets, and

employees from their asbestos liabilities, transferring those liabilities to Aldrich and Murray. This

enabled Old IRNJ and Old Trane to achieve their goal of placing their asbestos liabilities in

bankruptcy without the entire Trane Enterprise filing for chapter 11

61.    Undertaking such Corporate Restructurings followed almost immediately

by two of the four newly created entities filing bankruptcy is an unorthodox strategy.   Other than

---

[89] Murray Plan of Divisional Merger (ACC Ex. 26) ¶¶ 5, 9(b); Tananbaum Supp. Decl. ¶ 15.
[90] ACC Ex. 290, at DEBTORS_00001493; ACC Ex. 291, at DEBTORS_00001497.
[91] ACC Ex. 289, at DEBTORS_00001340; ACC Ex. 292, at DEBTORS_00001344.
[92] ACC Ex. 43, at DEBTORS_0050597-50603 (showing the times of incorporation and reincorporation of entities involved in the Corporate Restructuring); Tananbaum Supp. Decl. ¶ 13.
[93] The corporate organizational charts represent a condensed version of the organizational charts marked as ACC Ex. 275.

a few recently filed asbestos bankruptcies (of which four are presently pending in this District), we are unaware of any precedent or business reason for such a transaction.

62.     After the 2020 Corporate Restructuring, New TTC and New Trane, as part of the Trane Enterprise, continued with the business operations once held by Old IRNJ and Old Trane. Each is paying its creditors in the ordinary course of business.[94]

63.     While we do not here estimate Old IRNJ/Old Trane's asbestos liabilities, it should be noted that their assets greatly exceeded their combined operating and asbestos liabilities. By contrast, and disregarding the Funding Agreement (described below), Aldrich/Murray's assets were not then, and are not now, sufficient to satisfy their liabilities.[95]

64.     Aldrich/Murray and New TTC/New Trane have been frank about what transpired in the 2020 Corporate Restructuring and, to a certain extent, as to why these actions were undertaken.   Despite the apparent inequities, each steadfastly maintains that the 2020 Corporate Restructuring was designed to ensure that Aldrich/Murray "ha[ve] the same ability to resolve and pay valid current and future asbestos-related claims and other liabilities as Old IRNJ and Old Trane had before the restructurings."[96]   This assertion is premised upon several intercompany agreements which were inked in conjunction with the Corporate Restructuring.

## G.     Intercompany Agreements

65.     In contemplation of the Divisional Merger, Old IRNJ/Old Trane drafted and purported to make several agreements as between the yet to be formed Aldrich and New TTC, and Murray and New Trane, as well as other agreements between their prospective successors and certain of the Non-Debtor Affiliates. These Agreements were dated "as of" May 1, 2020, the day

---

[94] Hr'g Tr. 394:19-395:15; 402:19-23, May 6, 2021 (Diaz Direct); *see also* Kuehn Dep. 237:9-13.
[95] Hr'g Tr. 397:18-23, May 6, 2021 (Diaz Direct)
[96] ACC Ex. 147 (Pittard Decl.) ¶ 17.

of the Texas divisional mergers. These agreements purport to establish the contractual relationships and obligations as between Old IRNJ and Old Trane's prospective successors and the other members of the Trane Enterprise.

66.     These Agreements are not "arm's length" contracts. They were "negotiated" after the first step of the Corporate Restructuring by the predecessors to the Debtors and their parents, for application to four companies that did not, at that moment, exist. The parent companies entered into the following agreements for Aldrich and New TTC, and Murray and New Trane. The agreements were then assumed, revised, and ratified by Aldrich and New TTC, and Murray and New Trane, through signatories who held positions with both entities and/or their parent.

67.     For example, Aldrich executed the Funding Agreement by signature of its CFO, Treasurer and Board member Amy Roeder. However, Roeder is employed as a Director of Finance by New TTC, the Debtor's counterparty to this agreement. [97]

68.     As these agreements were between affiliated companies, there was no arm's length negotiation over their terms.[98] Like the Divisional Merger, their legal enforceability vis a vis third parties is seriously in doubt.[99]  That said, the most pertinent agreements are as follows:

   i.   The Funding Agreements

69.     Two "Funding Agreements" are at issue: (1) the "Aldrich Funding Agreement" between New TTC as payor and Aldrich as payee;[100] and (2) the "Murray Funding

---

[97] Hr'g Tr. 185:9-10, May 5, 2021 (Roeder Direct); Roeder Dep. 29:13-18.
[98] Hr'g Tr. 159:5-21-160:11; 160:22-161:13, May 5, 2021 (Tananbaum Direct); Tananbaum Dep. 209:16-24; *see also* Daudelin Dep. 253:18-21. In fact, those who authorized the execution of and/or signed the key agreements arising from the Corporate Restructuring had no understanding at the time of signing what they were signing or what the purpose was. *See* Daudelin Dep. 190:19-191:7; 234:11-237:3; 238:19-246:15; 248:19-254:2; *see also* Kuehn Dep. 223:4-13 (failing to recall authorizing the execution of a secondment agreement and a services agreement).
[99] *Schmoll v. AC and S, Inc*., 703 F. Supp. 868, 874 (D. Or. 1988), aff'd, 977 F.2d 499 (9th Cir. 1992) (Disregarding corporate transactions which while meeting technical legal requirements, were designed with the improper purpose of escaping asbestos-related liabilities and would not have been undertaken in an arm's length transaction).
[100] ACC Ex. 13 ("Aldrich Funding Agreement").

Agreement" between New Trane as payor and Murray as payee.[101] The Funding Agreements are essential to the Debtors' assertion that each "has the same ability to resolve and pay valid current and future asbestos-related claims and other liabilities as [Old IRNJ] and Old Trane had before the restructurings."[102] This is so because New TTC and New Trane have committed to giving Aldrich and Murray, respectively, the necessary money, at the appropriate time.

70.     More particularly, the Funding Agreements provide that New TTC and New Trane will transfer funds to  Aldridge and Murry, respectively,  to pay any "Permitted Funding Use."[103] The term "Permitted Funding Use" includes (a) the costs of administering the Debtors' Chapter 11 Cases, (b) amounts necessary to satisfy each Debtor's "Asbestos Related Liabilities" in connection with funding a § 524(g) trust,[104] and (c) the Debtors' indemnification obligations to New TTC, New Trane, and the other non-debtor affiliates under any agreement provided in the Plans of Divisional Mergers.[105]

71.     The Funding Agreements are not loans, and they impose no repayment obligation on the Debtors.[106] Nor are they capped.[107]

72.     However, the Funding Agreements are not unconditional promises by New Trane and New TTC to pay all the Aldrich/Murray Asbestos Claims, either. They are payment backstops. New Trane and New TTC are obligated to pay the chapter 11 administrative expenses and the Debtors' indemnification obligations <u>only if</u> the cash distributions from 200 Park (to

---

[101] ACC Ex. 86 ("Murray Funding Agreement").

[102] ACC Ex. 147 (Pittard Decl.) ¶ 17.

[103] Aldrich Funding Agreement (ACC Ex. 13), at DEBTORS_00003821-22 (definition of "Permitted Funding Use"); Murray Funding Agreement (ACC Ex. 86), at DEBTORS_00004101 (definition of "Permitted Funding Use").

[104] TTC and New Trane are also obligated to provide backstop funding to satisfy the Debtors' asbestos-related liabilities at any time when the Debtors are not debtors in a bankruptcy case.

[105] Aldrich Funding Agreement (ACC Ex. 13), at DEBTORS_00003821-22; Murray Funding Agreement (ACC Ex. 86), at DEBTORS_00004101-02.

[106] *See* Debtors' Exs. 72, 73; Hr'g Tr. 110:18-21, May 5, 2021; Hr'g Tr. 485:2-8, May 7, 2021.

[107] *See* Debtors' Exs. 72, 73; Hr'g Tr. 110:1-13, May 5, 2021; Hr'g Tr. 485:2-486:8, 510:10-13, 516:4-7, May 7, 2021.

Aldrich) or ClimateLabs (to Murray) are insufficient to pay those expenses and obligations in full.[108] In addition, New Trane and New TTC are each obligated to fund a § 524(g) trust <u>only if</u> their respective Debtor's "other assets are insufficient to fund amounts necessary or appropriate to satisfy . . . Asbestos Related Liabilities in connection with the funding of such trust."[109] Arguably Aldrich/Murray would have to spend all of their distributions before they can pay administrative expenses, and would have to liquidate before they could secure funding for a plan. According to the Debtors' own metrics, their assets (without the Funding Agreements) are already insufficient, as they are less than their asbestos liabilities.[110]

73.    Moreover, the funding commitment is made by New TTC to Aldrich and by New Trane to Murray, not to asbestos creditors.   Only the Debtors can enforce these agreements. And practically, no one can enforce them absent the consent of New TTC/New Trane. As Aldrich and New TTC are owned by the same corporate parent and Murray is owned by New Trane, each is subject to the dictates of the parent or sister company against whom enforcement must be sought. Since the Debtors have no employees of their own and are consigned to borrow staff from New TTC, under the Funding Agreements, the people who would have to enforce the agreement against New TTC and/or New Trane are in fact officers and employees of New TTC.

74.    Further, the Debtors' rights and obligations under this Agreement may not be assigned without the prior written consent of New TTC or New Trane.[111] Therefore, arguably a Creditor's Plan could not be funded unless New TTC and/or New Trane favor that Plan.

---

[108] Aldrich Funding Agreement (ACC Ex. 13), at DEBTORS_00003822; Murray Funding Agreement (ACC Ex. 86), at DEBTORS_00004102.

[109] *Id.*

[110] Hr'g Tr. 397:18-23, May 6, 2021 (Diaz Direct) ("[T]he Aldrich liabilities as disclosed—and as discussed, this is just the debtors' numbers, not my point of view—is $315 million of asbestos liabilities, plus $3 million of operating liabilities. So that's $318 million of liabilities and their assets are $210 million."); *Id.* at 398:20-23 ("Similar to Aldrich, the assets of Murray, $127 million, if you exclude the funding agreement, are less than the total liabilities of . . . $194 million.").

[111] PI Hr'g Tr. at 157:21-162:4. Aldrich Funding Agreement (ACC Ex. 13) par. 13, at DEBTORS_00003821-22;

75.     Regarding the 2020 Corporate Restructuring, the Divisional Merger, and these intercompany agreements, the structure of these Debtors is based upon the blueprint first employed in the *Bestwall* and *DBMP*, cases.   However, these latest iterations of the Funding Agreements contain two new features not previously seen.

76.     First, the Funding Agreements require, as a precondition to funding a § 524(g) trust, that a confirmed chapter 11 plan provide New TTC or New Trane, as applicable, "with all the protections of section 524(g) of the Bankruptcy Code."[112] Whether legally New TTC or New Trane are entitled to such relief is an open question.[113] And even if they are,  the current asbestos claimants must by a 75% vote, approve the Plan. Otherwise, these Debtors have no ability in bankruptcy to pay the asbestos claims assigned to them by the Divisional Merger.

77.     Second, the Funding Agreements have "Automatic Termination" provisions whereby New TTC's and Trane's respective funding obligations automatically cease "on the effective date of a Section 524(g) Plan."[114] Absent further modification which would require the payors' consent, the Funding Agreements could never serve as post-effective date "evergreen" sources of funding that § 524(g) contemplates.

78.     When combined with the Funding Agreements' anti-assignment provisions,[115] these two new provisions call into question whether the Debtors could confirm a chapter 11 plan that relies on funding provided by the Funding Agreements. And once exclusivity has ended, these provisions of the Funding Agreements will also impair, if not disable, the ability and right of other parties-in-interest to propose a competing 524(g) plan.

---

Murray Funding Agreement (ACC Ex. 86), at DEBTORS_00004101-02.

[112] *See* definitions of "Section 524(g) Plan" and "Permitted Funding Use, Aldrich Funding Agreement (ACC Ex. 13) par. 1, at DEBTORS_00003821-22; Murray Funding Agreement (ACC Ex. 86) par. 1, at DEBTORS_00004101-02.

[113] The ACC argues that New TTC and New Trane do not fall within the enumerated categories of Section 524(g)(4)(a)(ii) and are therefore ineligible for injunctive relief.

[114] Aldrich Funding Agreement (ACC Ex. 13) § 2(e); Murray Funding Agreement (ACC Ex. 86) § 2(e).

[115] Aldrich Funding Agreement (ACC Ex. 13) § 13; Murray Funding Agreement (ACC Ex. 86) § 13.

79.    In sum, while the Funding Agreements may provide funding for a plan, they will do so only if New TTC and New Trane favor that plan. And that favor is dependent on these entities receiving permanent injunctive relief from the Aldridge/Murray Asbestos Claims—whether they are entitled to it or not.

80.    The Debtors' abilities to obtain funding and New TTC/New Trane's obligations under the Funding Agreements are also dependent on New TTC/New Trane's continued viability. While New TTC/New Trane are prosperous corporations, these obligations are unsecured and not guaranteed by any of the Non-Debtor Affiliates or other Protected Parties.[116] Nothing in the Funding Agreements prevent New TTC/New Trane from adding debt that would be senior in priority to their obligations under their respective Funding Agreements.[117] Nothing in the Funding Agreements requires New TTC/New Trane to provide financial statements to the Debtors that are audited or contain information at a level that provides details on account balances and material transactions (e.g., footnotes to financial statements). New TTC/New Trane do not have to provide payments that "exceed the aggregate amount necessary" for the Debtors to fund all "Permitted Funding Uses,"[118] thus giving New TTC/New Trane unilateral discretion to determine what is "necessary" and the ability to reduce payments if either disagrees with the use of funds. And there is no dispute resolution mechanism if a funding request by a Debtor is denied.[119] The Funding Agreements do not prevent New TTC/New Trane from engaging in additional divisional mergers, and they explicitly allow New TTC/New Trane to engage in consolidations and mergers, and to transfer "all or substantially all" of their assets.[120] And nothing

---

[116] Tananbaum 30(b)(6) Dep. 111:15-21; 112:6-15.
[117] *See id.* at 113:4-8.
[118] Aldrich Funding Agreement (ACC Ex. 13) § 2(a); Murray Funding Agreement (ACC Ex. 86) § 2(a).
[119] Hr'g Tr. 300:15-17, May 6, 2021 (Diaz Direct).
[120] Aldrich Funding Agreement (ACC Ex. 13) § 4(b)(i); Murray Funding Agreement (ACC Ex. 86) § 4(b)(i).

in the Funding Agreements limits or prohibits dividends, or other distributions of value, by New TTC/New Trane TTC to equity holders, potentially including their full value.[121]

81.    In sum, the Funding Agreements are  not unconditional promises to pay the Aldrich/Murray Asbestos Liabilities. They are instead conditional agreements dependent on New TTC/New Trane's approval of any reorganization plan and upon New TTC/New Trane's continued good financial health.

ii.    The Support Agreements

82.    In connection with the Divisional Mergers, agreements were drawn that (ostensibly) created indemnification obligations between the new companies. These were: (1) the Divisional Merger Support Agreement between New TTC and Aldrich (the "Aldrich Support Agreement");[122] and (2) the Divisional Merger Support Agreement between New Trane and Murray (the "Murray Support Agreement" and together, the "Support Agreements"). [123]

83.    Among other things, the Support Agreements require the Debtors to "indemnify and hold harmless New TTC or New Trane and their respective  affiliates (each of which is an express third party beneficiary . . .) from and against" any "Losses" and "Proceedings" to which New TTC/New Trane and their respective affiliates "may become subject."[124] Thus, the new company which received precious few of the old company's assets—but 100% of that company's asbestos liabilities—is charged with indemnifying a sibling (in the case of Aldrich) or

---

[121] *See id.* at 223:2-24 ("Q. Are you aware of any limitations in the funding agreement that prevents New Trane Technologies from sending cash payments to its parent Trane Technologies Holdco Inc.? A. So am I correct that your question refers to this Aldrich funding agreement that we're looking at here? Q. Yes, sir. A. No, I'm not aware of any such limitation Q. Same answer with the Murray funding agreement, there's no limitations that you're aware of on New Trane US Inc.? A. That's correct, because as I testified, the purpose of the funding agreement was to give these new entities the same ability to fund that the predecessor entities had, but not to give them enhanced ability to fund, just the same ability to fund.").
[122] ACC Ex. 77 ("Aldrich Support Agreement").
[123] ACC Ex. 211 ("Murray Support Agreement").
[124] Aldrich Support Agreement (ACC Ex. 77) § 3; Murray Support Agreement (ACC Ex. 211) § 3.

parent (in the case of Murray) that bears an almost total resemblance to the old company, from the old company's asbestos liabilities.

84.     Adding to the irony, these payments could be funded with money borrowed from the new sibling or parent. If the cash distributions from 200 Park are insufficient to allow Aldrich to pay its indemnification obligations to New TTC and its affiliates, under the Aldrich Support Agreement, the Aldrich Funding Agreement provides that New TTC will provide the funds to Aldrich so that Aldrich, in turn, may indemnify New TTC or any other affiliate.[125] A substantially similar provision appears in the Murray Funding Agreement that enables Murray, in the event of insufficient cash distributions from ClimateLabs, to receive funding from New Trane so that Murray may, in turn, indemnify New Trane or any other affiliate.[126]

85.     The Support Agreements' indemnity provisions, when coupled with the Funding Agreements, create a potential circular transfer of funds between the Debtors and New TTC/New Trane. Thus, the Support Agreements are unorthodox transactions with no apparent business purpose (apart from aiding this bankruptcy case and securing injunctive relief for the Protected Parties).

iii.     The Secondment Agreements

86.     Intending that Aldrich and Murray would have no employees of their own, Old IRNJ and Old Trane created Secondment Agreements between the as yet to be formed Aldrich,

---

[125] Aldrich Funding Agreement (ACC Ex. 13), at DEBTORS_00003822 (clause (f) in the definition of "Permitted Funding Use"). The Support Agreements differ from the previous iterations seen in *Bestwall* and *DBMP* insofar as the indemnification obligations run not only to the sister affiliates of the Debtors (here, New TTC and New Trane) but also to their other non-debtor affiliates.

[126] Murray Funding Agreement (ACC Ex. 86), at DEBTORS_00004102 (clause (f) in the definition of "Permitted Funding Use"); *see also* Kuehn Dep. 308:14-309:5 (acknowledging the "circularity" of the Funding Agreements: ·"Q. [I]f Trane Technologies Company LLC is the entity being sued for an asbestos claim, it will seek indemnification from Aldrich Pump, who, if it does not have sufficient funds, will go right back to Trane Technologies Company LLC for that payment, ·is that correct? . . . A. Yes, that's my understanding."); Tananbaum Dep. 217:20-219:12 (stating that clause (f) includes "a permitted funding use for the debtor seeking funding from its sister affiliate . . . for the debtor to satisfy an indemnification obligation that it owes to said affiliate" in the event that a debtor's funds are insufficient to cover its indemnification obligations).

Murray, and New TTC, whereby three of New TTC's employees would be loaned to the Debtors to work.[127]

87.    Creating two companies with no employees evidences the fact that Aldrich and Murray were simply inert vessels designed to carry their predecessors' asbestos liabilities into bankruptcy.  This lack of employees, but for the handful loaned to the Debtors by New TTC, appears intended to set up the argument in then contemplated (now present) bankruptcy cases that a preliminary injunction is necessary to avoid overwhelming the Debtors' employees.

**H.    Post 2020 Corporate Restructuring, Pre-Bankruptcy**

88.    Aldrich and Murray's prepetition activities were limited to managing their asbestos liabilities, overseeing their equity interests in 200 Park and ClimateLabs, and significantly, preparing for a bankruptcy filing.

89.    As to corporate governance, Aldrich's Board of Managers (the "Aldrich Board") includes Amy Roeder, Robert Zafari, and Manlio Valdes.[128] Murray's Board of Managers (the "Murray Board" and, together with the Aldrich Board, the "Debtor Boards") includes Ms. Roeder, Mr. Valdes, and Mr. Dufour.[129] Ms. Roeder and Mr. Valdes are employed by non-debtor Trane affiliates.[130] Neither Mr. Zafari nor Mr. Dufour is currently employed by a Trane company, but each is a retired employee of a Trane Affiliate.[131]

90.    For each of Aldrich and Murray, Mr. Valdes serves as President, Ms. Roeder serves as Chief Financial Officer and Treasurer, Mr. Tananbaum serves as Chief Legal Officer and Secretary, and Mr. Pittard serves as Vice President and Chief Restructuring Officer.[132]

---

[127] ACC Ex. 105 ("Secondment Agreement").
[128] Hr'g Tr. 112:18-23, 187:11-14, May 5, 2021; Hr'g Tr. 498:11-17, May 7, 2021.
[129] Hr'g Tr. 112:18-23, 187:11-16, May 5, 2021.
[130] Hr'g Tr. 185:9-186:3, 187:25-188:4, May 5, 2021; Hr'g Tr. 498:22-24, May 7, 2021.
[131] Hr'g Tr. 112:18-23, 187:20-23, May 5, 2021; Hr'g Tr. 498:25-499:2, May 7, 2021.
[132] Hr'g Tr. 112:5-11, 185:9-12, 188:7-15, May 5, 2021; *see* Debtors' Exs. 27-28, 29, 32.

91.     Ms. Roeder is also chief financial officer of the Debtors' operating subsidiaries, 200 Park and ClimateLabs, and serves as a member of their boards.[133] Additionally, Ms. Roeder maintains her position as finance director for information technologies and legal at New TTC.[134]

92.     The Debtors are staffed by three seconded employees (Allan Tananbaum, Robert Sands, and Phyllis Morey) pursuant to a secondment agreement among New TTC, Aldrich, and Murray.[135]

93.     In addition to his role as the Debtors' CLO, Mr. Tananbaum holds the position of deputy general counsel for product litigation at New TTC.[136] In addition to being an in-house attorney seconded to the Debtors, Mr. Sands holds the position of associate general counsel for product litigation at New TTC.[137]

94.     In addition, the Debtors receive various corporate services (and the services of their other officers) through services agreements with New TTC.[138]

i.   The Debtors' Boards Meet and Consider Options to Address Asbestos Liabilities

95.     On  June 18, 2020, a mere 49 days after their creation, Aldrich and Murray filed chapter 11 in this Court.

96.     In those 49 days, the Debtor Boards met nine times (five joint meetings and two separate meetings for each board).[139] The first meeting took place on May 8, 2020, one week after the Debtors were formed.[140] Aldrich and Murray insist that the decision to file bankruptcy

---

[133] Hr'g Tr. 185:12-13, May 5, 2021 (Roeder Direct); Roeder Dep. 49:10-19 (200 Park); 49:24-50:4 (ClimateLabs).
[134] Hr'g Tr. 185:9-10, May 5, 2021 (Roeder Direct); Roeder Dep. 29:13-18.
[135] See Debtors' Ex. 74, ACC Ex. 105; Hr'g Tr. 129:21-130:6, May 5, 2021.
[136] Tananbaum Dep. 43:3-13.
[137] Id. at 16:17-37:18; 38:4-10.
[138] See Debtors' Exs. 75-76; Hr'g Tr. 185:23-25, May 5, 2021.
[139] See Debtors' Exs. 18-20, 22-23, 25-28; Hr'g Tr. 112:24-113:7, 192:16-193:2, May 5, 2021.
[140] Debtors' Exs. 18-19; Hr'g Tr. 112:24-113:7, May 5, 2021.

was made only at the last of these meetings, the one on June 17, 2020.[141] Thus, according to the

Debtors, the decision to file was reached the night before the bankruptcy petitions were filed.

97.     As with the Project Omega meetings, lawyers attended and led discussions

during meetings of each Debtor's board of managers after the Debtors' formation.  Mr. Tananbaum,

as the Debtors' chief legal officer, chaired all board meetings even though he was not formally a

member of either board.[142]  Board meetings were also attended by other in-house attorneys as well

as outside counsel from Jones Day and Evert Weathersby Houff.[143]  The minutes of the board

meetings were initially drafted by Jones Day attorneys and then reviewed and edited, when

necessary, by Mr. Tananbaum.[144]

98.     The Debtors suggest that the central issue facing the Debtor Boards was

determining how best to address the Debtors' asbestos liabilities, including both the tens of

thousands of pending claims against the companies and the future claims expected to be filed over

the next three decades or more.[145]  Thus, during this seven-week period, Aldrich and Murray's

Board members (a) familiarized themselves with their duties and responsibilities; (b) received

information concerning the financial condition of the Debtors and their respective operating

subsidiaries; and (c) received and assessed information concerning the Debtors' historical, current,

and projected future asbestos-related personal injury claims.[146]

---

[141] *See* Debtors' Exs. 27-28; Hr'g Tr. 118:11-14, 120:15-25, 195:21-196:20, 197:22-24, May 5, 2021.

[142] Tananbaum Dep. 271:5-22; 49:10-50:2; Roeder Dep. 46:21-25.

[143] *See, e.g.*, Tananbaum Dep. 271:5-12; 271:23-272:2; Roeder Dep. 42:11-22; 48:25-49:4; ACC Ex. 31 (May 15, 2020 Joint Meeting included the following in-house counsel: Allan Tananbaum, Phyllis Morey, Evan M. Turtz, and Sara Walden Brown. It also included the following outside counsel: Mark Cody, Brad Erens, Troy Lewis, and Alex Kerrigan from Jones Day and Michael Evert of Evert Weathersby Houff); ACC Ex. 32 (May 22, 2020 Joint Meeting included the same in-house counsel and outside counsel).

[144] Tananbaum Dep. 272:25-273:5; Hr'g Tr. 163:14-164:3, May 5, 2021 (Tananbaum Cross-Exam).

[145] *See* Hr'g Tr. 113:23-114:6, May 5, 2021.

[146] *See* Debtors' Exs. 18-20, 22-23, 25-28; Hr'g Tr. 113:23-114:14, 193:20-194:5, May 5, 2021.

99.     The Debtors further posit that starting with their joint meeting on May 15, 2020, the Debtor Boards were presented with four options to address these asbestos liabilities:

a)  "Status quo" approach where Aldrich and Murray would continue to defend Aldrich/Murray Asbestos Claims in the tort system;

b)  "Structural optimization" strategy entailing additional corporate reorganization intended to optimize the ability to manage asbestos liabilities;

c)  The purchase of an insurance product that would vest in a third party the responsibility for addressing Aldrich/Murray Asbestos Claims; and

d)  Chapter 11 bankruptcy filings by Aldrich and Murray with the goal of establishing and funding a section 524(g) trust.[147]

100.    According to the Debtors, over the course of several meetings their boards evaluated these options and only reached a decision to file bankruptcy on the evening of June 17, 2020, meaning the night before they filed.[148]

101.    In arriving at their decisions to commence these Chapter 11 Cases, the Debtor Boards supposedly acted without direction from New TTC, New Trane or any other non-debtor entities or personnel.[149] The Debtors further posit that in deciding to file bankruptcy, their Boards considered not just the best interests of their sister companies and affiliates, but that of asbestos claimants.[150]

102.    Regrettably, ACC was unable to fully test these assertions. For even as the officer and director witnesses from Aldrich, Murray, New TTC and New Trane offered selective testimony about these matters during their depositions, these entities interposed attorney client and

---

[147] *See* Debtors' Exs. 20, 22-25; Hr'g Tr. 115:23-118:21, 194:6-21, May 5.
[148] *See* Debtors' Exs. 27-28; Hr'g Tr. 118:11-14, 120:15-25, 195:21-196:20, 197:22-24, May 5, 2021.
[149] *See* Hr'g Tr. 119:4-19, 198:1-199:4, May 5, 2021; Hr'g 550:15-24, May 7, 2021.
[150] *See* Hr'g Tr. 136:9-20, 196:23-197:11, 198:1-15, May 5, 2021.

work product privilege assertions to block a fulsome inquiry by the ACC about the details of the Board members' deliberations.

103.     Shortly before the Hearing, the ACC filed a motion to compel ("Motion to Compel") seeking to obtain testimony related to the Debtors' Board meetings and the conversations that were held during these meetings along with the May 2020 PowerPoint identified by Mr. Bates.[151] The Debtors and the Non-Debtor Affiliates objected and claimed privilege based upon having attorneys present and leading the meetings along with work product claims as to the documents created for use at the meetings.[152] However, at the same time, the Debtors selectively used the Board member's testimony to describe their decision-making. Many of these matters appear in fact privileged and the assertions were proper, but for the fact that the Debtors' corporate representatives proceeded to testify about the same topics—only to the extent that they found it advantageous. Given the limited time between the privilege assertions and the Hearing, a full-blown motion to compel hearing was untenable. Given this, on April 27, 2021, the ACC filed a Motion to File Confidential Documents Under Seal seeking to exclude this information altogether on the assertion that the privileges were being improperly employed by the Debtors as both 'shield and sword.' Following the Hearing, the motion to file under seal was withdrawn by the ACC. Therefore, the original Motion to Compel is still at issue to be decided by this Court.

104.     Obviously, the Debtors, New TTC, and New Trane cannot have it both ways. The attorney client and work product privileges may not be used as both shield and sword.[153] In lieu of further delaying resolution, we will instead disregard the self-serving witness testimony proffered by the Debtors, New TTC, and New Trane witnesses as to the corporate deliberations.

---

[151] ACC Motion to Compel [Adv. Pro. Dkt. 141].
[152] Debtors' Objection [Adv. Pro. Dkt. 173].
[153] *See generally Tackett v. State Farm Fire & Cas. Ins. Co.,* 653 A.2d 254, 259 (Del. 1995); *Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 419 (Del. 2010).

Instead, we will look at the available documentary evidence and the circumstances that reflect on what the corporations actually did, and the factual inferences which flow from their actions.

105.    That evidence tells a different story. The Debtors freely admit that Project Omega was launched to address the asbestos liabilities of Old IRNJ and old Trane.[154] Under Project Omega, a bankruptcy filing by part of the organization to obtain § 524(g) relief for the entire Trane Enterprise was at least an option.  But what of the other alleged options?

106.    The first non-bankruptcy option, continuing to defend asbestos claims in the tort system, was not an option at all. That was the status quo.

107.    The two other options were to either: (a) undergo additional corporate reorganization to optimize the ability to manage asbestos liabilities to a third party; or (b) to purchase an insurance product that would pay them.[155] On the truncated evidence available to us, it does not appear that either option was seriously considered. The Corporate Restructuring (inclusive of the Divisional Merger which created these Debtors) was in fact a corporate reorganization intended to optimize the ability to manage asbestos liabilities. By virtue of the Texas Divisional Merger, all of Old IRNJ and Old Trane's asbestos liabilities were isolated in Aldrich and Murray. Thus, this was not a separate option but was instead a component part of the plan to create and file limited subsidiaries in bankruptcy in order to seek Section 524(g) relief for the entire Trane Enterprise. Even if one considers additional corporate reorganization to be an option, it was needless. Since the 2020 Corporate Restructuring had already removed the asbestos liabilities from the Trane Enterprise, there was no need to further separate them.

108.    Similarly, if purchasing insurance was a viable option, this could have been done without the expense and disruption involved in the Corporate Restructuring. Thus, before

---

[154] Roeder Dep. 38:12-19; Kuehn Dep. 121:19-122:12, Mar. 19, 2021; Bowen Dep. 154:18-22, Mar. 5, 2021.
[155] *See* Debtors' Exs. 20, 22-25; Hr'g Tr. 115:23-118:21, 194:6-21, May 5.

and after the 2020 Corporate Restructuring, the Trane Enterprises' choice was binary: (1) do nothing and continue to spend $100 million per year in the tort system, or (2) use the 2020 Corporate Restructuring and Divisional Merger to cabin all of the asbestos liabilities into limited successor corporations and then file those companies in bankruptcy.[156] By entering into the 2020 Corporate Restructuring, Old IRNJ/Old Trane were choosing the bankruptcy option.

109.    Logic aside, that these bankruptcies were the only option to be considered is confirmed by the available evidence.

110.    Mr. Turtz said he was not aware of any Project Omega "workflow stream document" pertaining to any non-bankruptcy "options."

111.    Project Omega team members emailed each other and "hit the data information jackpot" regarding the *Bestwall* chapter 11 case.

112.    Project Omega team members expected and planned for a long-term bankruptcy prior to the 2020 Corporate Restructuring, one which they estimated would last for five or more years.  They also circulated standard bankruptcy forms to one another that would have to be completed and filed after the chapter 11 filing(s).  And long before the Petition Date, Project Omega team members explicitly discussed plans to merge the Debtors' operating subsidiaries, 200 Park and ClimateLabs, back into New TTC and New Trane after the Debtors' bankruptcies concluded.

113.    Jones Day was brought in early to Project Omega. The firm would first guide the Old IRNJ and Old Trane through the 2020 Corporate Restructuring process and then, seven weeks later, would file these bankruptcy cases for Aldrich and Murray.

---

[156] It is no coincidence that this exact exact fact pattern and the same alleged "options" are found in both *Bestwall* and *DBMP*, and that all four companies have been represented by the same law firm.  Be it an appropriate use of the bankruptcy laws, or not, the "Texas Two Step" is an attorney designed strategy for use in a bankruptcy case.

114.    The minutes of the Aldrich and Murray board meetings were initially drafted by the Jones Day firm, and then reviewed and edited, when necessary, by Mr. Tananbaum.[157] Mr. Tananbaum testified that the minutes of the Aldrich and Murray board meetings were used as a means of "creating" a "record" that the four options had been duly considered.[158]

115.    And consistent with Mr. Tananbaum's admission, the minutes of those board meetings display serious consideration only of the bankruptcy option, with all affirmative steps leading to the Debtors' eventual chapter 11 filings. During the May 15, 2020 joint meeting of the Debtors' boards, "Mr. Tananbaum reviewed options available to the [Debtors] with respect to the resolution of current and future asbestos claims," with a special emphasis on "section 524(g) of Bankruptcy Code [*sic*]."[159] By that date, Mr. Tananbaum had already made up his mind that he preferred bankruptcy over the other alleged alternatives.[160]

116.    A week later, at the May 22, 2020 joint meeting of the boards, Mr. Tananbaum and other lawyers led a discussion regarding the "mechanics and limitations" of the non-bankruptcy options.[161] Manlio Valdes, a member of both boards, admitted that, after the May 29, 2020 joint meeting of the boards, he thought it was "a probability" that the Trane entities would end up paying less to asbestos claimants in bankruptcy.[162]

117.    On June 5, 2020, Mr. Tananbaum informed the boards that, while they were not currently being asked to take any action, "he anticipated management of the [Debtors] would soon ask the Boards to authorize the [Debtors] to file chapter 11 bankruptcy and pursue final

---

[157] Tananbaum Dep. 272:25-273:5; Hr'g Tr. 163:14-164:3, May 5, 2021 (Tananbaum Cross-Exam).
[158] Tananbaum 30(b)(6) Dep. 252:3-12; 253:15-254:7.
[159] *See* ACC Ex. 31, at DEBTORS_00050790.
[160] Tananbaum Dep. 287:4-12.
[161] ACC Ex. 32, at DEBTORS_00050795.
[162] Valdes Dep. 264:21-265:7, Mar. 1, 2021; ACC Ex. 33.

resolution of their current and future asbestos claims using 524(g) of the Bankruptcy Code."[163] On

June 17, 2020, the Aldrich and Murray boards unanimously approved resolutions authorizing the

Debtors to file chapter 11.[164]

118.    Indeed, on May 27, 2020, Rolf Paeper, a Project Omega member, asked

why the bankruptcy filings had been delayed since the Trane entities were "pushing to do that in

less than 30 [*sic*] days."[165] In response, Eric Hankins, another Omega member, wrote: "[W]e can't

push, it has to be an independent [Board] decision."[166] Mr. Paeper replied, expressing his

skepticism of each board's independence by putting the word "independent" [*sic*] in quotes.[167]

119.    Finally, one cannot credibly suggest that a corporate enterprise the size and

sophistication of Old IRNJ and Old Trane would restructure their entire business configuration,

and then just leave it to the Debtors' Boards to determine whether to file the Chapter 11 Cases that

fulfilled the (sole) business purpose of the Corporate Restructuring.

120.    Thus, the weight of the evidence, suggests the decision to file these two

entities in bankruptcy was not made the night before the bankruptcy filings on June 17, 2020. Nor

was the decision to file made by the Debtors' Boards. At best, the Board resolutions simply

rubberstamped decisions to place Aldrich and Murray into chapter 11 made even before Aldrich

and Murray were in existence. The 2020 Corporate Restructuring and the Divisional merger were

undertaken so that the Trane Enterprise might obtain the injunctive benefits of an asbestos

bankruptcy plan and trust without filing themselves.

---

[163] ACC Ex. 34, at DEBTORS_00050805.
[164] *See* ACC Ex. 36, at DEBTORS_00050813-816; ACC Ex. 44, at DEBTORS_00050819-22
[165] ACC Ex. 193, at TRANE_00007527.
[166] *Id.*
[167] *Id.* Earlier, Mr. Paeper had expressed similar skepticism of board independence, writing in a December 4, 2020 email that "Trane maintains equity ownership and control of the board of the bankrupt and operating entities." ACC Ex. 18, at TRANE_00006711. In response to Mr. Paeper's email, Mr. Valdes responded "[t]his is a lot brighter outlook than was originally expected." *Id.*

121.    Nor were these actions undertaken for the benefit of the asbestos claimants. Rather, these bankruptcies were designed to isolate the asbestos claimants from the overall corporate enterprise and strand them in bankruptcy until such time as they agree to a Section 524(g) plan.

## I.    Post-Merger Suits Against New TTC/New Trane

122.    Following the 2020 Corporate Restructuring, individual asbestos claimants began (a) naming New TTC/New Trane and/or other Protected Parties of the Debtors as defendants in newly filed Aldrich/Murray Asbestos Claims or (b) adding or seeking to add New TTC/New Trane as defendants in previously filed Aldrich/Murray Asbestos Claims.[168] Over roughly one month, New TTC/New Trane had been named in or added (or sought to be added) as a defendant to approximately 65 such cases.[169] Approximately 150 claims have been filed against Protected Parties since the 2020 Corporate Restructuring on account of Aldrich/Murray Asbestos Claims.[170]

123.    At least two such complaints to recover on Aldrich/Murray Asbestos Claims have been asserted against a Protected Party alleging alter ego claims. Others seek to recover Aldrich/Murray Asbestos Claims against New TTC/New Trane by alleging that the 2020 Corporate Restructuring is a fraudulent conveyance.[171]

124.    The number of Aldrich/Murray Asbestos Claims already initiated against New TTC/New Trane and other Protected Parties after the 2020 Corporate Restructuring confirms that absent injunctive relief, the asbestos-related litigation in the tort system would recommence and continue as before the chapter 11 filing.

---

[168] Tananbaum Decl. ¶ 34.
[169] *Id.*
[170] See Debtors' Ex. 10.
[171] Tananbaum Decl. ¶ 34.

125.   Indeed, the stated reason for the ACC's opposition to the injunctive relief sought here is to enable asbestos claimants to recommence suing New TTC/New Trane and potentially the Protected Parties and Distributors for Aldrich/Murray Asbestos Claims.[172]

## J.   The Bankruptcy Cases, Thus Far

126.   Notwithstanding all that transpired before bankruptcy, the Debtors insist that their goal in these Chapter 11 Cases is to negotiate and confirm a plan of reorganization that would (a) establish and fund a trust to resolve and compensate valid asbestos-related claims in an efficient and equitable manner, and (b) provide for the issuance of an injunction pursuant to section 524(g) of the Bankruptcy Code that will protect the Debtors from any further liability related to the Aldrich/Murray Asbestos Claims.[173]

127.   The Debtors will have the necessary financial resources to achieve their reorganization objectives only if New TTC and New Trane provide them under the Funding Agreements. That funding, in turn, is conditioned upon the asbestos claimants voting in favor of the plan by a 75% supermajority and New TTC /New Trane et. al. receiving protections under a Section 524(g) injunction. Otherwise, Aldrich and Murray lack the ability to pay their liabilities and future demands from their own assets.

128.   Perhaps that funding will be forthcoming.  Thus far, New TTC and New Trane have fulfilled their obligations under the Funding Agreements. Before the Petition Date, Aldrich made two requests for funding in the aggregate amount of $15 million, while Murray made

---

[172] First Day Decl. ¶¶ 21-22.
[173] See Hr'g Tr. 135:7-24, 136:9-20, 139:18-140:8, 196:23-197:19, 199:6-12, May 5, 2021. Given the wording of the Funding Agreements and the Preliminary Injunction Motion, this statement should be understood to include Section 524(g) injunctive protection for not just the Debtors but also New IRNJ, New Trane, the Affiliates, Distributors and Insurers.

one request for $5 million.[174] Each request was fulfilled.[175] The Debtors have not needed to make any additional funding requests since the Petition Date.[176]

129.    Also, New TTC and New Trane have stated their commitment to comply with their future contractual obligations under the Funding Agreement, including meeting the Debtors' contractually authorized funding requests to provide funding for a section 524(g) trust as established under a confirmed plan of reorganization in the Chapter 11 Case.[177] Certainly, New TTC and New Trane have the ability to fund these liabilities and to satisfy their respective obligations under the Funding Agreements. That ability is demonstrated by, among other things, New TTC's book-value equity of approximately $7.8 billion and New Trane's book-value equity of $3 billion, as of December 31, 2020.[178] By contrast, the Debtors' estimate for financial reporting purposes of the cost of resolving current and future Asbestos Claims was approximately $500 million just prior to the Petition Date.[179]

130.    In contrast to *Bestwall* and *DBMP,* the FCR, the fiduciary for the future asbestos victims supports the Debtors' effort to address their asbestos tort liability through the creation of a section 524(g) asbestos trust.[180] The FCR believes this to be the most expeditious and just way for the Debtors to ensure that holders of current and future asbestos claims are compensated fully and fairly. The Debtors and the FCR have commenced negotiations concerning a plan of reorganization. The Debtors have also begun discussions with their insurers.[181]

---

[174] *See* Hr'g Tr. 486:9-19, May 7, 2021; *see also* Debtors' Ex. 3.
[175] *Id.*
[176] *See* Hr'g Tr. 508:25-509:5, May 7, 2021.
[177] Hr'g Tr. 486:4-487:2, 551:10-13, May 7, 2021.
[178] Hr'g Tr. 487:11-16, May 7, 2021.
[179] *See* Hr'g Tr. 541:5-12, May 7, 2021.
[180] *See* FCR's Initial Submission.
[181] Hr'g Tr. 137:4-6, 174:7-10, 175:8-10, May 5, 2021.

131.    However, given its view about the impropriety of the 2020 Corporate Restructuring and these bankruptcy cases, and giving priority to this Injunction Motion, to date, the ACC has declined the Debtors' and the FCR's invitations to open plan negotiations.[182] The ACC confidently predicts that the current asbestos claimants (who are represented by a dozen or so plaintiffs' law firms around the country), will never agree to a Debtors plan given all that has transpired. Indeed, the stated reason for the ACC's opposition to the injunctive relief sought here is to enable asbestos claimants to recommence suing New TTC/New Trane and potentially the other Distributors in the tort system.[183]

## III.    CONCLUSIONS OF LAW

### A.    Jurisdiction and Venue

132.    Unlike the parallel injunctive proceedings conducted in *DBMP*, in the present cases subject matter jurisdiction has not been contested. However, the same principles apply. To summarize the jurisdictional holding in *DBMP*,[184] this Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §1334.[185] Venue of this matter is proper under 28 U.S.C. § 1409. These matters present "core proceedings," or at a minimum, "related to" proceedings under 28 U.S.C. § 157(b).

133.    More specifically, a bankruptcy court has "jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11," 28 U.S.C. § 1334(b). All three statutory bases pertain and provide subject matter jurisdiction to enjoin third-party litigation under the circumstances presented.

---

[182] Hr'g Tr. 137:4-7, 174:10-11, May 5, 2021.
[183] *See generally* ACC Objection [Adv. Pro. Dkt. 151].
[184] *See* Case No. 20-03004, Doc. No. 343. Aug. 10, 2021.
[185] In contrast to the *DBMP* case where the matter has been argued vociferously, in these two cases, the ACC has not disputed that the Court has subject matter jurisdiction to grant the Motion.

134.    First, "arising under" jurisdiction lies. A proceeding "aris[es] under" the Bankruptcy Code if it "invokes a substantive right created by the Bankruptcy Code."[186] The Debtors' request for declaratory relief aims to confirm the scope of the automatic stay, "a substantive right created by [section 362 of] the Bankruptcy Code."[187] The Debtors are seeking a section 105(a) injunction in aid of the automatic stay (to the extent it does not apply by its own force). These asbestos claims are presently, "claims against the debtor and therefore impair the automatic stay."[188]

135.    Second, as we discuss below in Section III(D)(ii), while the Divisional Merger and the subsequent allocations are subject to challenge as fraudulent transfers[189] or under remedial doctrines like alter ego and successor liability, with Aldrich and Murray in bankruptcy, those challenges may not be made by individual creditors. The applicable remedial causes of action are estate property under Code Section 541 or else fraudulent transfer claims under Sections 544 and 548 which under controlling Circuit precedent must be asserted in the first instance by the bankruptcy trustee for the benefit of all creditors. Permitting an individual creditor to assert such general claims for its individual benefit would clearly, and adversely, affect the bankruptcy estate. Under 28 U.S.C. 1334(e)(1), this Court has exclusive jurisdiction over all property of the Debtors as of the commencement of the case, and overall estate property.

---

[186] *FPSDA II, LLC v. Larin (In re FPSDA I, LLC)*, No. 10-75439, Adv. No. 12-08032, 2012 WL 6681794, at *4 (Bankr. E.D.N.Y. Dec. 21, 2012), *as corrected* (Dec. 26, 2012).

[187] *See A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999-1000 (4th Cir. 1986); *In re Brier Creek Corporate Ctr. Assocs. Ltd.*, 486 B.R. 681, 685 (Bankr. E.D.N.C. 2013)

[188] *Chase Manhattan Bank (N.A.) v. Third Eighty-Ninth Assocs. (In re Thirty Eighty-Ninth Assocs.)*, 138 B.R. 144, 147 (S.D.N.Y. 1992).

[189] The Corporate Restructuring occurred through a series of transactions that occurred within hours and, in some cases, within days of one another. However, "[c]ourts have 'collapsed' a series of transactions into one transaction when it appears that despite the formal structure erected and the labels attached, the segments, in reality, comprise a single integrated scheme when evaluated focusing on the knowledge and intent of the parties involved in the transaction." In re Abell, 549 B.R. 631, 660 (Bankr. D. Md. 2016) (alteration in original) (quoting *In re Sunbeam*, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002)).

136.    "Arising in" jurisdiction also exists here. A proceeding "arises in" a bankruptcy case when it "would have no existence outside of the bankruptcy."[190] Here, the Debtors are seeking a Section 105(a) injunction in aid of the automatic stay. A claim for such an injunction, tied to and lasting only during a bankruptcy case, "arises only in bankruptcy cases in that such an injunction would have no existence outside of bankruptcy. "The debtors would not be entitled to a § 105 injunction but for the existence of their bankruptcy cases."[191]

137.    There is a close nexus between the injunction sought by the Debtors and the substantive rights created by the automatic stay. "[C]ommon sense indicates that, if the Court has subject matter jurisdiction over a proceeding to determine the applicability of the automatic stay" as it does here, "then it has jurisdiction over a related motion for preliminary injunctive relief" in the same proceeding.[192]

138.    Third, and "at a minimum, [this court has] 'related to' jurisdiction" over these disputes.[193] "Related to" jurisdiction over third-party claims occurs when "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."[194] Litigation of the Aldrich/Murray Asbestos Claims against the Protected Parties outside of this case could "conceivably have [an] effect" on the Debtors' estates and reorganization.[195]

---

[190] *Bergstrom v. Dalkon Shield Claimants Tr. (In re A.H. Robins Co., Inc.)*, 86 F.3d 364, 372 (4th Cir. 1996); *accord Grausz v. Englander*, 321 F.3d 467, 471 (4th Cir. 2003).
[191] *Brier Creek*, 486 B.R. at 685.
[192] FPSDA I, LLC, 2012 WL 6681794, at *5 (quoted in *Brier Creek*, 486 B.R. at 685).
[193] *Brier Creek*, 486 B.R. at 686.
[194] *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984); *see Robins*, 788 F.2d at 1002, 1002 n.11.
[195] *Id.*

**B.   The 2020 Corporate Restructuring was not Preempted by Section 524(g)**

139.   The ACC suggests that the Bankruptcy Code generally, and § 524(g) in particular, preempts Old IRNJ and Old Trane's efforts under the Texas divisional merger law to cabin all of their asbestos liabilities with the Debtors.[196]

140.   As noted below, there may be problems with the way in which the Debtor's predecessors restructured their corporations, both under the TCOB and potentially the Bankruptcy Code.[197]  Further, full compliance with Section 524(g) will be required if the Debtors are to obtain the relief they seek for themselves and the Protected Parties. Nevertheless, the undersigned agrees with Judge Beyer in *Bestwall* that a divisional merger under Texas Law is not preempted by Section 524(g).[198]  The Texas statutes and Section 524(g) (and the other provision of the Bankruptcy Code) work together to address different purposes.

141.   There is a "strong presumption against inferring Congressional preemption" of state law.[199]  And "[t]his presumption is strongest when Congress legislates in a field which the States have traditionally occupied"—such as the field of corporate organization relevant to the Texas provisions.[200]

142.   Here, the ACC argues only for implied preemption, which can occur either through conflict or field preemption. "Conflict preemption" occurs "when compliance with both federal and state regulations is a physical impossibility, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[201] There is no conflict preemption here, because, as *Bestwall* noted, the Texas divisional merger

---

[196] *See* 11 U.S.C. § 524(g).
[197] To be confirmed, a plan must be proposed in good faith and not by any means forbidden by law. 11 USC 1129(a)(3).
[198] *See Bestwall*, 606 B.R. at 251.
[199] *Integrated Sols., Inc. v. Serv. Support Specialties, Inc.*, 124 F.3d 487, 493 (3d Cir. 1997).
[200] *S. Blasting Servs., Inc. v. Wilkes Cty., N.C.*, 288 F.3d 584, 590 (4th Cir. 2002).
[201] *Id.*

provisions and section 524(g) "concern completely different subjects and work readily in tandem."[202] There also is no conflict apparent in the "[s]tatutory text and structure" of the provisions, which are "the most reliable guideposts in th[e] [preemption] inquiry."[203] In addition, as the *Bestwall* court confirmed, the Texas divisional merger provisions and section 524(g) "concern completely different subjects and work readily in tandem."[204]

143.    The ACC argues that the Texas divisional merger provisions, "as applied" to the 2020 Corporate Restructuring, create an obstacle to the purpose of section 524(g) because the Texas provisions (a) allow asbestos liabilities to vest in one entity created through a divisional merger, and not the other, (b) without the "procedural and due process protections" of section 524(g) of the Bankruptcy Code, and (c) without requiring the dividing company to file for bankruptcy.[205] This argument confuses both the nature and effects of the divisional merger as well as the purposes of section 524(g).

144.    The section 524(g) requirements upon which the ACC relies are mandated if the claims and demands are to be discharged and all current and future claims are to be channeled to a trust. All of those procedural and substantive protections afforded under section 524(g) remain in place.

145.    Meanwhile, the 2020 Corporate Restructuring did not finally resolve any of Old IRNJ or Old Trane's asbestos liabilities; it only allocated them, as between Aldrich and New TTC and as between Murray and New Trane, and provided which entity was to bear those liabilities. As we note below in Section III(C)(i), the Divisional Merger statutes presume that the

---

[202] 606 B.R. at 251.
[203] *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 474 (4th Cir. 2014), *aff'd sub nom.*, *Hughes v. Talen Energy Mktg., LLC*, 136 S.Ct. 1288 (2016).
[204] 606 B.R. at 251.
[205] ACC Obj. at 70-71.

new corporation to which those liabilities are allocated will have the ability to pay those liabilities. If not, creditors of the old entity may contest the merger, including the asset and liability allocations. They may seek to hold the other company responsible for those liabilities.

146.    All of those safeguards generally available to protect creditors' rights, including fraudulent-transfer laws, remain in effect.[206] To date, New TTC and New Trane have not escaped, discharged, or eliminated any liability for Aldrich/Murray Asbestos Claims through the divisional merger.

147.    There is also no basis to find field preemption "of asbestos-related corporate reorganizations."[207] "Field preemption" occurs when "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it."[208] Field preemption is rare and requires a showing that Congress has "regulat[ed] so pervasively that there is no room left for the states to supplement federal law," or that "there is a 'federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'"[209]

148.    Section 524(g) itself confirms the absence of field preemption because it expressly contemplates prepetition corporate restructurings without establishing any requirements for them.[210] This reflects the long-standing principle that corporate governance is traditionally left

---

[206] *Id.*
[207] ACC Obj., 72.
[208] *Cipollone v. Liggett Grp., Inc.,* 505 U.S. 504, 516 (1992); *S. Blasting Servs.*, 288 F.3d at 590.
[209] *U.S. v. South Carolina*, 720 F.3d 518, 528-29 (4th Cir. 2013); accord *Hillsborough Cty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985). The Court is not persuaded that *MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 913-14 (9th Cir. 1996) supports the ACC's field preemption argument. The facts of that case are distinguishable from the facts here; the Debtor is not collaterally attacking or seeking to address asbestos claims outside the chapter 11 process.
[210] *See* 11 U.S.C. § 524(g)(4)(A)(ii)(IV).

to the States: "No principle of corporation law and practice is more firmly established than a state's

authority to regulate domestic corporations."[211]

149.    Section 524(g) also is not sufficiently comprehensive to occupy the field of

resolution or discharge of asbestos liabilities. Even after section 524(g) became law, the

Supreme Court called on Congress to do more regarding asbestos liabilities, recognizing that

Congress had not comprehensively addressed the area.[212]

**C.    The 2020 Corporate Restructuring Appears Materially Prejudicial to the Rights of Asbestos Claimants, and in Accordance with the Texas Statutory Scheme, is Subject to Legal Challenge.**

150.    At the center of these cases is the propriety of what the ACC terms the

"Texas Two Step," a Texas Divisional Merger followed shortly thereafter by a bankruptcy filing

by one of the successor companies and in which the debtor seeks Section 524(g) relief for the

entire enterprise.

151.    Aldrich/Murray and New TTC and New Trane maintain that these are

practical, prudent and fair actions that enable the Trane Enterprise to globally resolve its asbestos

claims under Section 524(g) but without subjecting the entire enterprise and its other stakeholders

to the deleterious effects of chapter 11. And due to the Funding Agreements, these parties argue

that the Debtors have the same ability to pay asbestos claims as did their predecessors, Old IRNJ

and Old Trane.[213] Arguing that New TTC and New Trane are willing to pay these liabilities, they

insist that asbestos claimants are not hurt.

152.    However, the ACC views these actions as a craven effort by Old IRNJ and

Old Trane (and now New TTC and New Trane) to separate their asbestos claims from the Trane

---

[211] *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987); *see also Cort v. Ash*, 422 U.S. 66, 84 (1975).
[212] *See, e.g., Ortiz Fibreboard Corp.*, 527 U.S. 815, 821 (1999); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 598 (1997).
[213] Hr'g Tr. 397:18-23, May 6, 2021 (Diaz Direct)

Enterprise assets. The ACC contends that the Divisional Merger allocations have all of the attributes of a fraudulent transfer. Worse, by virtue of the Section 362 stay and the proposed preliminary injunction, the Trane Enterprise seeks not just a stay of recovery actions against the Debtors, but also as against New TTC and New Trane, the other Non-Debtor Affiliates and other non-debtor third parties. This, the ACC contends, gives these non-debtors all of the protections afforded a bankruptcy debtor (e.g., the automatic stay, access to Section 524(g), etc.) but without the corresponding creditor protections imposed on debtors by the Bankruptcy Code (e.g., the absolute priority rule, debtor transparency, and court supervision).

153.   We should note here what is not presently before this Court for decision. There is no pending motion to dismiss the cases as "bad faith" filings. Even if there were, it would likely fail as it did in *Bestwall* due to the exacting *Carolin* requirements of subjective bad faith <u>and</u> objective futility.[214]

154.   Although no motion to dismiss has been filed here, the ACC seeks the functional equivalent. The Committee openly express its desire for an end to these bankruptcy cases. It argues for a denial of the Preliminary Injunction request—anticipating that this would effectively end the reorganization effort and return all concerned to the tort system. The tort system is the forum in which the ACC, or more specifically, the law firms which represent the asbestos claimants, prefer to litigate.

155.   Second, and while there have been many arguments made suggesting that the Divisional Merger constitutes a fraudulent transfer, there is no pending avoidance action in these cases that challenges the transaction. A few individual creditors have filed such actions in state court, but the debtors in possession (which hold the powers and duties of a bankruptcy trustee

---

[214] *Carolin Corp. v. Miller*, 886 F.2d 693, 700-01.

in chapter 11) have not. Nor can Aldrich and Murray be expected to do so, given their close relationships to New TTC and New Trane. Even though the ACC believes the merger to be a fraudulent conveyance, to date it has not sought authority to pursue such an action on behalf of the bankruptcy estate. Instead, the ACC seeks to force a dismissal of the cases, through denial of the preliminary injunction.

156.     Given this, we are not in a position today to rule on the core dispute between the parties:   whether New TTC and New Trane should be held liable for the Aldrich/Murray asbestos liabilities. Even so, this topic informs the motions which are currently before us. Thus, some preliminary observations are in order about the Texas Divisional Merger and how it was employed by Old IRNJ and Old Trane.

     i.   <u>The Texas Divisional Merger Laws</u>

157.     For over 30 years, Texas law has permitted divisional mergers that authorize an existing corporation to divide itself into two or more new entities.[215]

158.     Under the TBOC, the current version of the statute, upon a divisional merger in which the dividing entity does not survive, "all liabilities and obligations" of the dividing entity automatically "are allocated to one or more of the . . . new organizations in the manner provided by the plan of merger."[216] Except as otherwise provided, "no other . . . entity . . . created under the plan of merger is liable for the debt or other obligation."[217]

159.     Technically, the 2020 Corporate Restructuring met all applicable state-law requirements to effect divisional mergers. At the time of the mergers, Old IRNJ and Old Trane

---

[215] *Compare* Tex. Bus. Corp. Act Ann. art. 5.06A(2), (3) (Vernon Supp. 1990) *with* Tex. Bus. Orgs. Code Ann. § 10.008(a)(2), (3).
[216] TBOC § 10.008(a)(2), (3).
[217] *Id.* § 10.008(a)(4).

were domiciled in Texas.[218] They made the necessary filings, including filing plans of merger (specifying, among other things, an allocation of assets and liabilities with the Secretary of State).[219]

160.    Upon the divisional mergers, Old IRNJ and Old Trane ceased to exist. All of Old IRNJ's asbestos liabilities were exclusively allocated to Aldrich; all of Old Trane's asbestos liabilities were exclusively allocated to Murray. Most of the assets and business operations of Old IRNJ and Old Trane ended up with New TTC and New Trane, respectively.

161.    That may well have been improper. For while the TBOC permits a company to engage in a divisional merger, it does not permit that company to thereby prejudice its creditors. The TBOC explicitly states that the merger provisions do not "abridge any right or rights of any creditor under existing laws."[220]

162.    This has been the unwavering and stated policy behind the Texas divisional merger statute since it was first adopted. The original version of the statute, Texas Business Corporations Act, provided: "Antitrust Laws; Creditors." "Nothing contained in Part 5 of this Act shall ever be construed as affecting, nullifying or repealing the Anti-trust laws or as abridging any right or rights of any creditor under existing laws."[221]

163.    So too the legislative history: "[c]reditors' rights would not be adversely affected by the proposed amendment, and creditors would continue to have the protections provided by the Uniform Fraudulent Transfer Act and other existing statutes that protect the rights of creditors."[222]

---

[218] There is no minimum period for which an entity must be domiciled under Texas law. *Phillips v. United Heritage Corp.*, 319 S.W.3d 156, 163 n.5 (Tex. App. 2010); *see also* Tex. Bus. Orgs. Code Ann. § 1.101.
[219] *See* TBOC §§ 10.001(b), 10.002, 10.003, 10.151.
[220] TBOC § 10.901.
[221] TBCA § 5.15. (1989).
[222] H. COMM. ON BUS. & COM., BILL ANALYSIS, H.B. 472, 1989 Leg., 71st Reg. Sess., at 23 (Tex. 1989).

164.     No change to this policy was made when in 2006, the Texas Business Corporations Act ("TBCA") was transformed into the TBOC. The divisional merger statute moved from section 5 of the TBCA to section 10 of the TBOC, but only non-substantive changes were made to the creditor protection provision in the divisional merger statute.[223]

165.     Curtis Huff, a primary author of the Texas divisional merger statute[224] has confirmed that the rights of creditors under federal and state fraudulent transfer laws are not abrogated or abridged by such a merger: "While the provisions permitting multiple surviving entities in a merger were intended to provide corporations with greater flexibility in structuring acquisition and restructuring transactions, they were not intended to have any material effect on the existing rights of creditors of the parties to a merger."[225]

166.     Huff has further explained that "all laws protecting the rights of creditors with respect to fraudulent conveyances, preferences and insolvency will remain in force and apply."[226] "Principal among the laws available to protect creditors in mergers with multiple survivors are the Uniform Fraudulent Transfer Act (the "UFTA"), the Uniform Fraudulent Conveyance Act (the "UFCA") and the United States Bankruptcy Code of 1978, as amended (the "Bankruptcy Code")."[227]

167.     Huff opines that although "a merger will not involve a 'transfer' of assets in the traditional sense," the "allocation of assets in a merger should constitute both a 'transfer' and 'conveyance' of assets under both the letter and spirit of the UFTA, the UFCA and the

---

[223] *Id.* at 1.
[224] Huff was a member of the subcommittee of the Corporation Law Committee of the Business Law Section of the State Bar of Texas that drafted the amendments to the merger provisions of the TBCA.
[225] *See* Curtis Huff, *The New Texas Business Corporation Act Merger Provisions*, 21 ST. MARY'S L.J. 109, 110 n.2 (1989) (emphasis added).
[226] *Id.* at 125.
[227] *Id.* at 126 (footnotes omitted).

Bankruptcy Code."[228] "The allocation of liabilities of the parties to a merger among the surviving entities in the merger should also constitute the incurrence of obligations under the UFTA and the Bankruptcy Code by the surviving entities."[229]

168.    The allocation of a creditor's claim to another corporation in a merger with multiple survivors will allow the creditor to challenge the merger and the transfer of assets if any of the requirements of fraudulent transfer law are met, including (1) the original corporation was insolvent and the transfer of assets to the other resulting corporation or entity was not for reasonably equivalent value or for fair consideration, (2) the transfer of assets to the resulting entity was not for reasonably equivalent value or fair consideration, and the resulting entity has an unreasonably small amount of assets in relationship to the business or transactions conducted or contemplated to be conducted by it or the resulting entity intended to incur, or believed that it would incur, debts beyond its ability to pay as they become due and absolute, or (3) the merger was effected with an actual intent to hinder, delay or defraud any creditor of the original corporation or the resulting entity.[230]

169.    Huff's analysis contemplates our current dispute and how it should be addressed: "if in a merger with multiple survivors, the parties allocate a creditor's claim to an inadequately capitalized or insolvent corporation, that creditor will have the right to challenge the merger as a fraudulent transfer."[231]

170.    As for a remedy, "[a]lthough various remedies are possible where the allocation of a liability in a merger constitutes a fraudulent transfer, the most appropriate remedy in such a case would generally be to reallocate all or a portion of the allocated liability to one or

---

[228] *Id.* at 129 (footnotes omitted).
[229] *Id.* at 129-30.
[230] *Id.* at 131-32.
[231] *Id.* at 133. (emphasis added).

more of the surviving entities in the merger or to make some or all of the resulting entities liable

for all or a portion of the liabilities of the predecessor debtor corporation."[232]

171.    Thus, if a corporation uses a divisional merger to dump its liabilities into a

newly created "bad" company that lacks the ability to pay creditors while its "good" twin walks

away with the enterprise's assets, a fraudulent transfer avoidance action lies.[233]

172.    The Debtors maintain that nothing like this has happened; they contend that

they have the same funding capacity after the 2020 Corporate Restructuring as did Old IRNJ and

Old Trane immediately before that restructuring[234] based upon the Funding Agreements and the

other assets allocated to Aldrich and Murray. Therefore, the Divisional Merger was not injurious

to asbestos claimants.

173.    Possibly, but that is not the relevant question. Under the TBOC, the proper

question is, "Were the rights of creditors, here asbestos claimants and holders of future demands,

materially affected by the Divisional Merger and its asset and liability allocations?"   The

preliminary answer to that question would have to be, "Yes."

174.    Before the 2020 Corporate Restructuring, asbestos claimants had the same

ability and rights to access Old IRNJ and Old Trane's assets as did other unsecured non-asbestos

creditors. As a result of the 2020 Corporate Restructuring, those assets were placed beyond the

reach of asbestos creditors, and recovery was made dependent on the Debtors' willingness to press

their rights under these Funding Agreements. As discussed above, the Funding Agreements are

unsecured, conditional, and can be enforced only by the given Debtor acting through seconded

---

[232] *Id.* at 132 n.73. (emphasis added).
[233] *See* Cliff Ernst, *Steps to Accomplish a Divisional Merger, in Divisive [Sic] Mergers: How To Divide An Entity Into Two Or More Entities Under A Merger Authorized By The Texas Business Organization Code*, 2016 Wl 10610449 (Tex. 2016) ("[O]ne could certainly imagine an egregious situation where all assets were allocated to one party to the merger and all liabilities were allocated to another party without assets and creditors might attempt to void the transaction as a fraudulent conveyance.").
[234] Hr'g Tr. 397:18-23, May 6, 2021 (Diaz Direct)

employees of New Trane, not by the asbestos claimants. The willingness of Aldrich or Murray to seek funding and the willingness of New TTC or New Trane willingness to pay asbestos claimants cannot be assumed.  Without monies obtained under the Funding Agreements, each Debtor lacks the ability to pay its current asbestos claims and future demands.

175.    Perhaps Aldrich/Murray and New TTC/New Trane mean exactly what they say. Perhaps these jointly administered Debtors will negotiate a fair plan that is acceptable to the claimants. Perhaps New TTC and New Trane will fund that plan, and all of these liabilities will be funded. It is too early to say.

176.    However, at the moment, it appears that the Divisional Mergers had a material, negative effect on the asbestos claimants' ability to recover on their claims. Thus, an action to contest the mergers and the exclusive allocation of all asbestos claims to Aldrich and Murray appears to be a viable cause. But with the two Debtors in bankruptcy, the next question is, "who has the standing to assert such claims—individual asbestos claimants or a bankruptcy trustee?" To answer this question, we must consider the nature of the claims at issue, and the procedural posture of this case.

**D.    The Prosecution of the Debtors' Asbestos Claims is Stayed Pursuant to Sections 362(a)(1) and 362(a)(3) of the Bankruptcy Code.**

i.    362(a)(1)

177.    By virtue of the TBOC, Aldrich is liable for Old IRNJ's asbestos liabilities, and Murray is liable for Old Trane's asbestos liabilities, collectively, the Aldrich/Murray Asbestos Claims.

178.    With the bankruptcy filings, the claimants were stayed from prosecuting the Aldrich/Murray Asbestos Claims against the Debtors pursuant to section 362(a)(1) of the Bankruptcy Code. Section 362(a)(1) of the Bankruptcy Code prohibits the "commencement or

continuation . . . of a judicial . . . proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title."[235]

179.    As the ACC points out, Section 362(a) ". . . provides only for the automatic stay of judicial proceedings and enforcement of judgments 'against the debtor or the property of the estate.'"[236] It does not shield non-debtor codefendants from asbestos lawsuits.[237]

180.    However, there are no such codefendants for whom injunctive relief is sought. The claims that the asbestos claimants seek to prosecute against the Protected Parties were claims against Old IRNJ and Old Trane, respectively. Old IRNJ and Old Trane are no more, and, at present, the Debtors are exclusively responsible for the Aldrich/Murray Asbestos Claims.[238]

181.    Thus, commencement or continuation of Aldrich/Murray Asbestos Claims against the Protected Parties would necessarily result in the liquidation and recovery of claims against the Debtors outside of the bankruptcy case. This is barred by the automatic stay.[239]

182.    The automatic stay imposed by section 362(a)(1) also either presently extends to, or can be extended through this action, to enjoin actions against the Protected Parties, who share such an identity of interests with the Debtors that the Debtors are, in effect, the real party defendants.[240]

183.    The Fourth Circuit in *Robins* described the type of situation that would cause such an identity of interests: "An illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that

---

[235] 11 U.S.C. § 362(a)(1).
[236] *Credit Alliance Corp. v. Williams*, 851 F.2d 119, 121 (4th Cir. 1988).
[237] *Williford v. Armstrong World Industries, Inc.*, 715 F.2d 124 (4th Cir. 1983).
[238] TBOC § 10.008(a)(4).
[239] *See In re Heating Oil Partners*, No. 3:08-CV-1976 CSH, 2009 WL 5110838, at *6-7 (D. Conn. Dec. 17, 2009), *aff'd sub nom. In re Heating Oil Partners, LP*, 422 F. App'x 15 (2d Cir. 2011).
[240] *See Robins*, 788 F.2d at 999.

might result against them in the case."[241] "To refuse application of the statutory stay in that case would defeat the very purpose and intent of the statute."[242] This logic applies equally to situations where third-party litigation raises collateral estoppel and *res judicata* issues for the debtor.[243]

184.    Both situations described by the *Robins* court are present here. Litigating the Aldrich/Murray Asbestos Claims against the Protected Parties would effectively liquidate claims against the Debtors. Also, they could potentially trigger indemnification rights.[244] There is an even an outside risk that such litigation could bind the Debtors through *res judicata* and collateral estoppel, or by creating an evidentiary record that prejudices the Debtors.[245] Thus, the Debtors, or at least one of them, are the real party defendants in any suit seeking to liquidate and recover on account of an Aldrich/Murray Asbestos Claim, even if directed at a Protected Party, and section 362(a)(1) applies to stay such actions.

ii.    362(a)(3)

185.    Additionally, any such effort to pursue New TTC and New Trane et. al. would necessarily involve third parties asserting claims which are now held by one of the two bankruptcy estates.[246] As the preceding analysis of the Texas Merger statutes reflects, in order to hold the Protected Parties liable for debts allocated under the merger to Aldrich and Murray, asbestos claimants will be required to assert (as some already have) claims for fraudulent transfer, successor liability, and/or alter ego arising from the Divisional Merger.

---

[241] *Id.*

[242] *Id.*

[243] *See id.*

[244] We need not decide today whether the indemnification provisions of the Support Agreements would give rise to absolute indemnification rights in these cases. As noted, these were not arm's length agreements, and they were made in contemplation of bankruptcy filings by the successor entities. Under similar circumstances, at least one Court has brushed aside such an agreement. *Schmoll v. ACandS, Inc.*, 703 F. Supp. 868, 869 (D. Or. 1988), aff'd, 977 F.2d 499 (9th Cir. 1992).  It is sufficient for now to say that if enforceable, under the authorities cited by Aldrich/Murray, the Support Agreements would give rise to claims against the Aldrich/Murray estates.

[245] Admittedly, this is a lesser concern as historically, Aldrich/Murray have not experienced such legal handicaps.

[246] These cases have been administratively consolidated, but they remain separate bankruptcy estates.

186.    The law in the Fourth Circuit is that certain theories of recovery through which claimants seek to liquidate the debtor's liability on a claim against a non-debtor are property of the debtor's estate. These include alter ego and successor liability theories of recovery.[247]

187.    And the same is true of fraudulent transfer actions, the primary relief for an improper divisive merger under the TBOC. One can split hairs as to whether fraudulent transfer claims are property of the estate or whether they simply permit avoidance of certain transfers, with the estate standing in the shoes of creditors.[248] For present purposes, the net result is the same.

188.    With Aldrich and Murray in bankruptcy, under the Fourth Circuit's "first crack" rule, it is the bankruptcy trustee, not individual asbestos claimants, that has standing to assert fraudulent conveyance claims and claims that share the same underlying focus as fraudulent conveyance claims.[249] "Reserving the [fraudulent conveyance] action for the [Debtor] maintains the integrity of the bankruptcy proceedings and ensures that individual creditors cannot hijack the bankruptcy process."[250] And to the extent that the remedial claims are state law alter ego or successor liability theories, these are claims held under applicable state law by DBMP's bankruptcy estate under Section 541.

189.    Or as our U.S. District Court has put it, "in the Fourth Circuit the rule is settled that [section] 362(a)(3) [of the Bankruptcy Code] stays automatically—without a

---

[247] *See, e.g.*, *Steyr-Daimler-Puch of Am. Corp. v. Pappas*, 852 F.2d 132, 136 (4th Cir. 1988); *In re Anderson & Strudwick, Inc.*, No. 14-32679, Adv. Pro. 14-03175, 2015 WL 1651146, at 5 (Bankr. E.D. Va. Apr. 8, 2015); *Mitchell v. Greenberg (In re Creative Entm't, Inc.)*, Adv. Pro. No. 00-3114, 2003 Bankr. LEXIS 2468, 28-29 (Bankr. W.D.N.C. May 28, 2003). *Acme Boot Co. v. Tony Lama Interstate Retails Stores, Inc.*, 1991 WL 39457, 929 F.2d 691 (4th Cir. 1991), cited by the ACC, is distinguishable, in part because it addresses a successor claim applicable only to a single creditor, rather than a claim generally available to the debtor's other creditors.
[248] Contrast *In re Midstate Mills, Inc.*, No. 13-50033, 2015 WL 5475295, at *7 (Bankr. W.D.N.C. Sept. 15, 2015) with *In re Fabian*, 458 B.R. 235, 258 (Bankr. D. Md. 2011).
[249] *See* 11 U.S.C. § 544(b); 11 U.S.C. § 548; *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co., Inc.*, 187 F.3d 439, 441 (4th Cir. 1999).
[250] *Ruppert*, 187 F.3d at 442.

restraining order—a creditor's claim against a third-party that the debtor can assert for the benefit of the estate."[251]

190.    Thus, the claims which the ACC envisions individual asbestos claimants pursuing against New TTC and New Trane, et. al. in the tort system for their own benefit are actually (1) liability claims against Aldrich and Murray by virtue of the TBOC, and (2) remedy claims which seek to make the Protected Parties, particularly New TTC and New Trane, liable for those same asbestos liability claims under theories of fraudulent conveyance, alter ego, etc. The former are claims against the debtor whose liquidation is stayed by Section 362(a)(1).  The later remedial claims are either bankruptcy estate property under Section 541 and/or avoidance claims. Either way, these claims are subject to the automatic stay under Section 362(a)(3).

191.    Additionally, section 362(a)(3) bars plaintiffs from bringing actions against the Debtors' Insurers on account of Aldrich/Murray Asbestos Claims because the insurance coverage is also property of the estate.[252]

### E.    The Summary Judgment Standard and the Automatic Stay

192.    Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure "when the evidence, viewed in the light most favorable to the party against whom summary judgment is sought, could not lead a rational fact finder to find for the non-moving party, and the opposing party does not produce sufficient evidence to demonstrate a genuine, dispositive issue exists for trial."[253] "[I]n order to survive a motion for summary judgment, '[t]he mere

---

[251] *In re Litchfield Co. of S.C. Ltd. P'Ship*, 135 B.R. 797, 803 n.4 (W.D.N.C. 1992).

[252] *Robins*, 788 F.2d at 1001 (agreeing with "the weight of authority" that insurance contracts are property of the estate and that "[a]ccordingly actions 'related to' the bankruptcy proceedings against the insurer . . . are to be stayed under section 362(a)(3)"); *In re Davis*, 730 F.2d 176, 184 (5th Cir. 1984) (agreeing with New York district court that the debtor's insurance policies were property of the estate and that the "bankruptcy court therefore has authority to issue a stay order intended to shield the [debtor's] insurers"); *In re Johns Manville Corp.*, 40 B.R. 219, 231 (S.D.N.Y. 1984) ("determin[ing] that Manville's insurance is property of the estate under the Code and that actions by third parties against the bankrupt's insurers are automatically stayed upon the filing of the petition").

[253] *In re Hilbrant*, No. 09-30556, 2012 WL 5248615 at *2 (Bankr. W.D.N.C. Oct. 24, 2012).

existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the[non-movant]."'[254]

193.    Here the salient facts are not in dispute: the mergers, the allocations of liability, the bankruptcy filings.  The only disputes are legal in nature, of what consequences flow from those actions.  Those facts lead to the legal conclusion that the actions against the Protected Parties to Recover Aldrich/Murray Asbestos Claims are stayed by Section 362 of the Bankruptcy Code. For the reasons just stated, it is appropriate to grant the Debtors' motion for partial summary judgment.[255]

**F.    Prosecution of Aldrich and Murray Asbestos Claims in the Tort System will Interfere with the Debtors' Reorganizations, and the Debtors have Otherwise Satisfied the Four-Prong Test for Maintaining the Preliminary Injunction.**

194.    Having determined that (1) the Asbestos Claims which the Defendants seek to assert against New TTC and New Trane and the Protected Parties are in the first instance claims against the Debtor,  and (2) the legal mechanisms to challenge the 2020 Corporate Restructuring so as to make the Protected Parties liable for the asbestos claims are either estate property and/or claims for which the Estate is given the "first crack" to assert under controlling Circuit authority, we might end there.   As the FCR has observed, in seeking a ruling that the assertion of the Aldrich/Murray Asbestos Claims outside of bankruptcy violates the stay and simultaneously asking for a preliminary injunction to prevent the assertion of the same claims, the Debtors have taken a "belt and suspenders" approach.[256] However, out of an abundance of caution, we will also

---

[254] *Catawba Indian Tribe of S.C. v. City of North Myrtle Beach*, No. 99-2177,2000 WL 770141 at *3 (4th Cir. June 15, 2000) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (brackets by the Fourth Circuit)).
[255] In *DBMP*, we considered a request by the ACC and FCR for relief from stay to pursue all these claims and those against the Debtor in the tort system. That motion was denied. [Adv. Pro. No. 20-03004, Dkt. 344]. While no lift stay motion has been filed in this case, the rationale of that ruling would apply with equal force in this case. To release all claims from the stay and to permit them to be pursued individually in the tort system would create bedlam and foreclose any reorganization effort by the Debtors.
[256] FCR's Reply [Adv. Pro. Dkt. 187].

consider the propriety of continued injunctive relief pending a resolution of this Chapter 11 Case

if the stay were not sufficient to prevent the prosecution of these claims as against the Protected

Parties.

### G.   The Preliminary Injunction Standard

195.    Preliminary injunctions are "extraordinary remedies involving the exercise

of very far-reaching power to be granted only sparingly and in limited circumstances."[257] In each

case, courts "must balance the competing claims of injury and must consider the effect on each

party of the granting or withholding of the requested relief."[258]

196.    To obtain the requested preliminary injunction, the Debtors are required to

make "a clear showing" "[1] that [they are] likely to succeed on the merits, [2] that [they are] likely

to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips

in [the Debtors'] favor, and [4] that an injunction is in the public interest."[259]

197.    Congress    intended    that    standard    apply    to    §    105(a)    preliminary

injunctions.[260] Indeed, the Fourth Circuit has employed the traditional standard when reviewing

an injunction staying actions against non-debtors under § 105(a).[261]

198.    "[T]he Fourth Circuit has made very clear that the critical, if not decisive,

issue over whether injunctive relief should be granted is whether and to what extent the non-debtor

litigation interferes with the debtors' reorganization efforts."[262]

---

[257] *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).
[258] *Id.* at 24.
[259] *Id.* at 20 (emphasis added).
[260] *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1094-95 (9th Cir. 2007) (citing S. REP. NO. 95-989, at 51 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5836-37 and H.R. REP. NO. 95-595, at 342, as reprinted in 1978 U.S.C.C.A.N.
[261] *Piccinin*, 788 F.2d at 1003-09.
[262] *In re Brier Creek Corp. Ctr. Assocs. Ltd.*, 486 B.R. 681, 694 (Bankr. E.D.N.C. 2013) (citing *Piccinin*, 788 F.2d 994, 1003-09 (4th Cir. 1986); *Kreisler v. Goldberg (In re Kreisler)*, 478 F.3d 209, 215 (4th Cir. 2007)).

199.    The Debtors have demonstrated that continued litigation of Aldrich/Murray Asbestos Claims against Protected Parties in the tort system, even as the Debtors attempt to address and resolve the same claims in the Chapter 11 Cases, would greatly interfere with the Debtors' reorganization efforts. In fact, it would almost certainly end them.

### i.    Likelihood of a Successful Reorganization

200.    In bankruptcy proceedings, "success on the merits is to be evaluated in terms of the likelihood of a successful reorganization."[263] Courts also consistently recognize that satisfying this factor does not present a high bar.[264] In the typical chapter 11 case, it can be satisfied where the debtor has demonstrated the financial ability to carry out a reorganization and efforts to negotiate with parties in interest.[265]

201.    Aldrich and Murray have repeatedly stressed that they seek to resolve their Asbestos Claims "finally and fairly"[266] through the establishment of a Section 524(g) trust. And as these Debtors seek to treat both present asbestos claims and future demands, and to afford permanent injunctive relief to the Protected Parties, nothing less than a Section 524(g) plan and injunction will do. This being so, in these two cases we believe the evaluation must necessarily focus on the likelihood of a successful reorganization which includes Section 524(g) relief.

202.    The ACC argues that Aldrich and Murray have failed to demonstrate such a likelihood. First, there has been no progress toward achieving a 524(g) plan—no filed plan, draft or even a term sheet. Second, Aldrich and Murray have not obtained funding commitments to the potential Section 524(g) trust from the "Protected Parties"—i.e., those that would benefit from a

---

[263] *Bestwall*, 606 B.R. at 254.

[264] *Id.*

[265] *See Chicora Life Ctr., LC v. UCF 1 Trust 1 (In re Chicora Life Center LC),* 553 B.R. 61, 66 (Bankr. D.S.C. 2016); *Litchfield Co. of S.C. Ltd. P'ship v. Anchor Bank (In re Litchfield Co. of S.C. Ltd. P'ship)*, 135 B.R. 797, 807 (W.D.N.C. 1992).

[266] Adv. Pro. Dkt. 2 at p. 3.

preliminary injunction. Third, a successful reorganization under § 524(g) is dependent on overwhelming creditor support.  Confirmation of a § 524(g) plan requires a supermajority of assenting current asbestos claimants.[267] Given all that has transpired, the ACC confidently predicts the Debtors will be unable to gain that creditor support. Fourth, the Funding Agreements may not provide a secure and stable source of capital for the Debtors. The terms of the Funding Agreements themselves indicate that they cannot serve as post-effective date "evergreen" sources of funding that § 524(g) contemplates.[268] Fifth, the ACC suggests that the Distributors of Old IRNJ and Old Trane's products do not fall within Section 524(g)'s four enumerated categories of derivative liability.[269] As these parties are not entitled to permanent injunctive protection, the ACC says they should not receive preliminary relief either.[270]

203.    The ability of these Debtors to successfully reorganize under chapter 11 with a Section 524 trust and injunction is far from certain. Nevertheless, it is within the scope of "likelihood."  Assuming that agreement can be reached on the terms of a Section 524(g) plan and trust, by virtue of their present assets and with contributions from New TTC/New Trane, two corporations with significant financial resources, and perhaps from other protected parties, it would appear that these Debtors could appropriately fund a section 524(g) trust and to pay the administrative costs of the Chapter 11 Case.

204.    Admittedly, there have yet to be meaningful settlement negotiations between the Debtors and the ACC or plan formulation actions in the case.  However, here that does not demonstrate an inability to reorganize, for two reasons.  First, injunctions of this kind are

---

[267] *See* 11 U.S.C. § 524(g)(2)(ii)(IV)(b) (requiring 75% acceptance of voting asbestos creditors).

[268] *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 248 (3d Cir. 2004), as amended Feb. 23, 2005.

[269] *See* 11 U.S.C. § 524(g)(4)(A)(ii)(I)-(IV)).

[270] *See DeBeers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945) (courts should not grant a preliminary injunction when such injunction is not "of the same character as that which may be granted finally").

entered at the outset of the chapter 11 case necessarily when no plan or negotiations have occurred. Rather, the requested injunction is necessary to provide the Debtor with an opportunity to negotiate and formulate a plan that can then be confirmed. Thus, bankruptcy courts routinely grant preliminary injunctions before plans of reorganization have been filed.

205. Here, we are admittedly a year into the case. Still, the fact that plan negotiations and plan formulation have not begun is not due to lassitude. Rather, from the first day hearings, the asbestos claimants have decried this case filing as a massive fraud and have passionately urged this Court to deny injunctive relief to the Protected Parties.

206. Given this, upon securing the appointment of the estate fiduciaries and professionals to represent the asbestos claimants, resolution of the Preliminary Injunction was made the first order of business. No one then envisioned that it would take a year and tens of millions of dollars of professional's fees to reach a hearing. But the fact remains: this Injunction was given priority. Other case activities like plan negotiations have been deferred.

207. The Debtors have initiated negotiations with the FCR, and have on several occasions, voiced their willingness to engage with the ACC as well, toward a consensual resolution of this case. Obviously, the prepetition transactions which Old IRNJ, Old Trane, Aldrich and Murray have undertaken have poisoned the well, at least for the moment. Nevertheless, the offer has been made.

208. Aldrich and Murray have also attempted to move forward into other case matters, such as Personal Injury Questionnaires and bar dates, only to have the ACC argue—and this Court to direct—that the Preliminary Injunction hearing should come first.[271] Thus, Aldrich

---

[271] *See* Joint Motion of the Debtors and the Future Claimants' Representative for an Order (I) Establishing a Bar Date for Certain Known Asbestos Claims, (II) Approving Proof of Claim Form, (III) Approving Personal Injury Questionnaire, (IV) Approving Notice to Claimants, and (V) Granting Related Relief [Dkt. No. 471]; ACC Motion to Continue/Reschedule Hearing [Dkt. No. 493].

and Murray cannot be faulted for a lack of diligence; nor is the lack of a plan or plan negotiations with the ACC indicative of an inability to reorganize.

209.    Second, and as to the ACC's prediction that the asbestos claimants will never agree to a Plan, it is simply too early to tell.[272] Multiple contentious asbestos bankruptcy cases have resulted in confirmed section 524(g) plans, including plans with a channeling injunction protecting third parties.

210.    Having sat on two other hotly contested and apparently irreconcilable asbestos bankruptcy cases that wound up with consensual plans as between these same constituencies (*Garlock Sealing* and *Kaiser Gypsum*) and many of the same attorneys, this Court is unable to conclude that our parties cannot reach an agreement, as well.  To find otherwise would be to prejudge the outcome of the Chapter 11 Case at its outset. Almost forty years of bankruptcy experience has impressed upon this Court that such prognostications cannot be accurately made in the early stages of the case.

211.    Similarly, it is simply too early in the case to determine whether any particular Protected Party is, or is not, eligible for section 524(g) relief.  That determination will be made based on the facts presented at confirmation. If the Protected Parties are not so entitled, such relief will not be afforded to them.  The current dispute after all concerns a preliminary, not a permanent, injunction. And the entire point of a preliminary injunction in a chapter 11 case is to

---

[272] *See* supra ¶ 131; *In re Purdue Pharm. L.P.*, 619 B.R. 38, 58 (S.D.N.Y. 2020) (affirming section 105 injunction enjoining mass tort claims against non-debtors, noting "Appellants cannot say that a reorganization is unlikely simply because they intend to object to the plan as presently constituted"); *In re Caesars Entertainment Operating Co., Inc.*, 561 B.R. 441, 452 (Bankr. N.D. Ill. 2016) (granting preliminary injunction notwithstanding creditors' argument that proposed restructuring support agreement "cannot serve as the basis for a successful reorganization," noting "[w]hatever merit the guaranty creditors' criticisms of the [restructuring support agreement] may have, they do not suggest a successful reorganization is less than likely. . .Objections to the specifics of the [restructuring support agreement]. . . prove that the parties have disagreements about the [restructuring support agreement], not that a resolution of those disagreements is out of the question").

afford the parties to sort out the finer points of the case and if necessary for the Court to rule on the close calls.

212.    Finally, the Court rejects the ACC's argument that "[t]he Debtors also cannot demonstrate a substantial likelihood of confirmation given that the [2020] Corporate Restructuring bears the hallmarks of a fraudulent transfer."[273] As a threshold matter, the ACC has not sought Court approval to file any action. Moreover, many successful asbestos bankruptcies have involved fraudulent transfer allegations.[274] Each of these cases ended in confirmed section 524(g) plans and each granted the same type of section 105 injunction sought by the Debtors.[275]

### ii.    Irreparable Harm to the Debtors' Estates and Reorganization Efforts

213.    As stated above, "the critical, if not decisive, issue" in determining whether to enjoin litigation against non-debtors is whether the litigation would, absent an injunction, "interfere[] with the debtors' reorganization efforts."[276] The Debtors' Estates and reorganization efforts in these cases will be irreparably harmed unless the injunction is maintained.

---

[273] ACC Obj. at 32.

[274] *See Lippe v. Bairnco Corp.*, 225 B.R. 846, 849-50 (S.D.N.Y. 1998), *on reargument in part*, 229 B.R. 598 (S.D.N.Y. 1999), *aff'd*, 99 F. App'x 274 (2d Cir. 2004); *In re Babcock & Wilcox Co.*, 274 B.R. 230, 234 (Bankr. E.D. La. 2002); *First Am. Discl. Stmt. for Second Am. Joint Plan of G-I Holdings Inc. and ACI Inc. Pursuant to Ch. 11 of the U.S. Bankr. Code* at 35 (Erens Decl., Ex. 3); Sealed Air Corp. 2011 Form 10-K at 16-17 (Erens Decl., Ex. 4); *In re Combustion Eng'g, Inc.*, 295 B.R. 459, 470-71 (Bankr. D. Del. 2003), *subsequently vacated sub nom, In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004), as amended (Feb. 23, 2005); *In re Specialty Prods. Holding Corp.*, No. 10-11780 [Dkt. 1799] (Bankr. D. Del. Nov. 14, 2011) (Erens Decl., Ex. 5); *In re Garlock Sealing Techs, LLC*, No. 10-31607 [Dkt. 2150] (Bankr. W.D.N.C. Apr. 30, 2012) (Erens Decl., Ex. 6); *In re Kaiser Gypsum Co., Inc.*, No. 16-31602 [Dkt. 1009] (Bankr. W.D.N.C. June 8, 2018). Notably, the claimant representatives also commenced investigating fraudulent transfer allegations in *Paddock*, which now is proceeding toward a consensual plan. *In re Paddock Enters., LLC*, No. 20-10028 [Dkts. 160, 164] (Bankr. D. Del. Mar. 11, 2020) (noting ACC and FCR in *Paddock* have commenced investigation into restructuring, which allegedly "bears the hallmarks of a textbook fraudulent transfer") (Erens Decl., Exs. 7, 8); Debtors' Ex. 79.

[275] *See* Mot. at 23 (citations to preliminary injunctions issued in *Babcock & Wilcox, G-I Holdings, W.R. Grace, Combustion Engineering, Specialty Products, Garlock, and Kaiser Gypsum*); *In re Keene Corp.*, 164 B.R. 844, 846-48 (Bankr. S.D.N.Y. 1994) (staying successor liability, alter ego, and fraudulent conveyance claims against non-debtor corporate defendant affiliates and directors and officers concerning prepetition spinoff transactions).

[276] *Brier Creek*, 486 B.R. at 694; *Kreisler*, 478 F.3d at 215 (section 105(a) injunction is appropriate if third-party action would "put detrimental pressure on [the debtors'] reorganization effort"); *Robins*, 788 F.2d at 1003 (injunction is appropriate when third-party litigation "would adversely or detrimentally influence and pressure the debtor through the third party") (internal citation omitted).

214.    The Aldrich/Murray Asbestos Claims asserted to this point in the tort system, and those that are likely to follow, seek to recover on account of the same liabilities that the Debtors seek to resolve through reorganization in bankruptcy. As previously described, prosecution of those same claims outside of this case would almost certainly end the Debtors' reorganization efforts.

215.    Moreover, the only way to make third parties liable for these claims would be for such plaintiffs to assert remedial causes of action like alter ego and successor liability as well as fraudulent conveyance claims which are either estate property or for which the first crack is afforded to the bankruptcy estate. And the litigation of Aldrich/Murray Asbestos Claims in the tort system while the Chapter 11 Case remains pending would undermine the purposes of chapter 11 and section 524(g) to resolve all such current and future claims in a fair and equitable manner through a chapter 11 plan.[277]

216.    This is not a mere assumption. Following the 2020 Corporate Restructuring, claimants filed approximately 150 new asbestos cases seeking to pursue Aldrich/Murray Asbestos Claims against one or more Protected Parties.[278] The same pattern played out in the *DBMP* case under nearly identical circumstances.[279] Pursuit of even a small fraction of the 50,000 active cases (of almost 90,000 total claims) that the Debtors faced as of the Petition Date, would impose unsustainable burdens upon the Debtors' reorganization effort, would undermine the purposes of the Chapter 11 Cases. It would also create bedlam as these claims would be pursued in multiple courts even as the parties attempt to negotiate their resolutions in this Court.

---

[277] The Debtor also argues that this would also divert the Debtors' officers from their duties, but this is not a compelling argument. These Debtors were designed not to have any employees but to borrow them. If the Debtors' employees are too few, New TTC has but to second others to the cause.

[278] *See* supra ¶ 122.

[279] *See DBMP* Findings of Fact and Conclusions of Law Regarding Order [Case No. 20-30080, Dkt. No. 972, ¶ 268].

217.    The parties also argue at length as to whether permitting Aldrich/Murray Asbestos Claims to proceed against the Protected Parties would fix and liquidate contingent indemnification claims against the Debtors and whether under preclusion principles, the Debtors might be bound by such determinations. Because we have concluded that permitting such actions in the tort system would necessarily involve (1) determining claims against the Debtors and (2) exercising control over estate property, we need not address these additional arguments. Irreparable harm has already been established.

218.    If there is to be a Chapter 11 Case, there can be no dispute that the preliminary injunction is necessary.

iii.    <u>Balance of the Harms</u>

219.    The demonstrated irreparable harm to the Debtors that would occur were the preliminary injunction lifted substantially outweighs any prejudice to the Defendants. Suffice it to say, the harm to asbestos claimants largely appears to be a delay in recovering what for most will be a small portion of their overall damages.

220.    The ACC again argues that the 2020 Corporate Restructuring undermined the legal recourse available to asbestos claimants, and has the characteristics of a fraudulent transfer, such as "badges of fraud."  The ACC suggests that these potentially fraudulent actions of Old IRNJ and Old Trane tip the equitable balance against granting the preliminary injunction.

221.    As noted above in Section III(C), there is reason to question the propriety of the 2020 Corporate Restructuring and the Divisional Merger. It is because of this prospect—that there may have been a colossal general injury worked upon the asbestos claimants—that redress must be sought in the bankruptcy case on behalf of all claimants—not piecemeal by a thousand individual plaintiffs for their personal benefit, in a hundred different courts.

222.    While the ACC suggests that New TTC and New Trane are being improperly rewarded with a preliminary injunction for their predecessors' misconduct, should a trustee (or the Representatives) assert those claims for the benefit of all asbestos claimants, then this injunction is not a reward. It is a marshaling of those claims and those responsible into a single forum, where the injuries might be addressed for the benefit of all asbestos claimants. This would seem to be a superior result for such creditors as opposed to forcing each to bring, and finance, the same litigation separately. From a judicial economy perspective, it is a far superior procedure.

223.    In sum, the potential delays occasioned by the stay and injunction are outweighed by the greater harms that would arise otherwise—the almost certain termination of the Debtors' reorganization effort and a pell-mell race to the courthouses.

    iv.   <u>Public Interest</u>

224.    Courts have consistently affirmed the public's interest in a successful reorganization, which interest may be at its greatest in mass-tort bankruptcies.[280]  This Court agrees.

225.    Aldrich and Murray's successful reorganization also would promote Congress's particular goal in section 524(g) by establishing an asbestos trust that would efficiently and equitably resolve tens of thousands of asbestos claims. A section 524(g) trust "will provide all claimants—including future claimants who have yet to institute litigation—with an efficient means through which to equitably resolve their claims."[281]

---

[280] *See U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 204 (1983)*; Robins*, 788 F.2d at 1008; *W.R. Grace & Co.*, 386 B.R. at 36.
[281] *Bestwall*, 606 B.R. at 257; *see also* Bates Report ¶ 10.

226.    There is, of course, no public policy interest in aiding a fraud on creditors—if that is what the 2020 Corporate Restructuring and Divisional Merger turn out to be.  But again, this is a preliminary injunction, implemented so that the proper inquiry can be made. Or as Judge Beyer put it in *Bestwall*, this preliminary injunction is necessary to protect the Debtors during their efforts to reorganize, but it will not "allow any party to escape any asbestos related liabilities," and a permanent channeling injunction will only be granted in connection with a confirmed plan of reorganization that meets the requirements of section 524(g).[282]

227.    It is far from clear that granting the preliminary injunction will result in the parade of horribles that the ACC suggests. If Aldrich/Murray and New TTC/New Trane are true to their word, if they are committed to providing "full and fair" resolution of these asbestos liabilities, the parties may reach an accord. If not, safeguards and creditor protections remain available to the asbestos claimants in this bankruptcy case, including state and federal fraudulent transfer law (which applies to Texas divisional mergers), the ability to dismiss a bankruptcy case if circumstances warrant, and the plan confirmation requirements under the Bankruptcy Code (especially, including the legal requirements for obtaining a channeling injunction under section 524(g). None of those protections is affected by the grant of the preliminary injunction.

228.    Again, continued litigation of Aldrich/Murray Asbestos Claims against Protected Parties in the tort system while the Debtors attempt to address and resolve those same claims in this Chapter 11 Case would undoubtedly interfere with, and almost surely would end, the Debtors' reorganization cases. With thousands of claims and proceedings spread out across the country, it would be all but impossible to negotiate or confirm a Section 524(g), or any other, plan.

---

[282] *In re Bestwall LLC*, Adv. Pro. No. 17-03105, slip op. at 5 [Adv. Pro. Dkt. 190] (Jan. 31, 2020).

229.    Thus, while this Court has concerns about the propriety of what Old IRNJ and Old Trane wrought through the 2020 Corporate Restructuring and Divisional Merger, controlling law and the present realities require that the Preliminary Injunction be maintained while this reorganization case proceeds.  The Preliminary Injunction will be **GRANTED.**

Signed: August 20, 2021
/s/ J. Craig Whitley
J. Craig Whitley
United States Bankruptcy Judge for the Western District of North Carolina